William Bacon, General Counsel (ISB #2766)
Shoshone-Bannock Tribes
Tribal Attorneys Office
P.O. Box 306
Fort Hall, Idaho 83203
Telephone: (208) 478-3822
Facsimile: (208) 478-9736
Email: bbacon@sbtribes.com

Mark A. Echo Hawk (ISB #5977)
ECHO HAWK & OLSEN, PLLC
P.O. Box 6119
505 Pershing Ave., Ste. 100
Pocatello, Idaho 83205-6119
Telephone: (208) 478-1624
Facsimile: (208) 478-1670
Email: mark@echohawk.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | Case No. |
| Plaintiff, | **VERIFIED COMPLAINT** |
| vs. | |
| UNITED STATES OF AMERICA; JOHN TAHSUDA III, in his capacity as Principal Deputy Assistant Secretary − Indian Affairs, Department of the Interior, Bureau of Indian Affairs (BIA); TWYLA STANGE, in her capacity as Acting Regional Director, BIA Northwest Region Office; RANDY THOMPSON, in his official capacity as Acting Superintendent, BIA Fort Hall Agency; BRIAN STEED, in his capacity as Acting Director, Bureau of Land Management (BLM); MICHAEL D. NEDD, in his capacity as Acting Deputy Director, BLM; PETER DITTON, in his capacity as BLM Idaho State Director; and, DOES I THROUGH XCIX, | |
| Defendants. | |

COMES NOW Plaintiff Shoshone-Bannock Tribes of the Fort Hall Reservation (Tribes) by and through its attorneys of record William Bacon and Mark A. Echo Hawk, and for causes of action against the Defendant United States of America, et al., states and alleges as follows:

## **NATURE OF ACTION**

1.      By this action the Tribes seek to resolve unsettled rights to land that has been abandoned or relinquished by the Union Pacific Railroad (UPR) in Pocatello, Idaho.  The Tribes want to protect Tribal interests and remove a long-standing obstacle to prudent land use in the community.

2.      In 1868 the United States solemnly promised by Treaty to protect the Tribes' Reservation as the permanent homeland of the Tribes. Despite that promise, UPR's predecessor Railroad Company wrongfully took Reservation land for a North South rail line in 1878.  The United States was promptly made aware, but stood by and let it happen.

3.      After a decade of watching its Treaty promise be trampled, the United States Congress took action by the Act of 1888 to retroactively give the Railroad Company a limited right of way for the land it stole from the Tribes. Congress deliberately limited the right of way by declaring that the land would revert to the Tribes when the Railroad Company ceased using it for railroad purposes. Congress took precaution to codify the Railroad Company's future obligation not to take any more Reservation land by selling or leasing the right of way land for non-railroad purposes.

4.       Congress acted to hold the Railroad Company and its successors in interest accountable, and Congress' Act of 1888 is still in effect today. By this action the Tribes seek to enforce that Act and hold the United States accountable to its Treaty promises.

5.      Also, the United States and the Railroad Company made a separate deal with the Tribes in 1882. The deal was for the Tribes to let the Railroad company have a right of way across the Reservation for an East/West rail line.  The United States facilitated the transaction as the Tribes' Trustee. The United States did not live up to the deal. Now the Tribes seek to enforce the Act of 1882.

6.      The stark reality of current circumstances in the local community is that the lands in question have clouded titles, buildings and spaces sit vacant, investment and city planning are hampered by uncertainty, and government agencies are confused with competing claims because the Acts of 1882 and 1888 have not be respected or enforced. To ameliorate this reality, the Tribes are asking for a judicial determination that certain lands no longer being used for railroad purposes have reverted to the Tribes.

7.      The Tribes hope that through this action, a way will be paved for the United States to make good on the deal and Treaty promises with the Tribes, and together with the Tribes overcome the obstacle that stands in the way of cooperation and prudent land use in the community.

## THE PARTIES

8.      Plaintiff Shoshone-Bannock Tribes of the Fort Hall Reservation is a federally-recognized sovereign Indian Tribe organized pursuant to the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), as amended by the act of June 15, 1935 (49 Stat. 378).

9.      Defendant United States of America is a body politic existing pursuant to the Constitution of the United States, and is trustee and a fiduciary to the Shoshone-Bannock Tribes of the Fort Hall Reservation pursuant to treaties and related federal statutes. Defendant United States includes the United States Department of Interior (DOI) and its Bureau of Indian Affairs,

and other current and former agencies and instrumentalities of the United States government (collectively United States).

10.     The United States of America is not an Indian or Indian tribe.

11.     Defendant John Tahsuda III is an individual named in his official capacity as Principal Deputy Assistant Secretary – Indian Affairs for the United States Department of the Interior.

12.     Defendant Twyla Stange is an individual named in her official capacity as Acting Regional Director, BIA Northwest Region Office.

13.     Defendant Randy Thompson is an individual named in his official capacity as Superintendent for the BIA Fort Hall Agency.

14.     The BIA is not an Indian or Indian tribe.

15.     Defendant Brian Steed is an individual named in his official capacity as Acting Director for the United States Bureau of Land Management.

16.     Defendant Michael D. Nedd is an individual named in his official capacity as Acting Director for the United States Bureau of Land Management.

17.     Defendant Peter Ditton is an individual named in his official capacity as Acting BLM Idaho State Director.

18.     The BLM is not an Indian or Indian tribe.

19.     Does I through XCIX have claims or interests related to the subject land. Plaintiff does not know the true names of defendants Does I through XCIX, and therefore sues them by those fictitious names. The actual names and identities of these persons or entities will be substituted when known.

20.     The subject Real Property described by the Act of 1888 and later relinquished by Union Pacific Railroad Company includes: that certain 3.27 acre parcel relinquished by UPR in 1964 and generally located within the S ½ NE ¼ SEC. 21, T. 7 2., R. 35 E., B.M., Bannock County, Idaho (3.27 Acres); and, that certain 49.92 acre parcel relinquished by UPR in 1989 and originally constituting a water pipeline right of way, excepting that portion acquired by the Pocatello First Corporation of the Church of Jesus Christ of Latter-day Saints in 1960 (City Creek Trailhead); and, that certain Parking Lot Area generally located from Bonneville Street north to Wyeth Street and from Union Pacific Avenue/Lewis Street east to the railroad tracks, situated in a portion of Section 26, and 35 T. 6 S., R. 34 E., B.M., Bannock County, Idaho (Parking Lot Area); and, that certain Municipal Bus Building, Parking Area and real property thereunder generally located south of Bonneville Street, east of Harrison Avenue, and west of the railroad tracks, situated in a portion of Section 35 T. 6 S., R. 34 E., B.M., Bannock County, Idaho (Bus Depot Building); and that certain Credit Union Building and real property thereunder generally located at 216 West Whitman Street, Pocatello, Bannock County, Idaho, situated in a portion of Section 35 T. 6 S., R. 34 E., B.M., Bannock County, Idaho (Credit Union Building).

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action presents a federal question and claim arising under the laws of the United States.

22.     This Court has original jurisdiction pursuant to the Act of 1882. 22 Stat. 148, 1 Kappler 199.

23.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1351 because this action seeks to compel officers of the United States to perform duties owed to Plaintiff.

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1362 because Plaintiff is an Indian tribe recognized by the Secretary of the Interior and this action arises under the Constitution, laws, or treaties of the United States.

25.     This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

26.     Pursuant to the 28 U.S.C. § 1381(b) and (e), venue is proper in the Federal District Court for the District of Idaho because one or more defendants are residents of the State of Idaho, a substantial part of the events or omissions giving rise to the claims occurred within this District, and the real property that is the subject of the action is situated in this District.

## FACTS

### History of Shoshone-Bannock Tribes & Fort Hall Reservation

27.     Since time immemorial, the Shoshone and Bannock people lived as sovereign Indian tribes in a vast aboriginal territory, including what is now known as Idaho, Oregon, Nevada, Utah, Wyoming, Montana, and part of Canada.

28.     In 1868, to be at peace with the United States Government, the Shoshone and Bannock Tribes entered into a Treaty with the United States, promising to "relinquish all title, claims, or rights in and to any portion of the territory of the United States, except such as is embraced within the limits [of the Treaty]." Article 2, Treaty with the Eastern Band Shoshoni and Bannock, July 3, 1868, 15 Stat. 673, 2 Kappler 1020 (Treaty or Fort Bridger Treaty of 1868). Treaty attached hereto as Exhibit 1.

29.     The Treaty was ratified by Congress on February 26, 1869.

30.     In exchange for acquiring vast lands from the Shoshone and Bannock Tribes, the United States promised that reservation land, "shall be and the same is set apart for the absolute and undisturbed use and occupation" of the Shoshone-Bannock Tribes. Treaty, Article 2.

31.     In connection with the Treaty, the Fort Hall Reservation (Reservation) was formally set apart by Executive Orders dated June 14, 1867, and July 30, 1869. Executive Orders attached hereto as Exhibit 2.

32.     The Reservation was set apart by the United States as a "permanent home" for the Tribes. Treaty, Article 2; Executive Orders.

33.     The United States "solemnly agreed" in the Treaty that no unauthorized person "shall ever be permitted to pass over, settle upon, or reside [on the Reservation]." Treaty Article 2; Executive Orders.

34.     The land which is the subject of this civil action was part of the land area that was set apart by the Treaty and Executive Orders.

### Nature of Tribal Ownership of the Reservation

35.     Under the Treaty, the Tribes obtained recognized title to the subject land.

36.     The Treaty constituted an act of recognition that vested equitable title to the land in the Tribe.

37.     The Tribes' recognized title in the Reservation included the absolute and exclusive rights to occupy, possess, use, and enjoy the Reservation land.

38.     At the time of the Treaty, the Tribes' acquired a split title to the Reservation land, with the United States holding 'ultimate title' or 'legal title,' and the tribes holding a 'title of occupancy' with 'beneficial ownership' of the land and resources.

39.     At the time of the Treaty the United States' 'ultimate title' was merely a 'naked fee' title of nominal ownership as Trustee, but little else.

40.     Beginning after the Treaty and Executive Orders, the Tribes held the entire bundle of property rights to the Reservation, except for the United States' legal title as Trustee.

*A Broken Treaty Promise*

41.     In 1878, ten years after the Reservation was first established as the Tribes' permanent home, and despite the United States "solemn agreement" that no unauthorized person would "ever be permitted to pass over, settle upon, or reside on the territory," the Utah & Northern Railroad built a road and railway from south to north across the Reservation (North/South line) without permission. 25 Stat. 452, Art. I. See Act of 1888 attached hereto as Exhibit 3.

42.     The trespass by the Railroad created tension between the Tribes and the Utah & Northern Railroad company.

43.     The Tribes objected to the trespass, but nothing was done by the Bureau of Indian Affairs to remove the road or North/South line.

*East/West Line Expansion*

44.     Four years later, in 1881, the Utah & Northern Railroad announced plans to construct a main line across Idaho toward the Pacific coast.  The proposed route would enter the Reservation west of Bancroft and pass westward across the Reservation boundary near Bannock Creek (East/West line).

45.     Utah & Northern Railroad sought a 100-foot wide right of way across the Reservation for the East/West line, with 102 acres for various station grounds, totaling approximately 670 acres.

*The United States was a Necessary Party to the Right of Way Conveyance*

46.     Utah & Northern Railroad was required to work through the United States to obtain a right of way on the Reservation for the East/West line.

47.     The United States was involved in the negotiation and conveyance transaction due to its legal relationship with the Tribes and related duties, not for the purpose of surreptitiously become the owner of the Tribal lands without just compensation.

48.     The United States was participating in the right of way negotiation and conveyance as a necessary party to the transaction.

49.     The conveyance of Tribal interest for the East/West line right of way to the Utah & Northern Railroad, through the United States, was required by 25 USC § 177 (1834).

50.     The Constitution of the United States and Indian Non-intercourse law applicable at the time required the Utah & Northern Railroad and the Tribes to involve the United States in the conveyance.

51.     The Indian Commerce Clause of the Constitution, Article 1, § 8, cl. 3, provides that Congress has the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

52.     Based upon the Indian Commerce Clause of the Constitution, in 1790, Congress passed an Act defining its substantive rights and duties in the field of Indian affairs, entitled "An Act to regulate trade and intercourse with the Indian tribes." Act of July 22, 1790, 1 Stat. 137.

53.     Section 4 of that Act specifically declared: No sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of preemption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States. Act of July 22, 1790, §4, 1 Stat. 137.

54.     In 1834, Section 4 was amended so that the restraint on conveyances from individual Indians was removed.  The restraint on tribal conveyances, however, continued.  That

Act has not otherwise been amended since 1834 and reads in part: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."

55.     Pursuant to 25 U.S.C. § 177, only the United States can extinguish or convey Indian Tribal lands.

56.     Under 25 U.S.C. § 177, the United States is required to be involved in approval of Indian Tribal land conveyances, and it also provides that no one besides the United States has the authority to negotiate the purchase of any interest in tribal lands.

57.     In 1881, the Department of the Interior actually conducted negotiations between the Tribes and the Utah & Northern Railroad, thus fulfilling the requirements of the Indian Non-Intercourse Act and 25 U.S.C. § 177.

58.     With regard to the Act of 1882, which ultimately ratified the Agreement reached in 1881 regarding the East/West line, the United States acted in its necessary intermediary role between the Utah & Northern Railroad and the Tribes; it was not acting to acquire an interest in the Tribes' land for its own gain.

59.     The legislative history of the Act of 1882 states:

> Mr. HASKELL. Under treaty stipulations with the United States, Secretary Kirkwood and the Commissioner of Indian Affairs both thought that the Government ought to take in charge the matter of negotiating the right of way, and not to allow the railroad company to make any direct trade or contract with the Indians.

47 Cong. Rec. H 5004 (Apr. 13, 1882). April 13, 1882 Congressional Record attached hereto as Exhibit 4.

60.     With regard to the Act of 1882, the United States' legal title as Trustee made the United States a necessary party for any conveyance of Tribal property rights.

### *East/West Line Agreement*

61.     On July 18, 1881, a gathering of head men and adult males on the Reservation agreed to let Utah & Northern Railroad purchase the East/West line right of way for $6,000.00.

62.     The purpose and terms of the agreement reached on July 18, 1881 are recorded in the Proceedings of Council, dated July 18, 1881. Proceedings of Council, dated July 18, 1881 attached hereto as Exhibit 5.

63.     The minutes from the Proceedings of the Council on July 18, 1881 contain the United States' representation about the scope and purpose of the request, including: "I will tell you how many acres will be wanted by the United States for the use of this railroad."

64.     The United States asked for the Tribes' "consent to the road being built" in the Proceedings.

65.     A recital in the actual Agreement signed by the Tribes declares the purpose of the Agreement: "Whereas the [Railroad] has applied for permission to construct a line of railroad from East to West through the Fort Hall Reservation and the said Indians have consented thereto and for that purpose have agreed…" Agreement of July 18, 1881, Archives. See Agreement of July 18, 1881 attached hereto as Exhibit 6.

66.     The actual Agreement goes on to express that the Tribes were giving up land interests that would "be hereafter used by the said [Railroad] its successors or assigns, as a right of way and road-bed." Agreement of July 18, 1881.

67.     The Tribes' agreement was based on the representations of the United States and Utah & Northern Railroad.

68.     A contemporaneous letter from the Department of Interior to the Commissioner of Indian Affairs about the Agreement reached on July 18, 1881 describes the property rights given by the Tribes as "so much…as is required by the legitimate and practical uses of the [Railroad]." Letter to Commissioner of Indian Affairs from Secretary Kirkwood, October 1, 1881, attached hereto as Exhibit 7.

69.     Conveyance of the Tribes' entire bundle of property rights in the Reservation land underlying the proposed route across the Reservation was not legally required in order to allow for a road and railway right of way.

70.     The proposal presented to the Tribes for approval in 1881 was inextricably tied to the request for a railroad right of way.

71.     In the context of a right of way proposal, the Tribes were asked to give up so much of their rights of use and occupancy of the subject land as may be necessary to allow for that railroad use.

72.     The purpose of the Act of 1882 was to implement the terms of the agreement reached on July 18, 1881.

73.     The purpose of the agreement reached on July 18, 1881 was not for the United States to divest the Tribes of all ownership in the subject land forever.

74.     Neither the Proceedings of Council—July 18, 1881, nor the actual Agreement of July 18, 1881 reference any consideration paid by the United States for an interest in Reservation lands.

75.     The United States promised the Tribes at the meeting in July 1881 that the agreement presented to the Tribes would be the same agreement presented to Congress. Speaking of the Agreement and the Tribes' wariness of being cheated, the United States'

representative promised, "That is all down in the paper that they will sign, and that paper will be taken to Washington—that very paper." Congress later ratified the 1881 Agreement presented to the Tribes, saying, "…and the same is hereby ratified and confirmed…" Proceedings of Council, dated July 18, 1881.

### Act of 1882—Purpose

76. The agreement reached on July 18, 1881, was ratified by the Act of July 23, 1882, 22 Stat. 148; 1 Kappler 199 (July 3, 1882). Act of 1882 attached hereto as Exhibit 8.

77. The Act of 1882 states, in relation to Utah & Northern Railroad Company's application "for permission to construct a line of railroad from east to west through the Fort Hall Reservation" that the Tribes for "that purpose have agreed, for the consideration hereinafter mentioned, to surrender to the United States their title to so much of land comprised in said reservation as may be necessary for the legitimate and practical uses of said road."

78. The Tribes "ceded to the United States that part of the Reservation" described therein, "the same being intended to be hereafter used by the said Utah and Northern Railroad Company as a right of way and road bed, containing by actual survey six hundred and seventy acres." Act of 1882.

79. The Tribes also ceded "the several pieces or parcels of land situate[d] and adjoining the said strip of land…the same being intended to be used by the said Utah and Northern Railroad Company, its successors and assigns, for depots, stations,…containing by actual survey, one hundred and two acres, more or less." Act of 1882.

80. The legislative history of the Act of 1882 confirms that "[i]t is a bill merely to give the right of way through the Fort Hall Indian Reservation in Idaho to the [Railroad]. Accordingly, the assistant attorney-general of the Interior Department was detailed by that

Department, and sent out upon the Reservation to confer with the Indians and with the railroad

company for this right of way." 47 Cong. Rec. H 5004, X233, Volume 13, 47th Congress, 1st

Session, 2859. Legislative history of the Act of 1882 includes discussion between

Representatives illustrating that it was only a bill for a right of way, not a complete divestment of

all Tribal interests in the subject land:

> Mr. HASKELL. Mr. Speaker, this is a bill which was drawn by the Interior
> Department at the Office of the Commissioner of Indian Affairs, by him agreed
> to, and by the President transmitted to Congress. **It is a bill merely to give the**
> **right of way** through the Fort Hall Indian reservation in Idaho to the Utah and
> Northern Railroad, a branch of the Union Pacific Railroad, which proposes to
> extend a line of railroad northwesterly through this Shoshone and Bannock
> reservation.
> Mr. SPARKS. **This, as I understand, is only as to a right of way**.
> Mr. HASKELL. **That is all.**
> Mr. SPARKS. Then let us vote for it.

*Id*., Exhibit 4.

81.    The purpose of the Act of 1882 was not for the United States to divest the Tribes

of all ownership in the subject land forever.

82.    The Act of 1882 characterizes the conveyance as "a sale of a portion of [the

Tribes] reservation in Idaho Territory required for the use of the Utah and Northern Railroad."

Act of 1882, 22 Stat. 148.

83.    The United States' Solicitor has concluded previously that the purpose for the

Tribes' conveyance of land interests in the Act of 1882 was limited: "The fifth paragraph makes

clear the purpose for the cession: 'the same being intended to be hereafter used by the said Utah

and Northern Railroad Company, its successors or assigns, as a right of way and road bed;'" and,

"The sixth paragraph explains that the other adjoining marked lands referred to are, 'intended to

be used by the said …[railroad], its successors and assigns, for depots, stations, sidings, and so

forth;'" and, "It is clear that the conveyances were for rights of way." Solicitor's Opinion, Dept. of Interior, Nov. 29, 2005, p.1, 3 attached hereto as Exhibit 9.

### *Act of 1882—Consideration from Railroad Company, Not the United States*

84. In consideration for the conveyance of Tribal interest in the lands, the Tribes were paid the sum of six-thousand dollars ($6,000), at the rate of $7.77 per acre, deposited into the United States Treasury to the credit of the Tribes, to bear interest at five percent per annum.

85. The $6,000 paid to the Tribes came from Utah and Northern Railroad Company. The Act of 1882, Section 3, required that "the Company, its successors or assigns, shall, within ninety days from the taking effect of the act, pay to the Treasurer of the United States said sum of six thousand dollars." Act of 1882.

86. By the express terms of Section 3 of the Act, the $6,000 paid by the Utah and Northern Railroad Company was "hereby appropriated to be paid by the United States for the lands relinquished to the United States by [the Agreement of 1881]." Act of 1882.

87. The payment of $6,000 by the Railroad Company, and the appropriation of that $6,000 to the credit of the Tribes was an express condition of the Railroad Company's ability to use the right of way land. Act of 1882, Section 3.

88. The United States did not pay consideration to the Tribes for the conveyance of land by the Tribes, in addition to the $6,000 paid by the Railroad Company.

89. The only consideration given to the Tribes for the conveyance of land subject to the Act of 1882 was paid by the Railroad Company.

90. Legislative History of the Act of 1882, Report No. 659, which accompanied H.R. 5004, reads: "It will be observed that, although by the agreement the United States is required to place $6,000 to the credit of the Indians, this money is in reality paid by the railroad company, so

that by this transaction the government is not subjected to any actual outlay of money." H.R. Rep. No. 659, at 2 (1882).

91.     The Tribes were only paid for what the Railroad Company was given–a limited right of way.

92.     Without paying consideration in addition to the $6,000 paid by the Railroad Company, the United States could not acquire more land interests than what the Railroad Company obtained. The United States is required to pay compensation when it takes tribal title recognized by treaty or statute.

93.     When Congress takes Tribal property, the fifth amendment of the Constitution requires the payment of compensation. U.S. Constitution, Amendment V.

94.     Where Congress by treaty has declared that the Tribes were to hold the Reservation lands permanently, compensation must be paid for subsequent taking.

95.     The Shoshone-Bannock Tribes were promised by the Treaty that they would permanently hold the subject land, so compensation by the United States was required if the United States intended to acquire any rights in addition to the right of way interest conveyed to the Railroad Company.

96.     As Trustee of the Tribes' land interests, the United States cannot lawfully convert the corpus of the trust—Reservation lands—to its own use or the dispose of the trust corpus to private corporations, municipalities, or individuals."

### *Act of 1882—Consideration Misappropriation by United States*

97.     At the time of the Agreement of July 1881, and the ratifying Act of 1882, the United States was already under previous obligation to pay to the Tribes certain annuities based on the Treaty.

98.     The consideration owed to the Tribes under the Act of 1882 was "to be in addition to any and all sums to which the [Tribes] [were] entitled by Treaty."  Act of 1882, Section 1.

99.     An accounting of the Treaty annuities to the Tribes is included in the General Services Administration Report (GSA Report) generated pursuant to the Petition of the Shoshone-Bannock Tribes of the Fort Hall Reservation, Idaho, Indian Claims Commission No. 326-C. (Washington, D.C., USA: Nation Archives and Records Center, 1968). GSA Report attached hereto as Exhibit 10.

100.    The $6,000 consideration for the railroad right of way was appropriated by Congress to the Tribes under the heading "Shoshone and Bannock Fund."  GSA Report, 28.

101.    According to a GSA Report, the United States failed to comply with the Act of 1882 because it did not pay the $6,000 to the Tribes in addition to all other sums to which the Tribes were entitled by Treaty.

102.    The United States did not separate, earmark, or appropriate the $6,000.00 consideration payment for the railroad right of way to the Tribes' credit in a manner that ensured it would be expended for costs the United States was not already obligated to pay.  Instead, the United States used the $6,000 to pay for pre-existing Treaty obligations, thus saving itself from having to spend its own funds on Treaty obligations.

103.    The disbursements made directly to the Tribes show no payment of $6,000.00 to the Tribes.  GSA Report, 34-35.

104.    The GSA Report demonstrates that the $6,000 consideration for the right of way money was used to provide for things such "Industrial Assistance, Irrigation, Provisions, etc." GSA Report, 35.

105.    "Industrial Assistance, Irrigation, Provisions, etc." were items that the federal government was already providing to the Tribes pursuant to Treaty obligations.

106.    The day after the Act of 1882 was passed, Utah & Northern Railroad sold its interest to Oregon Short-Line Railroad company for $6001.00.

107.    Utah & Northern Railroad Company and Oregon Short-Line Railroad Company are predecessors in interest to Union Pacific Railroad Company (UPR).

108.    The Shoshone-Bannock Tribes have a reversionary interest in right of way lands granted under the 1882 Act of Congress, 22 Stat. 148; 1 Kappler 199 (July 3, 1882).

### *Agreement of 1887 for North/South Line*

109.    After the Agreement of 1881, the Tribes continued to complain about the unauthorized trespass of the Railroad Company in 1878.

110.    On May 27, 1887, Tribal leaders and adult males met to consider granting a formal right of way to the Railroad Company the North/South rail line that had already been established, as well as a town site at the Pocatello junction.

111.    The representations made to the Tribes at the meeting on May 27, 1887 are recorded in the Proceedings of Council, May 27, 1887.  Proceedings of Council, May 27, 1887 attached hereto as Exhibit 11.

112.    The Tribes were told that the United States was acting as trustee to protect Tribal interests, including that the United States "would look out for the Indians as a Father, to protect their rights." Proceedings of Council, May 27, 1887.

113.    The United States' agents also represented, and directed that "[o]ur work is to see that you are not imposed on, or wronged, in fact, as I have told you for the last 15 months, it is my duty at all times and under all circumstances, to see you and look after you, to guide you in

doing right, and in this matter I expect you to give full and free consent." Proceedings of Council, May 27, 1887.

114.    The Tribes were specifically told they were only negotiating a right of way during the Proceedings of Council, May 27, 1887.

115.    In response, Tribal leaders explained that they did not want to sell forever, but wanted long-term ownership of the land. One of the Tribal leaders, said: "I do not want to sell right off, want to send a letter to Washington first.  We Bannocks have the first right to this land, and we want to stay on it. [] Just one word and then I will be done.  God sees we run here under all good, and we do not want to sell everything.  That is all, if I talk any more I will be telling lies." Proceedings of Council, May 27, 1887.

116.    The Tribes were then compelled to agree by coercive tactics, including the United States' agent's question: "Are you ready to make such an agreement, or do you want the railroad company to use the land the same as they have been doing, for nothing?  That is the question." Proceedings of Council, May 27, 1887.

117.    The United States' agent represented to the Tribes that they would become the richest Indians in America if they agreed: "[I]] told you time and time again, that this is a matter for you to settle, and if you do satisfactorily, I will make you the richest Indians in America." Proceedings of Council, May 27, 1887.

118.    The United States' agent told the Tribes they would be starved if they did not agree to the right of way: "There is not a better Bannock on the hill than old Propakura, but I tell him 'friend, you will keep hungry if you continue to do what you have been doing today, and I am sorry for you and now you must do as you please, and if you propose to do as you said, you I

will pledge you my word, you will see nothing but starvation before you." Proceedings of Council, May 27, 1887.

119.    The United States' agent told the Tribes it was their duty to sell the land and that they owed it to their children: "Gibson Jack, through interpreter: 'If we want to back out of what we said the other day about selling the land at Pocatello, would it make any difference to the Government, would we be doing right, or wrong?' Mr. Gardiner: 'you ask me as your friend and I will tell you very plainly you are doing wrong. The white people are settling down very closely and they are coming in right along. As quick as the Agents back is turned, the white man squats down and builds a shanty. And my friends, you must look at things with another pair of eyes than in the past, you are living in an age of progress. The buffalo, the deer and elk are all gone, and how are you to subsist; you have the land but you cannot eat it. It is your duty to place yourself in a position to sell the land. You owe it to your children.'" Proceedings of Council, May 27, 1887.

120.    Nothing in the minutes of the Proceedings of Council, May 27, 1887 shows that the United States explained to the Tribes that they would not end up with the right of way lands after they were no longer used for railroad purposes.

121.    Nothing in the minutes of the Proceedings of Council, May 27, 1887 shows that the United States explained to the Tribes that the United States was going to receive Tribal lands for no consideration after the Railroad Company was done using the land.

122.    The United States is bound to uphold the Agreement as the Tribes understood it, and as represented to the Tribes in the Proceedings of Council, May 27, 1887.

123.    The Agreement reached on May 27, 1887, was accepted and ratified by Congress on September 1, 1888.

124. The very same "agreement made and entered into by the United States of America [on May 27, 1887], represented as therein mentioned, with the Shoshone and Bannack Indians resident in the Fort Hall Reservation, [was] accepted, ratified, and confirmed" by the Act of 1888. 25 Stat. 452.

### Act of 1888—Purpose

125. On September 1, 1888, Congress ratified the agreement, granting a right-of-way, running from the Reservation's northern boundary to the southern boundary. 25 Stat. 452; 1 Kappler 292.

126. The general purpose of the Act of 1888 was "for the surrender and relinquishment to the United States of a portion of the Fort Hall Reservation, [] for the purpose of a town-site, and for the grant of a right of way through said reservation to the Utah and Northern Railway Company." Act of 1888.

127. A specific and express purpose of the 1888 Act was to right the wrong done by Utah & Northern Railroad's trespass on the Reservation ten years earlier.

128. Congress expressly pointed out in the preliminary Article of the 1881 Act, as context for the rest of the Act's provisions:

> "Whereas in or about the year 1878 the Utah and Northern Railroad Company constructed a line of railroad running north and south through the Fort Hall Reservation, and has since operated the same without payment, or any compensation whatever to the Indians, for or in respect of the lands taken for right of way and station purposes; and
> Whereas the treaty between the United States and the Shoshone and Bannack Indians, concluded July 3, 1868, under which the Fort Hall Reservation was established, contains no provisions for the building of railroads through said reservation, now therefore…" 25 Stat. 452, Article I.

### *Act of 1888—Subject Land*

129.    The Act of 1888 ratified the Tribes' agreement to give up certain interests "an area of eighteen hundred and forty (1840) acres" for the Pocatello townsite. Act of 1888, Art. I.

130.    The legal description for the 1840 acres included the area within which the 102 acres previously given under the Act of 1882 for depots and stations was located.  Act of 1888, Art. I.

131.    The provisions of Article III, Section 11 of the Act of 1888 apply to all the lands encompassed by the legal description of the 1840 acres identified in Article I of the Act of 1888. Act of 1888.

132.    The Act of 1888 "granted to the said Utah and Northern Railway Company a right of way not exceeding two hundred feet in width (except such portion of the road where the Utah and Northern and the Oregon Short-Line Railways run over the same or adjoining tracks, and then only on hundred feet in width) through the lands above described, and through the remaining lands of the Fort Hall Reservation, extending from Blackfoot River, the northern boundary of said reservation, to the southern boundary thereof." Act of 1888, Art. III, Section 11.

133.    In addition, the Act of 1888 gave the Railway Company a right of way to "grounds adjacent thereto for station buildings, depots, machine shops, side-tracks, turn-outs, and water-stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road, according to maps and plats of definite location."  Act of 1888, Art. III, Section 11.

134.    Also, the Act of 1888 gave the Railway Company a right of way near its station at Pocatello, "for its use for station grounds, depot buildings, shops, tracks, side-tracks, turn-touts,

yards, and for water purposes, not to exceed one hundred fifty acres, as shown by maps and plats of the definite location thereof." Act of 1888, Art. III, Section 11.

### *Act of 1888—United States was a Necessary Party*

135.     The United States was not involved in the negotiation or conveyance transaction in May 27, 1887 in order to surreptitiously become the owner of the Tribal lands without just compensation to the Tribes.

136.     The United States was participating in the right of way negotiation and conveyance contemplated by the Act of 1888 as a necessary party to the transaction.

137.     The conveyance of Tribal interest for the North/South line right of way to the Utah & Northern Railroad, through the United States, was required by 25 USC 177 (1834).

138.     The Constitution of the United States and Indian Non-intercourse law applicable at the time required the Utah & Northern Railroad and the Tribes to involve the United States in the conveyance for the North/South line right of way.

139.     In 1887, the Department of the Interior actually conducted negotiations between the Tribes and the Utah & Northern Railroad, thus fulfilling the requirements of the Indian Non-Intercourse Act and 25 U.S.C. § 177.

140.     With regard to the Act of 1888, which ultimately ratified the Agreement reached in 1887 regarding the North/South line, the United States acted in its necessary intermediary role between the Utah & Northern Railroad and the Tribes; it was not acting to acquire an interest in the Tribes' land for its own gain.

141.     With regard to the Act of 1888, the United States' legal title as Trustee made the United States a necessary party for any conveyance of Tribal property rights.

### *Act of 1888—Consideration for Railroad Right of Way*

142.    The Act of 1888 ratified the Tribes' agreement to accept as consideration for the railroad right of way, payment by the Utah and Northern Railway Company "to the Secretary of the Interior for their use and benefit of the sum of ($8.00) eight dollars for or in respect of each and every acre of land of the said reservation, taken and used for the purposes of its said railroad." Act of 1888, Art. II.

143.    In exchange for the consideration paid by the Utah and Northern Railway Company, the Company became "entitled to a right of way not exceeding two hundred (200) feet in width, through said reservation." Act of 1888, Art. II.

144.    In addition, for the one hundred and fifty acres near its Pocatello townsite station, the Railway Company was obligated to pay, "in addition to the eight dollars per acre provided in [the Agreement], a further sum equal to the average appraisal of each acre of town lots in the proposed townsite of Pocatello, outside of said one hundred and fifty acres." Act of 1888, Art. III, Section 11.

145.    The Act of 1888, Article III, Section 11 specifically provided that the Railway Company "pay to the Secretary of Interior, for the use and benefit of the [Tribes], the sum of eight dollars per acre…, the moneys from this source to be deposited in the Treasury of the United States, to the credit of the [Tribes], bearing interest at five per centum per annum." Act of 1888, Art. III, Section 11.

146.    The United States did not pay any consideration to the Tribes for any interest in lands subject to the Act of 1888; the $8.00 per acre for the railroad right of way referenced in the Act of 1888 was paid by the Railroad Company.

147.     The $8.00 per acre for the railroad right of way, and the further per-acre, average appraisal sum for any town lots near the Pocatello station used by the Railway Company were used by the United States to satisfy pre-existing Treaty obligations the United States owed to the Tribes.

*Act of 1888—Reversion Conditions*

148.     Article III, Section 11 of the Act of 1888, imposed conditions on the Railway Company's right of way.  Act of 1888.

149.     One of the reversion express conditions imposed on the Railway Company's right of way is expressed in the first Proviso of Article III, Section 11, which states that "all lands acquired by said railway company near its station at Pocatello for its use for station grounds, depot buildings, shops, tracks, side-tracks, turn-outs, yards, and for water purposes, as hereinbefore provided, shall, whenever used by said railway company, or its assigns, for other purposes, be forfeited and revert to the United States, and be subject to the other provisions of this act." Act of 1888, Art. III, Section 11.

150.     Another express reversion condition imposed on the Railway Company's right of way is expressed in the third Proviso of Article III, Section 11, which states, "and provided further, that no part of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used, except in such manner and for such purposes only as shall be necessary for the construction, maintenance, and convenient operation of a railway, telegraph or telephone lines, and when any portion thereof shall cease to be so used, such portion shall revert to the tribe or tribes of Indians from which the same shall have been taken, or in case they shall have ceased to occupy said reservation, to the United States; and the construction, maintenance, and operation of said railway shall be conducted with a due regard for the rights of

the Indians, and in accordance with such rules and regulations as the Secretary of the Interior may make to carry out this provision." Act of 1888, Art. III, Section 11.

151.    The third Proviso does not make exception for 'station ground land' but encompasses all lands authorized to be taken under the Act.  In this regard, the Department of Interior has opined that, "the language of the Third Proviso [] applies generally to the entire grant." Department of Interior Memo, June 17, 1960. Thus, all land that was conveyed under the Act of 1888 is thus subject to the third Proviso's broad coverage.

152.    The third Proviso applies to any lands 'leased or sold by the company' for non-railroad purposes.

153.    A further express reversion condition imposed on the Railway Company's right of way is contained in Article III, Section 15, which states: "That the said Utah and Northern Railway Company shall accept this right of way upon the expressed condition, binding upon itself, its successors and assigns, that they will neither aid, advise, nor assist in any effort looking towards the changing or extinguishing the present tenure of the Indians in their remaining lands, and will not attempt to secure from the Indian tribes any further grant of land or its occupancy that is hereinbefore provided: Provided, that any violation of the condition mentioned in this section shall operate as a forfeiture of all the rights and privileges of said railway company under this act." Act of 1888, Art. III, Section 15.

154.    The Shoshone-Bannock Tribes have a reversionary interest in right of way lands granted under the 1888 Act of Congress.

### *Relinquishment of Lands by Union Pacific Railroad*

155.    The Union Pacific Railroad Company (UPR) is a successor and assign of the Utah and Northern Railway Company, and the Oregon Short-Line Railroad Company.

156.     UPR has affirmatively and formally relinquished two parcels of land pursuant to the Act of 1888.

157.     On June 30, 1964, UPR and Oregon Short-Line Railroad Company executed a formal relinquishment of 3.27 acres of land subject to the Act of 1888.  The relinquishment was expressly made pursuant to the Act of 1888.  1964 Relinquishment attached hereto as Exhibit 12.

158.     The 1964 relinquishment partially reads "The undersigned, Oregon Short Line Railroad Company, and its Lessee, Union Pacific Railroad Company, hereby relinquish to the United States of America any and all rights to a certain strip of land near Pocatello, Bannock County, in the State of Idaho…obtained as successor in interest to the Utah and Northern Railway Company under the Act of Congress of September 1, 1888 (25 Stat. 452)."  1964 Relinquishment.

159.     On July 28, 1964, UPR sent correspondence to the Land Office Manager of the BLM in Boise, Idaho, enclosing the signed Relinquishment of Right of Way located in Section 21, T.7 S., R. 35 E, B.M., Bannock County, Idaho. UPR Letter, July 28, 1964, attached hereto as Exhibit 13.

160.     Certified copies of Resolutions adopted by the UPR Executive Committee on June 25, 1964 and the Oregon Short Line Railroad Company Executive Committee on July 14, 1964 authorizing execution and delivery of the Relinquishment were also enclosed with the July 28, 1964 letter.   UPR Letter, July 28, 1964.

161.     After receiving and reviewing the 1964 Relinquishment, on February 11, 1965, the Idaho Land Office sent a Decision to Oregon Short Line Railroad Company and Union Pacific Railroad Company entitled "Partial Relinquishment Accepted" and indicated that the

"terms of the right-of-way have been complied with and the partial relinquishment is accepted."
February 11, 1965 Decision attached hereto as Exhibit 14.

162.    The 3.27 acres of relinquished land is in not in the possession of the Tribes.

163.    The 3.27 acres of relinquished land is not in the possession of the United States.

164.    UPR claims no interest in the 3.27 acres of relinquished land.

165.    The Tribes have a reversionary interest in the 3.27 acres of relinquished land.

166.    The 3.27 acres of relinquished land or part thereof appears to have been deeded to an individual, on Bannock County Parcel Report, Parcel Number R4013033100, Deed 140526.

167.    On December 6, 1989, UPR sent correspondence to the BLM Pocatello Resource Area giving notice of partial relinquishment of rights. Letter of Notice, December 6, 1989, attached hereto as Exhibit 15.

168.    In its December 6, 1989 Letter of Notice, UPR communicated that its review of Section 11 of said Act (of 1888):

"indicates that the right-of-way the Railroad elects to relinquish reverts to the United States in accordance with the provisions contained therein, which state: 'when any portion thereof shall cease to be used, such portion shall revert to the tribe or tribes of Indians from which the same shall have been taken, or in case they shall have ceased to occupy said reservation, to the United States.'"

Letter of Notice, December 6, 1989.

169.    The December 6, 1989 Letter of Notice concludes "THEREFORE, please be advised that by this letter and on behalf of the Union Pacific Railroad Company as successor to the Utah and Northern Railway Company, I do hereby respectfully request that certain area comprising 49.92 acres, more or less, as shown on that certain map or plat marked 'Exhibit VIII, Pocatello'".  Letter of Notice, December 6, 1989.

170.    UPR sent correspondence to the Portneuf Greenway Committee on May 23, 1991 confirming that UPR's right-of-way had been relinquished in 1989. May 23, 1991 Letter attached hereto as Exhibit 16.

171.    The land relinquished in 1989 is in not in the possession of the Tribes.

172.    The land relinquished in 1989 is in the possession of the United States, except for that portion of the 49.92 acres conveyed by Public Law 86-784 on September 14, 1960.

173.    Neither UPR nor any railroad company claims any interest in land relinquished in 1989.

174.    The Tribes have a reversionary interest in the land relinquished in 1989, except for that portion of the 49.92 acres conveyed by Public Law 86-784 on September 14, 1960.

175.    The Bureau of Land Management (BLM) controls the lands relinquished in 1989, except for that portion of the 49.92 acres conveyed by Public Law 86-784 on September 14, 1960, pursuant to a Land Management Plan (referred to hereinafter as City Creek Trailhead area).

176.    The BLM Pocatello Field Office has issued two right of way authorizations within the relinquished City Creek Trailhead area, including IDI-29795, which is a FLPMA grant issued on 4/6/1994 to James and Mary Lagos for a lawn and garden site and a shed, expiring on 4/6/2024.

177.    The BLM Pocatello Field Office also issued IDI-29271, which is a FLPMA grant issued on 3/29/1993 to the City of Pocatello for the Portneuf Greenway.  The Greenway right of way includes hiking trails and trail head parking, expiring on 3/29/2023.   IDI-29271 attached hereto as Exhibit 17.

178. The BLM also issued land use authorization IDI-32246, which was issued for a corner of a home that is built within the land relinquished in 1989, owned by Wei Lun Li, that has not expired.

179. On January 27, 2004, the Tribes sent a letter to the District Manager for the BLM Upper Snake River District and the Field Manager for the BLM Pocatello Field Office inquiring about leases of portions of the City Creek Trailhead and water reservation right of way to individuals for horse grazing, parking areas, yards, out buildings and garages, and asking for help identifying the status of the rights-of-way granted by the United States. January 27, 2004 Letter attached hereto as Exhibit 18.

180. UPR shows as the owner of the City Creek Trailhead area on Bannock County Tax Parcel Report, Parcel Number RPCPP098200.

181. The Tribes have a reversionary interest in the lands subject to the Act of 1882 or the Act of 1888 that have been relinquished.

182. The Tribes have an enforceable right to have the relinquished lands held in trust for them, and have a right to record and occupy such lands.

### *Other Lands Sold or Leased by UPR for non-railroad purposes*

183. Aside from the relinquished lands referenced above, UPR has stopped using several parts of the right of way lands for railroad purposes.

184. UPR stopped using a former railroad building located south of Bonneville Street, east of Harrison Avenue, and west of the Railroad tracks, situated in a portion of section 35 T. 6 S., R. 34 E., B.M., Bannock County, Idaho, (Bus Depot Building) for railroad purposes.

185. The Bus Depot Building was formerly used by Greyhound Lines, Inc., as a bus terminal.

186.    UPR sold the Bus Depot Building to the City of Pocatello for non-railroad purposes on October 1, 1998, for $1.00. Bill of Sale, Audit No. 209232.   Bill of Sale attached hereto as Exhibit 19.

187.    UPR also stopped using land underlying Bus Depot Building for railroad purposes.

188.    UPR leased the land underlying the Bus Depot Building to the City of Pocatello beginning on April 18, 1996 for a municipal bus system and parking area, and then leased it again to the City of Pocatello on March 22, 1999, extending for 20 years.  Lease of Property, 209232, Folder 01733-28, attached hereto as Exhibit 20.

189.    The City of Pocatello abandoned the Bus Depot Building and land thereunder at least one year ago.

190.    UPR has not used the Bus Depot Building or land thereunder for railroad purposes for years.

191.    The Bus Depot Building is currently vacant.

192.    The Bus Depot Building and land thereunder are subject to the Act of 1888, or alternatively to the Act of 1882.

193.    UPR has stopped using a parking lot area for railroad purposes that is located from Bonneville Street north to Wyeth Street and from Union Pacific Avenue/Lewis Street east to the railroad tracks, situated in a portion of section 26, and 35 T. 6 S., R. 34 E., B.M., Bannock County, Idaho (Parking Lot).

194.    The Parking Lot includes "four strips or parcels of land adjacent to and easterly of the first alley easterly of Main Street."

195.    UPR leased the Parking Lot to the City of Pocatello for non-railroad purposes beginning on March 28, 1936.  UPR – City of Pocatello Parking Lot Lease and Extension Riders attached hereto as Exhibit 21.

196.    The UPR lease to the City of Pocatello for the Parking Lot was renewed by extension riders for non-railroad purposes in 1939, 1945, 1946, 1951, 1954, 1957, 1962, 1973, 1989, and 2000.

197.    The UPR leases included Leases L&T #14749, 11591, Extension Rider 1/4/96, 15177, Extension Rider 9/9/58, Lease 3/22/1999, Lease 7/16/2002, & Lease Audit No. 145568.

198.    UPR lease rates to the City of Pocatello varied from $1.00 annually, to $250 for 60 months, to $100 per month.

199.    The Parking Lot is subject to the Act of 1888, or alternatively to the Act of 1882.

200.    UPR assigned or conveyed a building located at 216 West Whitman Street, Pocatello, Idaho, Lot 7, Block 435 of Pocatello Town site (Credit Union Building), for a non-railroad purpose beginning in 1976.

201.    UPR conveyed the Credit Union Building to Lucy Tomanek, who, by Instrument No. 558615 on July 20, 1976 conveyed the property to Pocatello Railroad Employees Federal Credit Union for a non-railroad purpose.  Warranty Deed attached hereto as Exhibit 22.

202.    Bannock County Parcel RPPOC278100 shows that UPR does not own the Credit Union Building.

203.    The Credit Union Building is subject to the Act of 1888, or alternatively to the Act of 1882.

204.    UPR leased land subject to the Acts of 1882 or 1888 to Ricks Pool & Spa Service for non-railroad purposes, by lease instrument dated September 25, 2003, Audit No. 204311, and

amended by Supplemental Agreement, Audit No. 204311, Folder 1636-00, dated December 17, 2013. Supplemental Agreement dated December 17, 2013 attached hereto as Exhibit 23.

205.     UPR has stopped using the house located at 515 Harrison, in Pocatello, Idaho, for railroad purposes.

206.     The house located at 515 Harrison is part of the right of way lands subject to the Act of 1888, or alternatively to the Act of 1882.

207.     UPR has sold or leased the house located at 515 Harrison.

208.     UPR has profited from the sales and leases of lands subject to the Acts of 1882 and 1888 for non-railroad uses.

209.     By the foregoing sales and leases, UPR engaged in conduct that changed or extinguished the present rights of the Tribes in the lands subject to those sales or leases.

210.     By the foregoing sales and leases of the Bus Depot Building, Parking Lot, Credit Union Building, UPR secured occupancy of the lands subject to such sales and leases by parties that did not include the United States or the Tribes.

211.     UPR has sold or leased lands subject to the Act of 1882 for non-railroad purposes.

212.     UPR has sold or leased lands subject to the Act of 1888 for non-railroad purposes.

213.     The Tribes have a reversionary interest in the lands subject to the Act of 1882 or the Act of 1888 that have been sold or leased for non-railroad purposes.

214.     The Tribes have an enforceable right to have the lands sold or leased for non-railroad purposes that are subject to the Act of 1882 or the Act or 1888 revert to the Tribes in trust, and to have the lands recorded in their favor, and to occupy such lands.

***Official Action by United States regarding Non-Railroad Use Lands Sold or Leased by UPR***

215. The United States Department of Interior, Bureau of Indian Affairs, Northwest Regional Office issued written notice to the Union Pacific Railroad Company on January 31, 2012 of particular uses that did not comply with the Act of 1882 or the Act or 1888 (DOI Notice Letter). DOI Notice Letter, January 31, 2012 attached hereto as Exhibit 24.

216. The DOI Notice Letter states,

"The United States has become aware of several non-complying uses the railroad company has made, and continues to make, on this right of way. The railroad company has allowed several parcels to be leased or sold, and certain areas are being use in ways not necessary to, or related to the running of a railway, or the operation of telegraph or telephone lines, and so by operation of the explicit Congressional language in the grants, the reversion in the United States has now vested in those areas. We, therefore, wanted to notify you that due to this automatic reversion, we believe that the areas within the grant that are being used for purposes no authorized by the grants have reverted to the United States in trust for the Shoshone-Bannock Tribes."

DOI Notice Letter, January 31, 2012.

217. The DOI Notice Letter identified the Bus Depot Building, the Parking Lot, and the Credit Union building as particular non-complying uses.

218. The Tribes have relied to their detriment upon the DOI Notice Letter.

219. Upon reaching the conclusions in the DOI Notice Letter about non-complying uses, the United States had a trust obligation to promptly address the violations.

220. Upon reaching the conclusions in the DOI Notice Letter about non-complying uses, the United States had a duty under the Act of 1888, Article III, Section 11 to promptly address the violations.

221. Upon reaching the conclusions in the DOI Notice Letter about non-complying uses, the United States had a duty under current BIA Right of Way Regulations to promptly address the violations.

222.    Upon reaching the conclusions in the DOI Notice Letter about the particular parcels automatically reverting to the Tribes in trust, and property rights being already vested in the United States, the United States had a duty to promptly record the Tribes' interest.

### Current Status of Tribes

223.    The Shoshone-Bannock Tribes of the Fort Hall Reservation is a federally recognized Indian Tribe.  81 FR 5109.

224.    The Tribes currently occupy the Fort Hall Reservation.

225.    The Tribes' Reservation land is defined as including all land within the limits of any Indian reservation, notwithstanding the issuance of any patent, and, including rights of way running through the reservation.  18 U.S.C. 1151.

226.    The Tribes have not expressly ceded or relinquished their reversionary interests in any subsequent cession agreements.

227.    The United States federal government has a trust relationship with federally recognized Indian tribes, including the Shoshone-Bannock Tribes.

### United States Government Positions about the Tribes' Reversionary Interest

228.    On several occasions the Tribes' have sought guidance from their Trustee, the Bureau of Indian Affairs and Department of Interior Solicitors.

229.    The United States has taken formal positions on the matter multiple times.

230.    On June 8, 1928, when asked by the General Solicitor for the Railroad whether the Railroad could lease or sell right of way lands for railroad purposes, the Assistant Commissioner of Indian Affairs responded that Section 11 of the 1888 Act absolutely prohibited the lease and sale of right of way land, even for railroad purposes. June 8, 1928 Letter referenced in Solicitor's January 15, 1980 Memorandum, p. 3, attached hereto as Exhibit 25.

231.    On March 25, 1960, the BIA Real Property Officer of the BIA Fort Hall Agency, issued a Memo for the record concluding that in passing the Act of 1900, Congress did not intend to abrogate provisions of the Act of 1888, and that Section II of that Act was still in full force and effect. BIA Memo, March 25, 1960, attached hereto as Exhibit 26.

232.    On April 19, 1962, the Regional Solicitor submitted a memorandum reviewing the 1882 Act and determining that the Railroad was only granted an easement for the uses and purposes of the 1881 agreement, with the residual fee title held by the U.S. government. Solicitor's Memorandum, April 19, 1962, attached hereto as Exhibit 27.

233.    On February 9, 1972, Assistant Regional Solicitor of the Department of Interior Portland Regional Office sent a Memo to the BIA Branch of Real Property Management acknowledging the Fort Hall Business Council's request for the Justice Department to file suit to terminate the right-of-way of UPR through Fort Hall Reservation if UPR does not fully perform "its representations and responsibilities under the original right-of-way agreement and treaty with the Indians," suggesting the Tribes meet with representatives of UPR to attempt to see whether the differences could be reconciled through negotiations. Solicitor's Memorandum, February 9, 1972, attached hereto as Exhibit 28.

234.    On March 22, 1973, the Portland Regional Solicitor addressed the ownership status of the land within the railroad right-of-way granted in 1888, concluding that Utah & Northern Railroad Company had a determinable fee with the right of an absolute owner until the event which terminates the fee has occurred (i.e., no longer used for railroad purposes) at which point the land reverts back to the Tribes.  Office of Regional Solicitor, Portland, Memorandum, March 22, 1973 attached hereto as Exhibit 29.

235.    On December 30, 1996, the Regional Solicitor for the Pacific Northwest Area sent a Memorandum to BIA Portland Area Director regarding the right-of-way, stating it was clear that UPR had the right to use the lands for railroad purposes only, and if UPR was to cease using the lands for railroad purposes, it would not be entitled to transfer its interest to another entity other than a successor railroad company. This Memorandum also indicates that the 1882 and 1888 Acts must be read together, and that if the subject lands were no longer to be used for railroad purposes, UPR would no longer have a possessory interest. Office of Regional Solicitor, Portland, December 30, 1996 Memorandum, attached hereto as Exhibit 30.

236.    On September 30, 1999, the Office of the Solicitor, Pacific Northwest Region, Department of the Interior, sent notice to UPR communicating that UPR was delinquent in its duties under the Act of 1888 and that the terms of the 1888 Act "are valid today and apply to UPR will full effect." See Solicitor's Letter, September 30, 1999, attached hereto as Exhibit 31.

237.    On November 29, 2005, the Solicitor's Office wrote to the Bureau of Indian Affairs Superintendent addressing both the 1882 and 1888 Acts, and concluded that the 1888 right-of-way clearly expressed a reversionary interest to the Tribes, noting, "one thing is clear; when the lands cease to be used for railroad purposes, the railroad company forfeits its interest in the lands" and that the railroad cannot "transfer its interest in the rights of way to a third party other than another railroad company, the Tribes or the U.S."  Office of the Regional Solicitor Memorandum, November 29, 2005 attached hereto as Exhibit 9.

238.    On January 31, 2012, Director of the BIA Northwestern Regional Office, sent correspondence to UPR regarding non-complying uses of the railroad right-of-way. The January 31, 2012 Letter notified UPR that three areas within the grants (from the Acts ratified in 1882 and 1888) were being used for purposes not authorized by the grants, and "have reverted to the

United States in trust for the Shoshone-Bannock Tribes." DOI Notice Letter, January 31, 2012 attached hereto as Exhibit 24.

239.    The Tribes have relied to their detriment on the positions, guidance, and advice of the United States.

### *Tribal Request to Record*

240.    On February 14, 2013, the Tribes informed the United States of two tracts of land where relinquishment had already occurred, containing the exhibits outlining the relinquishments. Letter, February 14, 2013, attached hereto as Exhibit 32.

241.    On September 30, 2013, the Tribes sent correspondence to Randy Thompson, BIA Fort Hall Agency Superintendent, enclosing a copy of the DOI Notice Letter dated January 31, 2012, identifying the three areas that had already reverted to the United States in trust for the Shoshone-Bannock Tribes. Letter, September 30, 2013, attached hereto as Exhibit 33.

242.    In accordance with the DOI Notice Letter, the September 30, 2013 Letter requested the implementation of the DOI Notice Letter decision, and asked for the Superintendent to begin the process for recording the Tribes' interest in the three subject parcels. Letter, September 30, 2013.

243.    On September 28, 2015, Chairman Blaine Edmo sent correspondence to BIA Fort Hall Agency Superintendent Randy Thompson reiterating the Tribes' request of September 30, 2013 to record the three parcels referenced in the January 2012, DOI Notice Letter.  September 28, 2015 Letter attached hereto as Exhibit 34.

244.    On January 25, 2016, after a meeting in Washington, D.C., counsel for the Tribes sent the Tribes' September 30, 2013 request to record to the Department of Interior Solicitor's

Office via email, and again reiterated the Tribes' request to record the two parcels relinquished by UPR in 1964 and 1989.  January 25, 2016 Email attached hereto as Exhibit 35.

245.     Recently, The Tribes' Chairman Nathan Small met with representatives of the Department of Interior and Bureau of Indian Affairs, on April 18, 2018 in Washington D.C. reiterating the Tribes' request to record the relinquished parcels again.

### United States' Unlawful Delay in Addressing the Tribes' Interests

246.     The United States has failed to timely respond to the Tribes' request to record the Tribes interest in the relinquished parcels or the non-railroad use parcels sold or leased.

247.     On December 21, 2010 the Tribes sent a litigation assistance request to the US Department of Justice for the District of Idaho. December 21, 2010 Letter attached hereto as Exhibit 36.

248.     On January 25, 2011, the Tribes sent correspondence to BIA Northwest Regional Director and Fort Hall Agency Superintendent formally requesting BIA provide litigation assistance through the Office of the Solicitor and the Department of Justice, and enclosed a copy of the litigation assistance request sent to the Department of Justice on December 21, 2010. January 25, 2011 Letter attached hereto as Exhibit 37.

249.     The United States has failed to timely respond to the Tribes' litigation assistance request for seven years, despite consistent encouragement from the Tribes.

250.     On March 3, 2011, a written request was made to the BIA Fort Hall Agency Superintendent for survey information related to right-of-way land in three areas: 1) north of the main rail yard to the Reservation boundary, 2) the Inkom station grounds, and 3) the McCammon station grounds. March 3, 2011 Letter attached hereto as Exhibit 38.

251.    The United States has failed to timely respond to the Tribes' request for survey assistance related to this matter.

### COUNT I – DECLARATORY JUDGMENT
### (Claim against all Defendants)

252.    Plaintiff incorporates and re-alleges the allegations contained in paragraphs 1 through 251 as though fully set forth herein.

253.    A substantial controversy exists regarding the status of the Subject Land.

254.    The Tribes retained a reversionary interest in the Subject Land, and the United States, as trustee and on behalf of and for the benefit of Plaintiff, retained an interest in the Subject Land over which an easement was granted to UPR.

255.    UPR was granted an easement for railroad purposes only.

256.    UPR no longer uses portions of the easement for railroad purposes, and has leased, abandoned, relinquished, or purported to convey the subject lands.

257.    UPR purported to relinquish certain portions of the subject lands to the Bureau of Land Management ("BLM").

258.    Neither the United States nor any of its political subdivisions ever approved the transfer of any portion of the easement to any third party.

259.    Plaintiff is entitled to a declaration from this Court that the interest granted to UPR was an easement, which automatically extinguished when UPR ceased to use the easement for railroad purposes.

260.    Plaintiff is entitled to a declaration from this Court that it owns and has a present possessory interest in the Subject Land that is currently not being used for railroad purposes under either the 1882 or 1888 Act of Congress.

261.    Plaintiff is entitled to a declaration from this Court that any purported transfer of any interest in any portion of the easement that was not formally approved by the BIA with the consent of the Shoshone-Bannock Tribes was void *ab initio*.

262.    Plaintiff is entitled to a declaration from this Court that UPR's act of relinquishing any portion of the easement to the BLM was void *ab initio*, and that it should have been conveyed to the Plaintiff or the BIA in trust for the Plaintiff.

263.    Plaintiff is entitled to a declaration that the easement was for railroad purposes only, that UPR has ceased to use the Subject Land for railroad purposes, and that the Subject Land has now reverted to the United States, in trust, for the benefit of the Shoshone-Bannock Tribes.

264.    Plaintiff is also entitled to declarations that:

a.    The Tribes have a reversionary interest in right of way lands granted under the Act of 1882 and the Act of 1888;

b.    Any lands that revert to the Tribes pursuant to their reversionary interest under either Act are held in trust by the United States;

c.    The 1882 and 1888 Acts granted UPR an easement only; and

d.    When UPR ceased to use any portion of either easement for railroad purposes, UPR's interest in said portion was extinguished and all right, title, and interest reverted to the United States in trust for the benefit of the Shoshone-Bannock Tribes automatically by operation of law;

e.    The termination of UPR's easement is based on the act of non-railroad use, and not on the legal instrument UPR may choose to use to express relinquishment at a time frame UPR may choose;

f.     The Fort Hall Reservation as presently constituted satisfies the qualification of the Tribes' reversionary interest—that the Tribes continue to occupy the reservation; and

g.     The Bureau of Land Management has no interest or possibility of an interest in any portion of the easement by virtue of either the 1882 or 1888 Acts; and

h.     Any attempt by UPR to transfer or convey any interest in any portion of the easement for non-railroad use to any party, except the United States in trust for the Tribes, is void *ab initio*; and that, any attempt by BLM to transfer or convey any interest or license in any portion of the relinquished water reservation parcel for non-railroad use is void *ab initio*.

## COUNT II – QUIET TITLE – PARKING LOT
### (Claim against all United States Defendants and Doe Entities)

265.    Plaintiff incorporates by reference paragraphs 1-264 as though fully set forth herein.

266.    The Acts of 1882 and 1888 granted easements to UPR for as long as the land should be used by UPR, its successors and assigns, for railroad purposes, and UPR accepted the easement on such condition.

267.    The easements included ground for "depots, stations, sidings, and so forth," and "station grounds, depot buildings, shops, tracks, side-tracks, turn-outs, yards." On one such portion of an easement, UPR constructed the Parking Lot.

268.    UPR ceased using the Parking Lot for railroad purposes in 1936 and began leasing it to the City of Pocatello for various amounts and various periods of time.

269.    Neither the United States nor any of its political subdivisions ever approved transfer of any portion of the easement to any entity for non-railroad purposes.

270.    When UPR ceased using the Parking Lot for railroad purposes, its easement was extinguished by operation of law as to the Parking Lot.

271.    When UPR's easement was extinguished as to the Parking Lot, split title to the property reverted, with legal title being vested in the United States government in trust for the benefit of the Shoshone-Bannock Tribes, and equitable title being vested in the Tribes.

272.    After UPR ceased to use the Parking Lot, Plaintiff demanded possession of the premises. The Defendants failed and refused, and continue to fail and refuse to relinquish claim to the land and deliver the premises to Plaintiff.

273.    The Defendants' conduct of continuing to assert title to the Parking Lot or undermine Plaintiff's claim has improperly placed a cloud on Plaintiff's title, and unlawfully withheld and retained material benefits that belong to the Shoshone-Bannock Tribes.

274.    Plaintiff is informed, believes, and thereon alleges that Defendants claim an interest adverse to Plaintiff's title to the Parking Lot and as a direct and proximate result of such claim, has caused a cloud on Plaintiff's title.

275.    Defendants' claims are without merit, and Defendants have no right, title, estate, lien, or interest superseding Plaintiff's legal and equitable title to the Parking Lot, aside from Defendants' obligation to hold legal title to the property for the benefit of the Tribes.

276.    The Tribes are entitled to the entry of decree quieting title, and declaring that the United States holds legal title to the Parking Lot in trust for the benefit of the Shoshone-Bannock Tribes, with the Tribes holding equitable title, that contrary claims of Defendants are without any right whatever, and said Defendants have no right, title, estate, lien, or interest superior to the Tribes in the Parking Lot.

## COUNT III – QUIET TITLE – BUS DEPOT BUILDING
## (Claims against all United States Defendants and Doe Entities)

277.    Plaintiff incorporates by reference paragraphs 1-276 as though fully set forth herein.

278.    The Acts of 1882 and 1888 granted easements to UPR for as long as the land should be used by UPR, its successors and assigns, for railroad purposes, and UPR accepted the easement on such condition.

279.    The easements included ground for "depots, stations, sidings, and so forth," and "station grounds, depot buildings, shops, tracks, side-tracks, turn-outs, yards." On one such portion of the easement, UPR constructed the Bus Depot building.

280.    UPR ceased using the Bus Depot Building and land thereunder for railroad, or any other purpose.

281.    UPR purported to convey the Bus Depot Building to the City of Pocatello for a nominal consideration, and also leased the land thereunder to the City of Pocatello.

282.    Neither the United States, nor any of its political subdivisions, approved any transfer of any interest in any portion of the Bus Depot Building or land thereunder to another entity for non-railroad purposes, and the Shoshone-Bannock Tribes never consented to the same.

283.    When UPR ceased using the Bus Depot Building and land thereunder for railroad, or any other purpose its easement was extinguished by operation of law as to that portion of the easement.

284.    When UPR's easement was extinguished as to the Bus Depot Building and land thereunder, split title to the property reverted, with legal title being vested in the United States government in trust for the benefit of the Shoshone-Bannock Tribes, and equitable title being vested in the Tribes.

285.     After UPR ceased to use the Bus Depot Building and land thereunder, Plaintiff demanded possession of the premises. The Defendants failed and refused, and continue to fail and refuse to relinquish claim to the land, and deliver the premises to Plaintiff.

286.     The Defendants' conduct of continuing to assert title to the Bus Depot Building and land thereunder has improperly placed a cloud on Plaintiff's title, and unlawfully withheld and retained material benefits that belong to the Shoshone-Bannock Tribes.

287.     Plaintiff is informed, believes, and thereon alleges that Defendants claim an interest adverse to Plaintiff's title to the Bus Depot Building and land thereunder, and as a direct and proximate result of such claim, has caused a cloud on Plaintiff's title.

288.     Defendants' claims are without merit, and Defendants have no right, title, estate, lien, or interest superseding Plaintiff's legal and equitable title to the Bus Depot Building and land thereunder, aside from Defendants' obligation to hold legal title to the property for the benefit of the Tribes.

289.     The Tribes are entitled to the entry of decree quieting title, and declaring that the United States holds legal title to the Bus Depot Building and land thereunder, in trust for the benefit of the Shoshone-Bannock Tribes, with the Tribes holding equitable title, that contrary claims of Defendants are without any right whatever, and said Defendants have no right, title, estate, lien, or interest superior to the Tribes in the Bus Depot Building and land thereunder.

### COUNT IV – QUIET TITLE – CREDIT UNION BUILDING
### (Claim against United States Defendants and Doe Entities)

290.     Plaintiff incorporates by reference paragraphs 1-289 as though fully set forth herein.

291.    The Acts of 1882 and 1888 granted easements to UPR for as long as the land should be used by UPR, its successors and assigns, for railroad purposes, and UPR accepted the easement on such conditions.

292.    The easements included ground for "depots, stations, sidings, and so forth," and "station grounds, depot buildings, shops, tracks, side-tracks, turn-outs, yards." On one such portion of an easement, UPR constructed the Credit Union building and parking lot area located at 216 West Whitman Street, Pocatello, Idaho, referenced herein as the Credit Union Building.

293.    UPR ceased using the Credit Union building for railroad purposes. In about 1976 UPR transferred its interest in the Credit Union Building to Lucy Tomanek for non-railroad purposes. UPR retained all benefits conferred on it by virtue of its transaction with Lucy Tomanek.

294.    The Credit Union Building is now claimed by an entity other than UPR and used as an office for conducting business other than railroad business.

295.    Neither the United States nor any of its political subdivisions ever approved transfer of any portion of the easement to any entity for non-railroad purposes.

296.    When UPR ceased using the Credit Union Building for railroad purposes, its easement was extinguished by operation of law as to the Credit Union Building.

297.    When UPR's easement was extinguished as to the Credit Union Building, split title to the property reverted, with legal title being vested in the United States government in trust for the benefit of the Shoshone-Bannock Tribes, and equitable title being vested in the Tribes.

298.    After UPR ceased to use the Credit Union Building, Plaintiff demanded possession of the premises. The Defendants failed and refused, and continue to fail and refuse to relinquish claim to the land and deliver the premises to Plaintiff.

299.    The Defendants' conduct of failing to recognized the Tribes' title to the Credit Union Building has improperly placed a cloud on Plaintiff's title, and unlawfully withheld and retained material benefits that belong to the Shoshone-Bannock Tribes.

300.    Plaintiff is informed, believes, and thereon alleges that Defendants claim an interest adverse to Plaintiff's title to the Credit Union Building and as a direct and proximate result of such claim, has caused a cloud on Plaintiff's title.

301.    Defendants' claims are without merit, and Defendants have no right, title, estate, lien, or interest superseding Plaintiff's legal and equitable title to the Credit Union Building, aside from Defendants' obligation to hold legal title to the property for the benefit of the Tribes.

302.    The Tribes are entitled to the entry of decree quieting title, and declaring that the United States holds legal title to the Credit Union Building in trust for the benefit of the Shoshone-Bannock Tribes, with the Tribes holding equitable title, that contrary claims of Defendants are without any right whatever, and said Defendants have no right, title, estate, lien, or interest superior to the Tribes in the Credit Union Building.

### COUNT V – QUIET TITLE – CITY CREEK TRAIL HEAD
### (Claims against United States Defendants and Doe Entities)

303.    Plaintiff incorporates by reference paragraphs 1-302 as though fully set forth herein.

304.    The Act of 1888 granted an easement for railroad purposes to UPR in a certain 49.92 acre parcel originally constituting a water pipeline right of way for the railroad operations (City Creek Trailhead), excepting that portion acquired by the Pocatello First Corporation of the Church of Jesus Christ of Latter-day Saints under Public Law 86-784 on September 14, 1960.

305.    UPR ceased using the portion of the City Creek Trailhead for railroad or any other purpose in approximately 1989.

306. On December 6, 1989, UPR executed a written notice of partial relinquishment of rights, formally relinquishing all right, title, and interest in the City Creek Trailhead.

307. The land relinquished in 1989 is in the possession of the United States Bureau of Land Management. The Bureau of Land Management (BLM) controls the lands relinquished in 1989, pursuant to a Land Management Plan.

308. Neither UPR nor any railroad company claims any interest in the City Creek Trailhead.

309. The Tribes have a reversionary interest in the City Creek Trailhead.

310. The United States' fiduciary responsibilities prevent it from converting tribal lands to its own benefit.

311. The Shoshone-Bannock Tribes did not consent to any relinquishment of any portion of the City Creek Trail Head to the BLM, nor did the United States at any time provide any consideration for any portion of the easement.

312. Defendants now claim an interest and title to the City Creek Trailhead, and actually assert possessory rights to the City Creek Trailhead area, contrary to the claims of the Plaintiff.

313. When UPR ceased using the City Creek Trailhead for railroad purposes, its easement was extinguished by operation of law, and split title to the property reverted, with legal title being vested in the United States government in trust for the benefit of the Shoshone-Bannock Tribes, and equitable title being vested in the Tribes.

314. UPR's conduct of attempting to transfer a portion of its interest in the City Creek Trail Head to BLM was void *ab initio* and has improperly placed a cloud on Plaintiff's title.

315.     The BLM Pocatello Field Office issued right of way authorizations within the relinquished City Creek Trailhead area, including IDI-29795, IDI-29271, and IDI-32246, without the Plaintiff's consent or approval.

316.     Plaintiff has demanded ownership and control of the City Creek Trailhead area. The Defendants failed and refused, and continue to fail and refuse to relinquish claim to the land and deliver the premises to Plaintiff.

317.     The Defendants' conduct of issuing right of way authorizations and undermining Plaintiff's title has improperly placed a cloud on Plaintiff's title, and unlawfully withheld and retained material benefits that belong to the Shoshone-Bannock Tribes.

318.     Plaintiff is informed, believes, and thereon alleges that Defendants claim an interest adverse to Plaintiff's title to the City Creek Trailhead, and as a direct and proximate result of such claim, has caused a cloud on Plaintiff's title.

319.     Defendants' claims are without merit, and Defendants have no right, title, estate, lien, or interest superseding Plaintiff's legal and equitable title to the City Creek Trailhead area, aside from Defendants' obligation to hold legal title to the property for the benefit of the Tribes.

320.     The Tribes are entitled to the entry of decree quieting title, and declaring that the United States holds legal title to the City Creek Trailhead in trust for the benefit of the Shoshone-Bannock Tribes, with the Tribes holding equitable title, that contrary claims of Defendants are without any right whatever, and said Defendants have no right, title, estate, lien, or interest superior to the Tribes in the City Creek Trailhead.

## COUNT VI – QUIET TITLE – 3.27 ACRES
### (Claims against United States Defendants and Doe Entities)

321.   Plaintiff incorporates by reference paragraphs 1-320 as though fully set forth herein.

322.   The Act of 1888 granted an easement for railroad purposes to UPR in a certain 3.27 acre parcel, used for a rail spur or turn out area (3.27 Acres).

323.   UPR ceased using the right of way for the 3.27 Acres for railroad or any other purpose in approximately 1964.

324.   On June 30, 1964, UPR and Oregon Short-Line Railroad Company executed a formal relinquishment of the right of way for the 3.27 Acres of land, and did so expressly pursuant to the Act of 1888.

325.   The United States accepted the relinquishment.

326.   UPR claims no interest in the relinquished 3.27 Acres right of way.

327.   The Tribes have a reversionary interest in the 3.27 Acres of relinquished land.

328.   The United States' fiduciary responsibilities prevent it from converting tribal lands to its own benefit.

329.   The Shoshone-Bannock Tribes did not consent to any relinquishment of any portion of the 3.27 Acres or the right of way to the BLM, nor did the United States at any time provide any consideration for any portion of the easement.

330.   Defendants now claim an interest and title to the 3.27 Acres, and actually assert possessory rights to the 3.27 Acres, contrary to the claims of the Plaintiff.

331.   When UPR ceased using the 3.27 Acres easment for railroad purposes, its easement was extinguished by operation of law, and split title to the property reverted, with legal

title being vested in the United States government in trust for the benefit of the Shoshone-Bannock Tribes, and equitable title being vested in the Tribes.

332.    UPR's conduct of attempting to transfer a portion of its interest in the 3.27 Acres to any party was void *ab initio* and has improperly placed a cloud on Plaintiff's title.

333.    Plaintiff has demanded ownership and control of the 3.27 Acres. The Defendants failed and refused, and continue to fail and refuse to relinquish claim to the land and deliver the premises to Plaintiff.

334.    The Defendants' conduct of issuing conveying ownership of the 3.27 Acres, and undermining Plaintiff's title has improperly placed a cloud on Plaintiff's title, and unlawfully withheld and retained material benefits that belong to the Shoshone-Bannock Tribes.

335.    Plaintiff is informed, believes, and thereon alleges that Defendants claim an interest adverse to Plaintiff's title to the 3.27 Acres, and as a direct and proximate result of such claim, has caused a cloud on Plaintiff's title.

336.    Defendants' claims are without merit, and Defendants have no right, title, estate, lien, or interest superseding Plaintiff's legal and equitable title to the 3.27 Acres area, aside from Defendants' obligation to hold legal title to the property for the benefit of the Tribes.

337.    The Tribes are entitled to the entry of decree quieting title, and declaring that the United States holds legal title to the 3.27 Acres in trust for the benefit of the Shoshone-Bannock Tribes, with the Tribes holding equitable title, that contrary claims of Defendants are without any right whatever, and said Defendants have no right, title, estate, lien, or interest superior to the Tribes in the 3.27 Acres.

## COUNT VII – MANDAMUS
### (Claims against Defendants United States of America, Bureau of Land Management, and Bureau of Indian Affairs)

338.    Plaintiff incorporates and re-alleges the allegations contained in paragraphs 1-337.

339.    The Acts of 1882 and 1888 granted easements to UPR for railroad purposes only.

340.    When UPR ceased to use any portion of the easements for railroad purposes, each such portion reverted to the United States in trust for the benefit of the Shoshone-Bannock Tribes by operation of law.

341.    Some portions of the easement no longer used by UPR its successors or assigns for railroad purposes are currently included in BLM's inventory of real property owned by the United States, because they were purportedly relinquished to the BLM by UPR.

342.    The Plaintiff has a right to the own, use, and enjoy such non-railroad use parcels.

343.    BLM has issued various right of way authorizations within those portions of the easement relinquished to it by UPR.

344.    The United States and its agencies, including the Department of Interior, owe a fiduciary duty to the Tribes, and a statutory duty based on the Act of 1888 to protect Plaintiff's interests in relinquished and non-railroad use lands.

345.    As trustee for the Tribes regarding those portions of the easement not being used for railroad purposes, BLM or the Department of Interior have a duty to transfer each such portion to the care and control of the BIA, the agency within the Department of Interior tasked with exercising fiduciary duties and real property management for the benefit of the Tribes.

346.    The Shoshone-Bannock Tribes have repeatedly asked the Department of Interior to take action on the Tribes' behalf to restore them to ownership and possession of the parcels in question, which it has never done.

347.    Because the trustees have failed or refused to act to protect the Tribes' interests and have converted the Shoshone-Bannock Tribes' resources for their own gain and profit, the Shoshone-Bannock Tribes are without a remedy to prevent alienation of their lands and waste or conversion of their land resources.

348.    Issuance of a Writ of Mandamus by this Court ordering the BLM or Department of Interior to transfer the parcels in question to the property inventory of the BIA, to hold in trust for the benefit of the Shoshone-Bannock Tribes, and to render litigation and other assistance as will restore the Shoshone-Bannock Tribes to the use and enjoyment of their lands will effect justice in these circumstances.

349.    Issuance of a Writ of Mandamus by this Court ordering BLM to cancel all grants and rights of way it has wrongfully issued, as well as an order that BLM disgorge to the Shoshone-Bannock Tribes any benefit received by virtue of issuance of any grant, right of way, license, or permit within the relinquished parcels, will effect justice in these circumstances;

350.    The interests of justice and statutory duties require a further Writ of Mandamus that:

a.    the BIA and United States immediately approve the Tribes' litigation assistance request regarding related claims in this civil action;

b.    the BIA immediately record in the Land Titles and Records Office the Tribes' interest in the two parcels relinquished in 1964 and 1989, and the three parcels sold or leased known as the Parking Lot, Bus Depot Building, and Credit Union Building;

c.    the BIA take action to enforce trespass regulations against any non-railroad uses of right of way lands granted under the Acts of 1882 or 1888;

d. the BIA take action to cancel UPR's right of way for any non-railroad use parcels of right of way lands;

e. the BLM immediately transfer the parcel of land relinquished by UPR in 1989 from its inventory of lands to the BIA, to be held in trust for the Tribes; and,

f. that the BLM conduct a survey of all right of way lands granted under the Act of 1882 and the Act of 1888 to ascertain whether there are any non-railroad uses of right of way lands.

### COUNT VIII – BREACH OF TRUST (CONSIDERATION)
### (Claim against the United States of America)

351. Plaintiff incorporates by reference paragraphs 1-349 as though fully set forth herein.

352. The United States of America had a trust obligation and fiduciary duty under the Act of 1882 to appropriate the consideration for the right of way as a credit to the Tribes, "in addition to any and all sums to which the above-named Indians [were] entitled by treaty." Act of 1882.

353. The United States did not appropriate the right of way consideration to the Tribes' credit in addition to sums to which the Tribes were already entitled by the Fort Bridger Treaty of 1868.

354. The $6,000 payment from the Railroad Company as consideration for the right of way granted by the Act of 1882 was used to satisfy pre-existing Treaty obligations of the United States.

355. The United States did not separate, earmark, or appropriate the $6,000.00 consideration payment for the railroad right of way to the Tribes' credit in a manner that ensured it would be expended for costs the United States was not already obligated to pay. Instead, the

United States used the $6,000 to pay for pre-existing Treaty obligations, thus saving itself from having to spend its own funds on Treaty obligations.

356.    The disbursements made directly to the Tribes show no payment of $6,000.00 to the Tribes.  GSA Report, 34-35.

357.    The GSA Report demonstrates that the $6,000 consideration for the right of way money was used to provide for things such "Industrial Assistance, Irrigation, Provisions, etc.," which were items that the federal government was already providing to the Tribes pursuant to Treaty obligations.

358.    The United States of America thus violated its specific statutory duty under the Act of 1882, and related fiduciary obligations to the Tribes.

359.    The United States' breach of trust invalidates the *quid pro quo* contemplated by the Act of 1882.

360.    The breach of trust obligation and fiduciary duty damaged the Tribes.

361.    By the Act of 1882, the Tribes agreed to surrender certain land interests to the United States. In exchange, the United States promised the Tribes to undertake certain duties with regard to the consideration paid by the Utah and Northern Railroad Company—post an extra-treaty amount to the Tribes' credit, plus 5% interest per annum.  Since the United States failed at its duty, the Tribes' conveyance to the United States is invalid or void *ab initio*.  The United States should not be allowed to benefit from its breach of trust by retaining any land interest to the exclusion of the Tribes in connection with the Act of 1882.

### COUNT IX – BREACH OF TRUST (TRESPASS ENFORCEMENT)
### (Claim against the United States of America)

362.    Plaintiff incorporates by reference paragraphs 1-361 as though fully set forth herein.

363.    The United States of America has a trust obligation and fiduciary duty under 25 CFR Part 169 to bring and enforce trespass actions against unlawful occupants of Indian lands.

364.    The United States is aware that persons other than the Plaintiff are unlawfully occupying the property that is the subject of this lawsuit.

365.    The United States has failed to bring or otherwise enforce trespass actions against those unlawful occupants.

366.     The United States of America thus violated is specific statutory duty under 25 CFR Part 169 to the Plaintiff.

367.    The breach of its trust obligations has damaged the Plaintiff.

## COUNT X – ACCOUNTING
### (Claim against the Bureau of Indian Affairs)

368.    Plaintiff incorporates by reference paragraphs 1-367 as though fully set forth herein.

369.    Defendants owe a fiduciary obligation to Plaintiff.

370.    Defendants have breached their duties owed to Plaintiff.

371.    Plaintiff has a need to obtain an accounting from the United States for the $6,000 that the United States received from the Utah and Northern Railroad Company in connection with the 1882 Act, in order to determine whether the United States used the $6,000 it received for the benefit of the Plaintiff or to pay for pre-existing Treaty obligations.

372.    Plaintiff has a need to obtain an accounting from the United States for those funds the United States received from the sale of lands pursuant to the 1888 Act and how those funds and any accrued interest of such funds have been used for the benefit and support of the Plaintiff.

373.    Plaintiff does not have an adequate remedy at law to obtain an accounting from defendants.

## COUNT XV – VIOLATION OF TREATY OF 1868
### (Claims against the United States of America and Bureau of Indian Affairs)

374.     Plaintiff incorporates by reference paragraphs 1-373 as though fully set forth herein.

375.     The Treaty with the Eastern Band Shoshoni and Bannock, July 3, 1868, 15 Stat. 673, 2 Kappler 1020 contains the express promise from the United States that Reservation lands were "set apart for the absolute and undisturbed use and occupation" of the Tribes. Treaty, Article 2.

376.     The Treaty also contains the United States' promise and "solemn agree[ment]" that no unauthorized person "shall ever be permitted to pass over, settle upon, or reside [on the Reservation]." Treaty Article 2.

377.     In 1878, the Utah and Northern Railroad Company built a road and railway from south to north across the Reservation without permission.

378.     Despite the referenced Treaty promises, the United States permitted the Utah and Northern Railroad Company to pass over and settle upon the Reservation.

379.     Despite the referenced Treaty promises, the United States permitted the Utah and Northern Railroad Company to disrupt the absolute and undisturbed use and occupation of the Reservation by the Tribes.

380.     The 1878 trespass by the Utah and Northern Railroad Company was officially recognized by Congress. 25 Stat. 452, Art. I. See Act of 1888.

381.     The Tribes objected to the trespass by the Utah and Northern Railroad Company, but nothing was done by the United States of America or the Bureau of Indian Affairs to remove the road or North/South railway line.

382.     The inaction and omissions by the United States and Bureau of Indian Affairs regarding the trespass caused damages to the Tribes.

383.     The United States' violation of the Treaty disqualifies the United States from lawfully claiming an interest in lands underlying the very trespass it allowed, or ending up with the land related to the subsequent necessary conveyances under the Agreements of 1881 & 1887.

384.     The Bureau of Indian Affairs' violation of the Treaty obligates the Bureau of Indian Affairs to remedy the trespass by undertaking actions to place lands underlying the trespass that have ceased being used for railroad purposes in the ownership and possession of the Tribes.

## COUNT XVII – MISAPPROPRIATION OF RIGHT OF WAY CONSIDERATION IN VIOLATION OF THE ACT OF 1882
### (Claim against United States of America)

385.     Plaintiff incorporates by reference paragraphs 1-384 as though fully set forth herein.

386.     The Act of 1882 contains an express obligation on the United States to appropriate the consideration for the right of way as a credit to the Tribes, "in addition to any and all sums to which the above-named Indians [were] entitled by treaty."  Act of 1882.

387.     The United States did not appropriate the right of way consideration to the Tribes' credit in addition to sums to which the Tribes were already entitled by the Fort Bridger Treaty of 1868.

388.     The $6,000 payment as consideration for the right of way granted by the Act of 1882 was used to satisfy pre-existing Treaty obligations of the United States.

389.     The United States did not separate, earmark, or appropriate the $6,000.00 consideration payment for the railroad right of way to the Tribes' credit in a manner that ensured

it would be expended for costs the United States was not already obligated to pay.  Instead, the United States used the $6,000 to pay for pre-existing Treaty obligations, thus saving itself from having to spend its own funds on Treaty obligations.

390.    The disbursements made directly to the Tribes show no payment of $6,000.00 to the Tribes.  GSA Report, 34-35.

391.    The GSA Report demonstrates that the $6,000 consideration for the right of way money was used to provide for things such "Industrial Assistance, Irrigation, Provisions, etc." GSA Report, 35.

392.    "Industrial Assistance, Irrigation, Provisions, etc." were items that the federal government was already providing to the Tribes pursuant to Treaty obligations.

393.    The United States of America thus violated the Act of 1882 and the express condition regarding appropriation of the consideration for the right of way granted thereby.

394.    The misappropriation of the $6,000 consideration for the right of way lands subject to the Act of 1882 damaged the Tribes.

395.    The United States' actions to misappropriate the consideration owed to the Tribes disqualifies the United States from receiving any benefit of the conveyance of land interest associated with the Act of 1882, including receipt by the United States of any interest in the lands to the exclusion of the Tribes, upon termination of the right of way.

## ATTORNEY FEES

By reason of Defendants' conduct, Plaintiff has been required to retain the services of legal counsel to pursue this action. Plaintiff is entitled to an award of costs under Rule 54 of the Federal Rules of Civil Procedure, and reasonable attorney fees under the bad faith exception to

the American Rule. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975).

Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Shoshone-Bannock Tribes of the Fort Hall Reservation requests and prays that judgment be entered against Defendants as follows:

A.      For a Declaration from this Court that:

1.      The Tribes have a reversionary interest in right of way lands granted under the Act of 1882 and the Act of 1888;

2.      Any lands that revert to the Tribes pursuant to their reversionary interest under either Act are held in trust by the United States;

3.      The 1882 and 1888 Acts granted UPR an easement only; and

4.      When UPR ceased to use any portion of either easement for railroad purposes, UPR's interest in said portion was extinguished and all right, title, and interest reverted to the United States in trust for the benefit of the Shoshone-Bannock Tribes automatically by operation of law;

5.      The termination of UPR's easement is based on the act of non-railroad use, and not on the legal instrument UPR may choose to use to express relinquishment at a time frame UPR may choose;

6.      The Fort Hall Reservation as presently constituted satisfies the qualification of the Tribes' reversionary interest, that the Tribes continue to occupy the reservation; and

7.      The Bureau of Land Management has no interest or possibility of an interest in any portion of the easement by virtue of either the 1882 or 1888 Acts; and

8.      Any attempt by UPR to transfer or convey any interest in any portion of the easement for non-railroad use to any party, except the United States in trust for the Tribes, is void *ab initio*; and that, any attempt by BLM to transfer or convey any interest or license to any person other than the Tribes or to the BIA for the benfit of the Tribes, in any portion of the City Creek Trailhead is void *ab initio*.

B.      For a writ of mandamus that:

1.      the BIA and United States immediately approve the Tribes' litigation assistance request regarding the claims in this civil action;

2.      the BIA immediately record in the Land Titles and Records Office the Tribes' interest in the two parcels relinquished in 1964 and 1989, and the three parcels sold or leased known as the Parking Lot, Bus Depot Building, and Credit Union Building;

3.      the BIA take action to enforce trespass regulations against any non-railroad uses of right of way lands granted under the Acts of 1882 or 1888;

4.      the BIA take action to cancel UPR's right of way for any non-railroad use parcels of right of way lands;

5.      the BLM immediately transfer the parcel of land relinquished by UPR in 1989 from its inventory of lands to the BIA, to be held in trust for the Tribes; and,

6.      that the BLM conduct a survey of all right of way lands granted under the Act of 1882 and the Act of 1888 to ascertain whether there are any non-railroad uses of right of way lands.

C.      For an Order that the BIA conduct an accounting and report to the Tribes regarding the use of the consideration to be paid to the Tribes under the Act of 1882 and the Act of 1888;

D.      For an Order quieting title in the Tribes favor, establishing ownership for the Tribes to the two parcels relinquished in 1964 and 1989, and the three parcels sold or leased known as the Parking Lot, Bus Depot Building, and Credit Union Building, and quieting claims adverse to the Tribes' for those parcels;

E.      For an Order disqualifying the United States from owning any land interests the Tribes ceded under the Act of 1882 or the Act of 1888; and

F.      That Plaintiff be awarded such other and further relief as the Court deems just and equitable under the circumstances.

DATED this 26th day of June, 2018.

ECHO HAWK AND OLSEN, PLLC

By: */s/ Mark A. Echo Hawk*
    Mark A. Echo Hawk
    Attorney for Plaintiff

SHOSHONE-BANNOCK TRIBES

By: */s/ William Bacon*
    William Bacon
    General Counsel

**VERIFICATION**

STATE OF IDAHO                    )
                                 )ss.
County of Bannock                )

I, Nathan Small, declare as follows:

1.      I am Chairman of the Fort Hall Business Council, governing body of the Plaintiff in the present case, a citizen of the United States of America and a resident of the State of Idaho.

2.      I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint, and if called on to testify I would competently testify as to the matters stated herein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint concerning the Shoshone-Bannock Tribes and its history and activities are true and correct.

Executed on this 22nd day of June, 2018.

                              /s/ Nathan Small
                              Chairman Nathan Small

SUBSCRIBED AND SWORN TO before me this 22nd day of June, 2018.

                              /s/ Cathy Coby
(SEAL)                        Notary Public for Idaho
                              Residing at: Bingham County, Idaho
                              Commission expires: 11/26/2019

**Exhibits to Verified Complaint**

| Ex. No. | Title/Description | Bates No. |
|---|---|---|
| 1 | Treaty with the Eastern Band Shoshoni and Bannock, 1868 | SBT 0000001-SBT 0000005 |
| 2 | Executive Orders, June 14, 1867 and July 30, 1869 | SBT 0000006-SBT 0000008 |
| 3 | Act of 1888 (25 Stat. 452) | SBT 0000009-SBT 0000014 |
| 4 | Congressional Record, April 13, 1882, 47th Congress, 1st Session | SBT 0000015-SBT 0000017 |
| 5 | Proceedings of Council, Fort Hall Indian Agency, July 18, 1881 | SBT 0000018-SBT 0000027 |
| 6 | Agreement of July 18, 1881 | SBT 0000028-SBT 0000036 |
| 7 | Letter to Commissioner of Indian Affairs from Secretary Kirkwood, October 1, 1881 | SBT 0000037-SBT 0000038 |
| 8 | Act of 1882 (22 Stat. 148) | SBT 0000039-SBT 0000041 |
| 9 | Solicitor's Opinion, November 29, 2005 | SBT 0000042-SBT 0000047 |
| 10 | GSA Report re: Petition of Shoshone-Bannock Tribes, October 15, 19 | SBT 0000048-SBT 0000174 |
| 11 | Proceedings of Council, Fort Hall Indian Agency, May 27, 1887 | SBT 0000175-SBT 0000191 |
| 12 | Relinquishment of 3.27 Acres, June 30, 1964 | SBT 0000192-SBT 0000194 |
| 13 | UPR Letter to BLM enclosing Relinquishment, July 28, 1964 | SBT 0000195 |
| 14 | BLM Acceptance of Partial Relinquishment, February 11, 1965 | SBT 0000196 |
| 15 | UPR Notice of Partial Relinquishment, December 6, 1989 | SBT 0000197-SBT 0000201 |
| 16 | UPR Letter to Portneuf Greenway Committee, May 23, 1991 | SBT 0000202 |
| 17 | IDI-29271, BLM Right-of-Way to City of Pocatello, March 24, 1993 | SBT 0000203-SBT 0000207 |
| 18 | SBT Letter to BLM, January 27, 2004 | SBT 0000208-SBT 0000209 |
| 19 | Bill of Sale, Bus Depot, October 1, 1998 | SBT 0000210-SBT 0000211 |
| 20 | Lease of Bus Depot to City of Pocatello from UPR, March 22, 1999 | SBT 0000212-SBT 0000219 |
| 21 | Lease of Parking Areas to City of Pocatello from UPR, March 6, 1952 | SBT 0000220-SBT 0000258 |

| Ex. No. | Title/Description | Bates No. |
|---------|------------------|-----------|
| 22 | Instrument No. 558615, Warranty Deed | SBT 0000259 |
| 23 | Supplemental Agreement, Union Pacific and Ricks Pool and Spa Service, December 17, 2013 | SBT 0000260-SBT 0000264 |
| 24 | Letter to UPR from BIA Northwest Regional Office (S. Speaks), January 31. 2012 | SBT 0000265-SBT 0000267 |
| 25 | Memo to BIA Portland Area Director from Office of Regional Solicitor, January 15, 1980 | SBT 0000268-SBT 0000274 |
| 26 | Memo from BIA Property re: 10-acre tract to quitclaim to LDS Church, March 25, 1960 | SBT 0000275 |
| 27 | Memo to BIA Portland from Office of Regional Solicitor, April 19, 1962 | SBT 0000276-SBT 0000278 |
| 28 | Memo to BIA Real Property Management from Office of Regional Solicitor, Portland, February 9, 1972 | SBT 0000279-SBT 0000282 |
| 29 | Memo to BIA Real Property from Assistant Regional Solicitor, March 22, 1973 | SBT 0000283-SBT 0000286 |
| 30 | Memo to Portland Area Director from Office of Regional Solicitor, January 2, 1997 | SBT 0000287-SBT 0000292 |
| 31 | Memo to UPR from Office of Regional Solicitor, September 30, 1999 | SBT 0000293-SBT 0000303 |
| 32 | Letter to Regional Solicitor from Counsel for Shoshone-Bannock Tribes, February 14, 2013 | SBT 0000304-SBT 0000305 |
| 33 | Letter to Superintendent, Fort Hall Agency, from Counsel for Shoshone-Bannock Tribes, September 30, 2013 | SBT 0000306-SBT 0000328 |
| 34 | Letter to Superintendent, Fort Hall Agency, from Shoshone-Bannock Tribes, September 28, 2015 | SBT 0000329-SBT 0000352 |
| 35 | Email to Solicitor from Counsel for Shoshone-Bannock Tribes, January 25, 2016 | SBT 0000353 |
| 36 | Letter to US Department of Justice/US Attorney, Idaho from Counsel for Shoshone-Bannock Tribes, December 21, 2010 | SBT 0000354-SBT 0000361 |
| 37 | Letter to BIA Regional Director and Superintendent, Fort Hall Agency, from Shoshone-Bannock Tribes, January 25, 2011 | SBT 0000362-SBT 0000363 |
| 38 | Letter to BIA Fort Hall Agency from Counsel for Shoshone-Bannock Tribes, March 3, 2011 | SBT 0000364-SBT 0000365 |