William F. Bacon, General Counsel (ISB #2766)
Shoshone-Bannock Tribes
Tribal Attorneys Office
P.O. Box 306
Fort Hall, Idaho 83203
Telephone: (208) 478-3822
Facsimile: (208) 478-9736
Email: bbacon@sbtribes.com

Mark A. Echo Hawk (ISB #5977)
Nathan R. Long (ISB #5645)
Joseph T. Preston (ISB #9082)
ECHO HAWK & OLSEN, PLLC
P.O. Box 6119
505 Pershing Ave., Ste. 100
Pocatello, Idaho 83205-6119
Telephone: (208) 478-1624
Facsimile: (208) 478-1670
Email: mark@echohawk.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,<br><br>Plaintiff,<br>vs.<br><br>UNITED STATES OF AMERICA; et al.,<br><br>Defendants. | Case No. 4:18-cv-285-DCN<br><br>**PLAINTIFF'S RESPONSE TO THE UNITED STATES' RENEWED MOTION TO DISMISS THE AMENDED COMPLAINT [Dkt. No. 77]** |

Plaintiff Shoshone-Bannock Tribes (the "Tribes" or "Plaintiff") submits this response to Defendant United States' Renewed Motion to Dismiss the Amended Complaint (Docket No. 77) (the "Defendant" or the "Government").

# INTRODUCTION

At the core of the Tribes' Amended Complaint are two Congressional Acts ratifying treaties made between the Tribes and the United States, which created the conditional rights-of-way through the Shoshone-Bannock reservation (hereinafter "Reverted Trust Property"). The language of these Acts of Congress unambiguously mandates return of control of the Reverted Trust Property to the Tribes. And when it comes to Tribal lands, Congress has the final say.

Supreme Court precedent emphatically establishes the plenary power of Congress to determine Indian Affairs—particularly with regard to Tribal lands and reservations.[1] This absolute Congressional authority is not subject to limitation or modification by any other branch of government, any agreements not ratified by Congress, or any executive or agency action—the Supreme Court has expressly mandated that, when determining whether reservation lands remain, "there is only one place [the Court] may look: the Acts of Congress."[2]

In its motion to dismiss, the Government seeks to upend decades of Supreme Court precedent by requesting this Court diminish reservation lands contrary to Congressional intent. But only Congress can divest a Tribal nation of its reservation lands and diminish its boundaries.[3] "[C]ourts have no proper role in the adjustment of reservation borders."[4] It is not within the purview of this Court to diminish the Reverted Trust Property. Further, "[d]iminishment . . . will not be lightly inferred."[5] Congress is required to "clearly express its intent" to divest or diminish

---

[1] *See, e.g.*, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978); *Solemn v. Bartlett*, 465 U.S. 463 (1984); *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020).
[2] *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020).
[3] *Solemn v. Bartlett*, 465 U.S. 463, 470 (1984).
[4] *McGirt*, 140 S. Ct. at 2462.
[5] *Solemn*, 465 U.S. at 470.

reservation lands.[6] Tribal Trust Lands cannot be revoked impliedly. A reservation is not diminished "until *Congress explicitly* indicates otherwise."[7]

   With regard to the Reverted Trust Property at issue, Congress explicitly delineated the terms under which the Railroad Company and its successors were permitted to exercise a temporary right-of-way through the Shoshone-Bannock Tribes' reservation. By their express terms, both the Act of 1882[8] and Act of 1888[9] created nothing more than rights-of-way. The statutes did not convey any other right or title to Shoshone-Bannock Tribal land other than a right-of-way.

   Congress declared the conditional nature of the right of way by expressly stating that when the Railroad Company ceases to use the Reverted Trust Property for railroad purposes, "such portion *shall revert* to the tribe . . ." To the extent the statute also states that the land "shall . . . revert to the United States," this is understood to mean "to the United States" *as trustee* on behalf of the Tribes. Land cannot "revert" back to a status that it never held—i.e., non-trust land held in fee by the Government and/or the Railroad Company. The land reverts to its original status as Shoshone-Bannock Reservation trust land.

   Canons of construction in Indian law require this reading of the statutes. "Canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians."[10] Federal courts are required to interpret treaties, agreements, and statutes "to give effect to the terms as the Indians themselves would have understood them."[11] The Tribes

---

[6] *McGirt*, 140 S. Ct. at 2463.
[7] *Id* (emphasis added).
[8] Dkt. No. 22-6, Am. Compl., Ex. 8 (emphasis added).
[9] Dkt. No. 22-1, Am. Compl, Ex. 3 (emphasis added).
[10] *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985).
[11] *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 198 (1999); *see also Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157, 1163 (9th Cir. 2017) ("As a general rule,

did not understand the agreements in the Acts of 1882 and 1888 to give more than a right-of-way or impliedly revoke the Tribes' reversionary interest.[12]

To the extent the Court finds any ambiguities in the interpretation of these Acts or agreements, such ambiguities must be construed to the benefit of the Indian Tribes. "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."[13] To the extent the Court finds ambiguities in the Acts, Treaty, or 2012 Settlement, such ambiguities must be construed to affirm Indian land title.[14]

Overlooking the supremacy of Congress' authority and the express language of the Acts, the Government focuses on the non-ratified 2012 Settlement. However, the 2012 Settlement is not dispositive, and Congressional intent with regard to the Reverted Trust Property must be respected.

## LEGAL STANDARDS

When ruling on Defendant's Rule 12(b)(6) motion, the Court must accept as true all of Plaintiff's factual allegations contained in the complaint,[15] and must deny the motion to dismiss if

---

treaties are to be construed, so far as possible, in the sense in which the Indians understood them.") (internal quotations omitted).

[12] See, e.g., Dkt. No. 21, Am. Compl. ¶¶ 3, 4, 54, 55-58, 68, 70-94, 98, 102, 106, 119, 121, 125, 129, 131-39, 143-58, 165.

[13] *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Cohen's Handbook of Federal Indian Law (2012)* § 2.02[1].

[14] *See Oneida County*, 470 U.S. at 247-48 ("[T]he Court has held that congressional intent to extinguish Indian title must be plain and unambiguous, and it will not be lightly implied."); *Cohen's Handbook of Federal Indian Law (2012)* § 2.02[1] ("[T]ribal property rights are preserved unless Congress's intent to the contrary is clear and unambiguous.").

[15] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

the Plaintiff pled factual content that allows the Court to draw the reasonable inference that the Defendant is liable for the misconduct alleged.[16]

Notably, Defendant's Motion requires factual findings on genuinely disputed facts that are intertwined with substantive legal issues, relying on three declarations and multiple exhibits to make their argument. A "[j]urisdictional finding on genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action."[17]  The question of jurisdiction and the merits of an action are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief."[18] "When a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous."[19]

As the D.C. Court already observed in this case in its Memorandum Opinion, "[a]djudicating these issue, as well as the DOI Notice's impact, may also require resolving factual disputes through evidentiary proceedings…"[20] "Furthermore, given that the Tribes' claims relate to the boundaries of their reservation, it would be imprudent for the Court to rule without a full understanding of the land interests created through the relevant treaties and Congressional acts."[21]

---

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009).
[17] *Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.,* 711 F.2d 138, 139 (*quoting Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983)).
[18] *Id*.
[19] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039–40 (9th Cir. 2004).
[20] Memorandum Opinion, Dkt. 109 at 10.
[21] *Id* (*citing McGirt v. Oklahoma*, 140 S.Ct. 2453, 2469 (2020)).

Last, any dismissed claims should be dismissed without prejudice and with leave to amend even after discovery; and, amendment could revive a dismissed claim.[22]

### ARGUMENT

**I.    THE 2012 SETTLEMENT DOES NOT REQUIRE DISMISSAL.**

**A.   The 2012 Settlement Did Not – and Could Not – Change the Character of the Reverted Trust Property or Relieve the Government From its Trust Duties.**

The Defendants are asking the Court to diminish and divest Tribal Reservation lands based on the non-ratified 2012 Settlement.[23] This non-ratified agreement cannot be used against a Tribe to diminish the reservation or take land out of trust—as only Congress has this authority.[24] Because Congress possesses plenary authority over Tribal land status, it is common practice for Tribal land settlements to be legislatively enacted/ratified—for example, the Maine Indians Settlement Act of 1980,[25] the Gila Bend Indian Reservation Lands Replacement Act of 1986,[26] the Puyallup Land Claims Settlement Act of 1989,[27] and the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993.[28] Each of these congressional acts, among many others, were enacted to ratify and enforce negotiated land settlement agreements between the U.S. and Tribal Nations, which actually divested or diminished the respective reservations in some capacity.

If Congress had intended the 2012 Settlement to permanently divest the Tribes of its Reservation land, it would have said so in a similar enactment. If the United States wishes to

---

[22] Fed. R. Civ. Pro. 15(a); *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009); Dkt. 88 at 13.
[23] *See* Dkt. No. 21, Am. Compl. ¶ 308 ("Neither the United States nor any of its political subdivisions ever approved the transfer of any portion of the easement to any third party.").
[24] *See, e.g.*, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978); *Solemn v. Bartlett*, 465 U.S. 463 (1984); *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020).
[25] 94 Stat. 1785.
[26] 100 Stat. 1798.
[27] 103 Stat. 83.
[28] 107 Stat. 1118.

diminish the Tribes' Reservation and break Treaty promises, Congress must do so explicitly. Supreme Court Justice Neil Gorsuch recently explained that "[the federal government] sometimes might wish an inconvenient reservation would simply disappear . . . But wishes don't make for laws, and saving the political branches the embarrassment of disestablishing a reservation is not one of [the Court's] constitutionally assigned prerogatives."[29]

The trust claims at issue before the court in *Salazar* were based upon: (1) the Government's duty to the Tribes to properly manage non-monetary trust assets or resources; (2) the Government's alleged failure to comply with its trust duties; and (3) harms or damages flowing from the Government's failure.[30]

Thus, the scope of the settlement by its own terms was limited to the Government's violation of trust obligations and resulting harms, occurring prior to May 16, 2012, that were owed to the Tribes for management of non-monetary trust assets. By arguing that the 2012 Settlement applies to the Reverted Trust Property at issue, the Government is precluded from arguing that the lands in question are not trust assets held for the benefit of the Tribes. The Government cannot pretend just one side of the coin exists. The other side of the 2012 Settlement coin is that the lands in question constitute non-monetary trust assets held for the Tribes. And, if the Government argues that the 2012 Settlement applies, conceding that the lands are trust assets, it cannot be allowed to simultaneously claim ownership contrary to Tribal interests of those lands.

Also, the 2012 Settlement did not, expressly or by effect, have any impact upon either the character of the trust property at issue, or the Government's corresponding duties to fully comply with all trustee obligations May 17, 2012, and thereafter. The 2012 Settlement did not alter the status of the land as a conditional right-of-way occurring through property held in trust on behalf

---

[29] *McGirt*, 140 S. Ct. at 2462.
[30] Dkt. No. 70, Status Report, Exhibit 2.

of the Tribes—it merely compensated the Tribes for the harms occurring from mismanagement of the Reverted Trust Property up until May 16, 2012. The Settlement did not release the Government from its ongoing trust duties to the Tribes nor did it preempt the Congressional mandates in the 1882 and 1888 Acts. The 2012 Settlement is not a free pass for the United States to continue causing injury to the Tribes' trust assets indefinitely.

Consequently, the Reverted Trust Property was and remains trust assets held by the United States for the benefit of the Tribes both before and after May 16, 2012. The United States' corresponding fiduciary duties to manage the Reverted Trust Property for the benefit of the Tribes continued after May 16, 2012. In fact, neither the character of the Reverted Trust Property nor the Government's corresponding trust obligations could be changed or impaired by the 2012 Settlement—even though incorporated into a federal court order. That is because it falls within the plenary power of Congress and not the federal courts—and certainly not the executive branch—to diminish or otherwise divest the Tribes of its Reservation lands.[31]

Rather, on May 17, 2012—the day after the Settlement—the Tribes had a renewed expectation that the Government would recognize the Reverted Trust Property as held in trust and fully comply with its corresponding fiduciary and statutory obligations from May 17, 2012 forward. Unfortunately, that expectation was not fulfilled, and the Government returned to its neglect and breach of its trust obligations owed to the Tribes on the Reverted Trust Property.

## B. This Court has Jurisdiction Over Plaintiff's Trust Property Claims for Harms or Violations Occurring After May 16, 2012 (Counts I, VII, IX, and XVI).

The D.C. District Court in *Salazar* expressly concluded that the 2012 Settlement "does not waive the Tribes' [right-of-way claims] against the United States for harms from violations that

---

[31] *Solemn v. Bartlett*, 465 U.S. 463, 470 (1984).

occurred after May 16, 2012."[32] The Tribes allege that the day after the Settlement it held a reversionary interest in the Reverted Trust Property that the United States held in trust for the Tribes as beneficiary.[33] The Tribes further allege that, on May 17, 2012 and thereafter, the United States failed to act in accordance with those duties and actually took action that was directly adverse to the Tribes' interests.[34] As recognized by the Court in *Salazar*, the Tribes' claims for harms (injuries) for violations (breach of trust obligations) on May 17, 2012 and thereafter, were not within the 2012 Settlement and, therefore, not waived by the Tribes. To hold otherwise would effectively relieve the United States from its duty, imposed by two Acts of Congress, to manage the Reverted Trust Property for the benefit of the Tribes. Again, that is something that neither the Court in *Salazar* nor this Court may properly do without Congressional approval.[35]

Instead, the character of the Reverted Trust Property remains—held in trust by the Government for the benefit of the Tribes. Similarly, the Government's ongoing fiduciary and statutory obligations remain unimpaired by the 2012 Settlement.

The Tribes have simply brought claims in this action to seek relief relating to the Government's violations after May 16, 2012, for its failure to comply with its trust obligations to properly manage the Reverted Trust Property for the benefit of the Tribes. Those violations and resulting harms include the Government's continuing failure to record the lands as trust lands, to prevent trespass, to eject those in improper possession of the Reverted Trust Property, as well as to allow the Tribes to occupy the lands.[36]

---

[32] Order, *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Bernhard*; 02-0254, September 10, 2020, Dkt. No. 110.

[33] Dkt. No. 21, Am Compl. ¶¶ 119, 165, 193, 194, 226, 244, 245, 248, 252, 254, 265, 266, 272, 273.

[34] *See, e.g., id* at ¶¶ 288, 296, 299, 301, 322-25, 339-42, 358-61, 376-83, 398-404, 419, 420, 439-42.

[35] *McGirt*, 140 S. Ct. at 2462.

[36] Dkt. No. 21, Am. Compl. ¶¶ 413-20.

Specifically, the Tribes have sought relief under Counts I (Declaratory Judgment), VII (Mandamus), IX (Breach of Trust – Trespass), and XVI (Ejectment and Restitution of Property). Each of these counts seek relief based upon or relating to the Government's failure to comply with its fiduciary obligations owed to the Tribes as trustee over the Reverted Trust Property resulting in harms for violations occurring *after* May 16, 2012.[37]

By seeking to dismiss these Counts based upon the application of the 2012 Settlement, the Government necessarily takes the position that the Reverted Trust Property was properly characterized as land held in trust for the benefit of the Tribes until at least May 16, 2012. That is because if the Reverted Trust Lands were not held in trust on May 16, 2012, they would not have been trust property and, by definition, would fall outside the scope of the 2012 Settlement.

Despite taking the position before this Court that the Reverted Trust Property is trust land, the Government appears to take the position that on May 17, 2012, it was somehow relieved of its corresponding fiduciary obligations owed to the Tribes and is now immune from any claims relating to violations of its fiduciary duties as trustee of the Reverted Trust Property.

For example, the Tribes have alleged that the Bus Depot should have been reverted to the Tribes upon cessation of use for railroad purposes.[38] The Government violated its duty to manage that portion of the Reverted Trust Property by failing to take appropriate action prior to May 16, 2012. But on May 17, 2012, the Bus Depot continued to be trust property for which the Government owed the Tribes a continuing fiduciary duty to manage on behalf of the Tribes in accordance with congressional intent and federal regulations.[39] The Settlement did not—and could

---

[37] Dkt. No. 21, Am. Compl. ¶¶ 262, 263, 275-84, 290-301, 413-20, 439-42, 498-500.

[38] Dkt. No. 21, Am. Compl. ¶¶ 196-204, 331-47; *see also* Dkt. No. 22-11, Ex. 24, 2.

[39] *See, e.g.,* 25 C.F.R. § 169.10 ("A right-of-way is a non-possessory interest in land, and title does not pass to the grantee."); *id* at § 169.410 ("If a grantee remains in possession after the expiration, termination, or cancellation of a right-of-way . . . we may treat the unauthorized possession as a

not—take the land out of trust or diminish the reservation without Congressional intent. The Tribes have alleged that, following May 17, 2012, the Government violated its trust duties when it failed to properly manage the Bus Depot and all other Reverted Trust Property in accordance with its congressionally mandated trust obligations.[40]

The Tribes have pled facts sufficient to state a claim for relief for harms (injuries) or violations (breach) occurring May 17, 2012 and thereafter due to Defendant's failure to comply with its congressionally mandated trust obligations.[41] Those allegations must be taken as true and, consequently, this Court should deny Defendant's Motion to Dismiss.

### C. The 2012 Settlement Does Not Apply to Quiet Title Claims (Counts II, III, IV, V, and VI).

The Tribes' Quiet Title Act Claims against the Government are based upon allegations that the Government claims improper ownership interests in the Reverted Trust Property that are contrary to and exclusive of the Tribes' interest[42] and are based upon 28 U.S.C. § 2409a. Although a third party cannot make a quiet title claim against the Government for trust land, an Indian Tribe can.[43]

---

trespass . . . "); *id* at § 150.3 (Bureau of Indian Affairs is "charged with the Federal responsibility to revord, provide custody, and maintain records that affect titles to Indian land, to examine titles, and to provide title status reports."); *id* at § 150.6 ("Bureau officials delegated authority by the Secretary to approve title documents or accept title are responsible for prompt compliance with the recording requirement.").

[40] Dkt. No. 21, Am. Compl. ¶¶ 290-95, 331-47.

[41] *Id* at ¶¶ 413-20.

[42] *Id* at ¶¶ 327, 328, 344, 345, 363, 364, 365, 385, 386, 387, 406, 407 (outright ownership claims).

[43] 28 U.S.C. § 2490a(a); *U.S. v. Mottaz*, 476 U.S. 834, 835 (1986) ("The provision of the Quiet Title Act that it does not apply to trust or restricted Indian lands operates solely to retain the United States' immunity from suit by third parties (not Tribes) challenging the United States' title to land held in trust for Indians. Thus, when the United States claims an interest in real property based on its status as trust or restricted Indian lands, the Quiet Title Act does not waive the United States' immunity. But when an Indian plaintiff challenges the United States' assertion of title in its own behalf, the Act applies.").

For purposes of Defendants' Motion to Dismiss, Plaintiff's allegations are taken as true. And unless the Defendant disclaims ownership interests that are contrary to the Tribes and acknowledges that it holds the Reverted Trust Property in trust for the benefit of the Tribes (as it impliedly does by raising the 2012 Settlement), this Court has jurisdiction to resolve the quiet title claims. That's because, by definition, those claims are not trust mismanagement claims, and not subject to the 2012 Settlement. Defendant's Motion to Dismiss these claims based upon an assertion that the 2012 Settlement constitutes a waiver of those claims is without merit and should be denied. A quiet title claim is simply not the same as a trust mismanagement claim. Therefore, the 2012 Agreement does not apply.

Defendant's sole basis to dismiss Plaintiff's Quiet Title Claims in Counts II, III, and IV was the application of the 2012 Settlement. Consequently, those claims should survive Defendant's instant motion to dismiss.

## II. THE COURT MUST DENY THE REQUEST TO DISMISS COUNTS V AND VI (QUIET TITLE) BECAUSE THE STATUTE OF LIMITATIONS HAS NOT RUN.

The Quiet Title Act statute of limitations has not run because: Congress has not acted in a way that starts the clock; the Government fails to show that the statute has run; and, the Quiet Title Act's statute of limitations is not a jurisdictional bar that should be addressed at this time.

The Government's motion to dismiss primarily argues that the Court lacks subject matter jurisdiction under Rule 12(b)(1) to hear the Tribes' Quiet Title Act claims because the allegations are time-barred by the Quiet Title Act's 12-year statute of limitations. The Government loses this argument because the Tribes' Amended Complaint specifically alleges claims and harm occurring after May 16, 2012, well-within the Quiet Title Act's 12-year time-bar, and the claims should be analyzed under Rule 12(b)(6).[44]

---

[44] *See United States v. Kwai Fun Wong*, 575 U.S. 402, 409 (2015).

A claim under the Quiet Title Act is "deemed to have accrued on the date the plaintiff … knew or should have known of the claim of the United States." The question of what the Plaintiff knew or should have known is a factual conclusion, and the factual allegations in the Amended Complaint must be accepted as true for purposes of the Motion to Dismiss.[45] Additionally, the Court considers clear restrictions against Government claims of ownership of Indian lands. That's because "Congress has the exclusive right to extinguish Indian title to lands."[46]

### A.  The statute of limitations has not run because Congress has not acted.

Only Congress has the power to take an adverse claim to Tribal land on behalf of the United States and such action will not be implied,[47] or found in the absence of a "clear and plain" congressional indication.[48] Neither the BLM nor any other federal agency or executive official has the authority, by itself,[49] to take an adverse claim to Tribal land.[50] The Government fails to point to any Congressional activity that makes an adverse claim to the Tribes prior to 2006—the date the Government claims the statute of limitations ran.

Significantly, since enacting the 1882 and 1888 Acts, Congress has only reaffirmed the Tribes' property rights in the Reverted Trust Property. By Public Law 86-784, Congress "revoked and held for naught" the Tribes' reversionary interest in an irregular tract of l0 acres that was

---

[45] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[46] *Solem v. Barlett*, 465 U.S. 463, 470 (1984).

[47] *Solem*, 465 U.S. at 470 (An intent to extinguish Indian property rights is not to be lightly inferred); *United States v. Winnebago Tribe*, 542 F.2d 1002, 1005 (8th Cir. 1976) (Such a drastic result requires "a clear expression of congressional intent.").

[48] *U.S. v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 353 (1941); *U.S. Pend Oreille Public Utility Dist. No. 1*, 28 F.3d 1544, 1551 (9th Cir. 1994); *see also McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462-63 (U.S. 2020); *Menominee Tribe v. United States*, 391 U.S. 404 (1968).

[49] Agency decisions cannot contradict statutes. "If Congress has spoken to the question at issue, then that is the end of the matter." *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460 (D.D.C. 2007). The Government cannot ignore the Act of 1882 or the Act of 1888.

[50] *U.S. v. Dann*, 873 F.2d 1189 (9th Cir. 1989); *Havasupai Tribe v. U.S.* 752 F.Supp. 1471 (D. Ariz. 1990).

conveyed to the Pocatello First Corporation of the Church of Jesus Christ of Latter-day Saints.[51]
If the Tribes did not have any reversionary interest, Congress would not have needed to revoke the
Tribes' interest during this Congressional action.

The past anomalistic actions of executive Government officials—without congressional
approval—fail to show that the Government has taken a legitimate adverse ownership claim. The
statute has therefore not yet run and dismissal of Counts V and VI on that basis is improper.

### B. Even overlooking the lack of congressional action, the Government fails to show that the statute of limitations has run.

The allegations in the Amended Complaint, which this Court must take as true, show the
Tribes were not aware of a possible adverse claim prior to the running of the statute of limitations,
and any potential running of the statute of limitations has been restarted by the Government
abandoning its claim.

### i. The Allegations Show the Tribes were not Aware of a Possible Adverse Claim Prior to the Running of the Statute of Limitations.

The question of what the Tribes knew or should have known is a factual issue and must be
resolved in the Tribes' favor given the Government's conduct over multiple decades in which it
continuously reaffirmed the Tribes' reversionary interest in the Reverted Trust Property, even after
2012. Also, the Government and Tribes' ownership rights can be concurrent and not adverse.

In determining when the twelve-year statute of limitations begins to run, courts have
adopted a reasonableness test.[52] "The question is whether the United States' action would have
alerted a reasonable landowner that the government claimed an interest in the land."[53] The

---

[51] 74 Stat. 1022.
[52] *California ex rel. State Land Comm'n v. Yuba Goldfields, Inc.*, 752 F.d 393, 396 (9th Cir. 1985).
[53] *Shultz v. Dept. of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989); *Wackerli v. Morton*, 390 F. Supp.
962 (D. Idaho 1975) (None of the plaintiffs knew, or should have known, of the government's
claim.).

Government's continual reaffirmation of the Tribes' interest in the Reverted Trust Property for decades would not have alerted a reasonable landowner that the Government claimed a conflicting interest.

A Department of Interior Memo, dated March 25, 1960, states: "section 11 of [the Act of September 1, 1888] is still in full force and effect."[54] In 1973, the Portland Regional Solicitor concluded that "the land reverts back to the Tribes."[55] In 2005, the Solicitor's Office took the position that the railroad cannot "transfer its interest in the rights of way to a third party other than another railroad company, the Tribes or the U.S."[56]  In 2008, an administrative agency decision was issued, adjudicating that the Act of 1888 granted a right-of-way with a reversionary interest in the Tribes and that certain land would revert back to the Government to be held in trust because it was no longer being used for railroad purposes.[57] A Notice Letter dated January 31, 2012, stated that the Tribes have an "automatic reversion" and that "by operation of the explicit Congressional language in the grants . . . areas within the grant that are being used for purposes not authorized by the grants **have reverted to the United States in trust for the Shoshone-Bannock Tribes**."[58]

The 2012 Agreement did not claim Government ownership, but reaffirmed the trust status of non-monetary assets. After 2012 the Government never indicated that it claimed ownership adverse to that of the Tribes during any of its meetings with Tribal representatives.[59] Dismissal is improper since it would not be reasonable for the Tribes to know that the Government claimed a contrary interest. And with these circumstances, it can hardly be said that the Tribes should have

---

[54] Dkt. 21, Am. Compl. ¶ 266; Dkt. 22-12, at 2.
[55] Dkt. 21, Am. Compl. ¶ 269.
[56] *Id* at ¶ 272.
[57] *Id* at ¶245.
[58] *Id* at ¶ 228 (emphasis added).
[59] *Id* at ¶ 295; Dkt. 22-16, at 2.

known of the Government's adverse claim because the Reverted Trust Property was not in trust status.

The Government rests its argument upon which federal agency was acting on the subject lands and cites to 25 U.S.C. § 2. But 25 U.S.C. § 2 simply provides that "[t]he Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations." While the BIA may be the primary federal agency involved with Indian tribes, it is certainly not the exclusive federal agency that Tribes deal with.

### ii.   The Government and Tribes' Ownership Rights can be Concurrent and not Adverse.

The twelve-year limitation period in 28 U.S.C. § 2409a(g) "begins when a claim of title in favor of the United States becomes adverse to the plaintiff."[60] Otherwise, it would lead to an undesirable result requiring a claimant be compelled to sue to protect against the possibility, however remote, that the government might someday change its position.[61] Thus, even if the United States openly claims a property interest, that fact alone does not start the running of the statute of limitations unless the claimed property interest conflicts with the Tribes.[62]

---

[60] *Leisnoi, Inc. v. U. S.*, 267 F.3d 1019, 1025 (9th Cir. 2001) (citing *Michel v. U.S.*, 65 F.3d 130, 131-32 (9th Cir. 1995)).

[61] *Michel v. U.S.*, 65 F.3d 130 (9th Cir. 1995); *Nielson v. United States, Bureau of Land Management*, 247 F. Supp. 3d 1152 (D. Idaho 2017) (The Quiet Title Act's waiver of sovereign immunity did not apply in a property owner's action against the United States where the United States had never asserted any claim of ownership to the property at issue and had never disputed the property owner's interest in or title to the property.); *Werner v. United States*, 9 F.3d 1514, 1518-19 (11th Cir. 1993), *cert. denied*, 517 U.S. 1119 (The Quiet Title Act is not triggered by just any government interest in property, but rather only a claimed interest that is inconsistent with— that is, adverse to—the plaintiff's asserted interest); *Shultz*, 886 F.2d at 1160-61.

[62] See, e.g., *Michel* 65 F.3d at 132 (citing *Werner v. United States*, 9 F.3d 1514, 1516 (11th Cir. 1993)); *Shultz*, 886 F.2d at 1160-61.

Concurrent property ownership rights are perfectly compatible between the Government and the Tribes.[63] The Government can hold the legal title, while the Tribes hold beneficial ownership rights. The Government's briefing fails to show how the Government's claimed interest is clearly adverse to the Tribes. It was not until 2016 that the Tribes were first aware that the Government had taken an adverse position with respect to the Reverted Trust Property.[64]

### iii. The Government Fails to Meet its Burden in Showing Conflicting Ownership Rights Prior to 2006.

To meet its burden, the Government has introduced material outside the pleadings[65] while simultaneously asking this Court to deny the Tribes' request to conduct discovery on point.[66] But, the Government's own statements cast doubt on whether the Government claimed an interest in the City Creek area prior to 2006. The BLM December 14, 2016 statement says that BLM did not receive the lands by relinquishment until 2014,[67] and simply observed that the reverted land would "remain open to the public while further reviews occur."[68] Moreover, even after 2016, during multiple meetings between representatives of the Tribes and the Government, the Government made further assurances that it was undertaking measures to support the Tribes' claims to the Reverted Trust Property.[69]

Next, the Government tries to point to an Environmental Assessment, but an Environmental Assessment cannot support the commencement of the running of the Quiet Title

---

[63] *Lyon v. Gila River Indian Community*, 626 F.3d 1059, 1068 (9th Cir. 2010); *McFarland v. Norton*, 425 F.3d 724, 727-28 (9th Cir. 2005); *Narramore v. United States*, 852 F.2d 485, 492 (9th Cir. 1988), vacated and remanded on other grounds, 960 F.2d 1048 (Fed. Cir. 1992).
[64] Dkt. 21, Am. Compl. ¶¶ 285-89.
[65] The Government's material recognizes that the relinquishment of the City Creek area in 1989 was faulty, and it was not until 2014 that the relinquishment was fixed. Dkt. 77-7, at 32.
[66] Dkt. 79.
[67] Dkt. 21, Am. Compl. ¶ 262; Dkt 22-18, at 2.
[68] *Id* at ¶ 284.
[69] *Id* at ¶ 286.

Act's statute of limitations because it is not a decisional document; its purpose is to help the government and the public evaluate a proposed agency action.[70] The allegations in the Amended Complaint, taken as true, overwhelmingly show that the Quiet Title Act's twelve-year statute of limitations had not expired at the time the Tribes filed this lawsuit.

> ### iv.   Any Potential Running of the Statute of Limitations has Been Restarted by the Government Abandoning its Claim.

If the government abandons a claim it once asserted, and then later reasserts the claim, the later assertion is a new claim and the statute of limitations for an action restarts.[71] As shown above, there is sufficient basis showing that any Government ownership claims were abandoned by inconsistent positions, thus restarting the running of the statute of limitations in 2016 at the earliest.[72]

At any rate, the quiet title statute of limitations is not a jurisdictional bar that should apply at this time. In light of the Supreme Court's holding in *Kwai Fun Wong*, the Quiet Title Act's time bar is non-jurisdictional. Even if the Quiet Title Act's statute of limitations is jurisdictional, it is proper and necessary for this Court to first resolve the merits of this case.

A defendant "must clear a high bar to establish that a statute of limitations is jurisdictional."[73] The Supreme Court has stated that "in recent years, we have repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has clearly stated as much."[74] "'Congress must do something special, beyond setting an exception-free deadline,' in

---

[70] *County of Shoshone, Idaho v. U.S.*, 589 Fed. Appx. 834 (9th Cir. 2014).
[71] *Shultz v. Department of Army*, 886 F.2d 1157, 1161 (9th Cir. 1989).
[72] Dkt. 21, Am. Comp. ¶¶ 282-289.
[73] *United States v. Wong*, 575 U.S. 402, 409 (2015).
[74] *Id.*

order to create a *jurisdictional* requirement, and that remains true 'even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are).'"[75]

Although Congress need not use "magic words," "traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences."[76] "Framed in mandatory terms," and even "emphatically expressed," statutes of limitations still "do not deprive a court of authority to hear a case."[77] The Supreme Court characterizes statutes of limitation more properly as claim processing rules that do not restrict a court's inherent power to hear a case.[78] Thus, in applying this clear statement rule, the Supreme Court has "made plain that most time bars are nonjurisdictional."[79]

Previously, the Ninth Circuit sustained the stance that the Quiet Title Act's statute of limitations is non-jurisdictional.[80] More recently, the Ninth Circuit reversed course and began to hold that the twelve-year limitations period deprives federal courts of jurisdiction.[81] However, the reversal was decided prior to *Wong,* and the Ninth Circuit has not yet revisited it after *Wong.*

It is abundantly clear that any prior holdings are incongruent with *Wong*. In deciding whether the Quiet Title Act's statute of limitations is a jurisdictional bar, courts like the United States District Court for the Central District of California have recognized that in light of *Wong,*

---

[75] *Organic Cannabis Foundation, LLC v. Commissioner of Internal Revenue*, 962 F.3d 1082, 1093 (9th Cir. 2020) (citing *United States v. Kwai Fun Wong*, 575 U.S. 402, 410, (2015)).

[76] *Wong*, 575 U.S. at 410.

[77] *Organic Cannabis Foundation, LLC*, 962 F.3d at 1093 (citing *United States v. Kwai Fun Wong*, 575 U.S. 402, 410 (2015)).

[78] *Id* (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)).

[79] *Id* (citing *United States v. Kwai Fun Wong*, 575 U.S. 402, 410 (2015)).

[80] *Fadem v. U.S.*, 52 F.3d 202, 206 (9th Cir. 1995) *cert. granted, judgment vacated*, 520 U.S. 1101 (1997) *and judgment reinstated*, 113 F.3d 167 (9th Cir. 1997); *see also Capital Tracing, Inc. v. U.S.*, 63 F.3d 859, 861 n.3 (9th Cir. 1995) (The appellate court treated the district court's action as a dismissal for failure to state a claim, rather than as dismissal for lack of subject matter jurisdiction because statute of limitations are not jurisdictional in nature.).

[81] *Kingman Reef Atoll Investments, L.L.C. v. U.S.*, 541 F.3d 1189 (9th Cir. 2008).

the statute of limitations in 28 U.S.C. § 2409a is non-jurisdictional and considered the United States' Motion to Dismiss under Rule 12(b)(6), rather than Rule 12(b)(1).[82]

In applying the clear statement rule, Congress did nothing that "imbued . . . with jurisdictional consequences" the Quiet Title Act's statute of limitations.[83] The Quiet Title Act's statute of limitations reads: "Any civil action . . . shall be barred unless it is commenced within twelve years of the date upon which it accrued."[84] This text speaks only to a claim's timeliness and not to a court's power.[85] It contains mundane statute-of-limitations language, saying only what every time bar, by definition must: that if a claim against the United States is not "commenced within twelve years," it shall be barred.[86]

This Court should readily conclude that the Quiet Title Act's statute of limitations "reads like an ordinary, run-of-the-mill statute of limitations, spelling out a litigant's filing obligations without restricting a court's authority."[87] There is no clear congressional intent to treat the Quiet Title Act time-bar as jurisdictional.

Because the Quiet Title Act statute of limitations is not jurisdictional, it only fashions a procedural bar and is simply a defense.[88] Dismissal of Counts V and VI is thus inappropriate.

---

[82] *Payne v. United States Bureau of Reclamation*, No. CV 17-00490-AB, 2017 WL 6819927 (C.D. Cal. Aug. 15, 2017).

[83] *Wong* 575 U.S. at 411.

[84] 28 U.S.C. § 2409a(g).

[85] *Id* at 410.

[86] 28 U.S.C. § 2409a(g); *Wong,* 575 U.S. at 410.

[87] *Wong,* 575 U.S. at 411.

[88] Under a Rule 12(b)(6) motion to dismiss, a statute of limitations defense must be "apparent on the face of the complaint," without the submission of additional information. *Jablon v. Dean Witter & Co*., 614 F.2d 677, 682 (9ᵗʰ Cir. 1980). While a statute of limitation defense may be raised by a motion for dismissal under Fed. R. Civ. Pro. Rule 12(b)(6), *Jablon,* 614 F.2d at 682, the United States Defendants do not seek dismissal of Counts V and VI under the basis of failure to state a claim upon which relief can be granted. *See* Third Decl. of Kristofor R. Swanson, Ex. 1 (chart illustrating various bases for dismissal) Dkt. No. 77-8 at 3.

### v. Even if the Quiet Title Act's statute of limitations is jurisdictional, it is proper and necessary for this court to first resolve the merits of this case.

When jurisdictional and substantive issues are so intertwined that the question of jurisdiction depends on the merits, it is "both proper and necessary for the trial court first to resolve the merits of the claim" to determine its own jurisdiction.[89]

In this case, if the statute of limitations is jurisdictionally determinative, this Court should first resolve the merits before deciding whether it has jurisdiction. As set forth previously, there are factual issues of whether the Government has made an adverse claim of ownership, when the Tribes knew or should have known of the Government's adverse claim, whether the Government's claimed ownership right was in conflict with the Tribes, and whether the Government's conduct amounts to an abandonment of its claim that must first be resolved before jurisdiction could be decided. Thus, should the Court determine that jurisdiction is potentially at issue, this Court should wait to render a decision until first resolving the merits of this case.

### III. COUNT VII (MAMDAMUS)—THIS COURT HAS JURISDICTION UNDER 28 U.S.C. § 1361 AND MANDAMUS IS THE PROPER RELIEF TO COMPEL ACTION BY THE DEFENDANT.

In a motion to dismiss, the moving party has the "burden of persuasion."[90] The Government has not met its burden to show that the Court lacks jurisdiction over Count VII (Mandamus).

The Government asserts that the complaint fails to state an adequate claim for relief because it does not identify any mandatory, non-discretionary duty. To make its argument, the Government relies heavily on a Ninth Circuit case, *Smith v. Grimm.* That reliance is misplaced. The holding in *Smith v. Grimm* is unique to the instant issue in that case.[91] The complaint in *Smith*

---

[89] *See, e.g.*, *Augustine v. United States,* 704 F.2d 1074, 1077-79 (9th Cir. 1983); *see also Young v. United States*, 769 F.3d 1047, 1052-53 (9th Cir. 2014).

[90] *Nat'l Bank of Ariz. v. Thruston*, 180 P.3d 977, ¶ 15 (9th Cir. 2008) (The burden of persuasion never shifts to the non-moving party.).

[91] *Smith v. Grimm*, 534 F.2d 1346 (9th Cir. 1976).

alleged no duty, constitutional or otherwise, nor did it seek to force an officer of the United States to do anything.[92]

Congress has explicitly given district courts power to consider cases in nature of mandamus against federal officials when it is claimed that federal officials are acting contrary to law, abusing their discretion in acting outside limits of fair permissible discretion, and when official conduct extends beyond any rational exercise of discretion, even though it is within letter of authority granted, mandamus affords appropriate judicial relief.[93] Allegations in a complaint that an agency failed to comply with its own regulations, and that the actions and conclusions were arbitrary, capricious, and unlawful, are, if supported by evidence, sufficient to warrant consideration of issuance of writ of mandamus under 28 USCS § 1361. A district court has the responsibility under 28 USCS § 1361 to determine whether prerequisites for mandamus relief have been satisfied: specifically, does the plaintiff have a clear right to relief sought; does the defendant have a duty to perform act in question and is there no other adequate remedy available.[94]  Recent Supreme Court case law finds that any failure to consider the factors of the claims in the mandamus presented serves as a due process rights basis to compel the complained of agency to perform its obligated duties.[95]

The Government suggests that the complaint fails because it either does not point to a specific duty or alleges a failure to perform only discretional duties. Decisions of the Ninth Circuit and other circuits do not follow that reasoning.[96]  A district court unquestionably has jurisdiction,

---

[92] *Smith v. Grimm*, 534 F.2d 1346 (9th Cir. 1976).
[93] *NAACP v. Levi*, 418 F. Supp. 1109 (D.D.C. 1976), superceded on other grounds by *Williams v. Glickman*, 936 F. Supp. 1 (D.D.C. 1996).
[94] *Bell v, Hood*, 327 U.S. 678, (1946).
[95] *Knox v. Unknown Parties*, 139 S. Ct. 2702 (2019).
[96] *Id* (citing *Mead v. Parker*, 464 F.2d 1108 (9th Cir. 1972)); *Martinez v. Richardson*, 472 F.2d 1121, 1123-1124 (10th Cir. 1973); *Walker v. Blackwell,* 360 F.2d 66 (5th Cir. 1966).

under the mandamus statute, to require defendants, all of whom are officers or employees of the United States, or an agency thereof, to perform the ministerial duty of complying with their own regulations.[97]

### A. The Amended Complaint Sufficiently States each claim for Mandamus and the appropriate relief.

Contrary to principles that should guide a trustee, the Government argues the duties of the United States as pertaining to Federal Indian trust lands are discretionary, even "antithetical to mandatory."[98] The federal regulations in 25 C.F.R., Part 169 clearly establishes an affirmative duty on the Agency to act and "address enforcement and compliance issues related to rights-of-way on Indian Land."[99]

Furthermore, the Government has no discretion to simply disregard the Tribe's interests.[100] The federal Indian trust responsibility is a legal obligation under which the United States "has charged itself with moral obligations of the highest responsibility and trust" toward Indian tribes.[101] Defendants assert that the regulations as set forth cannot be interpreted to compel performance of statutory duties. Defendant is incorrect. For an agency interpretation to be granted deference, it must be consistent with the Congressional purpose.[102] Congress enacted the Indian Reorganization Act, the mechanism by which trust lands are held for Tribes, in 1934 to improve the economic status of Indians through ending the alienation of tribal land, achieving the return of

---

[97] *Workman v. Mitchell*, 502 F.2d 1201 (9th Cir. 1974).

[98] Dkt. No. 77-1 at 27.

[99] 25 C.F.R. §169.401.

[100] *See, e.g., United States v. Santa Fe Pac. R.R. Co*., 314 U.S. 339, 355-56 (1941); *United States v. Dann*, 873 F.2d 1189, 1196 n.5 (9th Cir. 1989).

[101] *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942); *Navajo Tribe of Indians v. United States*, 364 F.2d 320 (1966).

[102] *Morton v. Ruiz*, 415 U.S. 199 (1974) (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973)); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381 (1969).

former tribal domains and facilitating Tribes' acquisitions of additional land.[103] In this instance, no action from the Agency entrusted to achieve the Act's purpose is contradictory, even antithetical, to Congress's intent.

On review, Courts will analyze mandamus relief in conjunction with relief under the Administrative Procedure Act ("APA").[104] In reviewing agency actions under the APA a court can "compel agency action unlawfully withheld or unreasonably delayed."[105]

The factors involved in reviewing unlawfully withheld or unreasonably delayed agency actions include: "(1) the time agencies take to make decisions must be governed by a 'rule of reason,' (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, the statutory scheme may supply content for this rule of reason, (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake, (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, (5) the court should also take into account the nature and extent of the interests prejudiced by delay, and (6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed'"[106] (hereinafter referred to as "the TRAC Test"). The Court should consider these factors rather than use the Government's low standard for an unfettered trustee.

---

[103] Newton, Nell Jessup; Cohen, Felix; and Anderson, Robert, "*Cohen's Handbook of Federal Indian Law*" (2012). Books. 76

[104] *In re A Comm. Voice v. U.S. Env't Prot. Agency*, 878 F.3d 779 (9th Cir. 2017); *Martin v. O'Rourke*, 891 F.3d 1338 (Fed. Cir. 2018); *Conservation Law Found. of New Eng., Inc. v. Clark*, 590 F.Supp. 1467, 1472 (D. Mass. 1984).

[105] 5 U.S.C. § 706(1).

[106] *In re Pesticide Action Network North America, Natural Resources Defense Council, Inc.*, 798 F.3 809, 813 (citing *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 79-80 (D.D.C. 1984)).

### i. Ordering the Cancellation of UPR's Rights of Way For Any Non-Railroad Use and Enforcing Trespass Regulations is Relief that Can Be Granted by Plaintiff's Mandamus claim.

Rights-of way approved under Title 25 "are subject to all applicable Federal laws." The 1888 Act imposed the following conditions on UPR's right-of-way: (1) if any of the lands are utilized for purposes other than railroad use, the lands shall be "forfeited and revert" and (2) the lands cannot be leased or sold by UPR, or the land will revert. All land under the 1888 Act is subject to this provision's language.  Under the Act, violating any of these conditions "shall operate as a forfeiture of all the rights and privileges of said railway company." In conjunction, applicable federal regulations state that when a right-of-way has not been used for the purpose for which it was granted for a consecutive two-year period, the Secretary will issue a written notice of termination to the grantee at its latest address.[107] If the grantee fails to correct the basis for termination, the Secretary shall issue an appropriate instrument terminating the right-of-way.

In addition, federal regulations state that unauthorized use of an existing right-of-way is considered a trespass. Even though, Defendants were aware of the trespasses occurring on the land as late as 2010, the 2012 DOI Notice Letter served as the notice of improper use of the subject lands, and the Government appeared to fully admit that trespass was occurring. The DOI Notice Letter informed UPR of the automatic reversion of subject lands and that it had evidence of other improper uses. UPR failed to correct the improper use within thirty days and has continued to trespass by using the subject lands improperly for over two years. However, unauthorized use continues because the Government has unreasonably delayed deciding if it will enforce trespass provisions or not, nine years after learning of it in the litigation request letter. Nine years is an unreasonable delay.

The 1888 Act's conditions were violated requiring the entirety of rights-of-way to be cancelled. Further, UPR is now considered to be a trespasser on the subject land and the

---

[107] *See, e.g.*, 25 C.F.R. §169.401.

Government has failed to enforce their own directive. Refusing to cancel the rights-of-way and refusing to enforce trespassing provisions leaves the Tribes without full use of the subject lands and unable to gain material benefits from them.

> ### ii. Compelling Defendant to Provide Litigation Assistance and Conduct a Survey of Rights-of-Way is Relief that Can Be Granted by Plaintiff's Mandamus claim.

The Government is required to represent Tribes "in all suits at law and in equity." The Tribes first requested litigation assistance in 2010. It again requested assistance in January 2011. Despite the Tribes' repeated attempts, the Government never responded.

At the time the Amended Complaint was filed on November 14, 2018, eight years had passed without a response from the Government. Treating the allegations in the Amended Complaint as true, the Court can easily determine that waiting over eight years to respond to litigation assistance is unlawfully withheld or unreasonably delayed action. By not responding, the Government has not only obstructed the transfer, but also has left the Tribes unsure if it will be responsible for the extensive litigation expenses it has incurred to persist with its requests to record and now to pursue this action.

Furthermore, when notified of a specific compliance issue, including non-use, Defendants "will promptly initiate an appropriate investigation." While §169.492(a)(1) informs grantees that in the instance of suspicion of non-compliance BIA agents may enter the Indian land subject to a right-of-way at a reasonable time with reasonable notice, the specific and mandatory duty imposed is to "protect the interests of the Indian landowners and to determine if the grantee is in compliance with the requirements of the right-of-way."

On March 3, 2011, the Tribes requested survey information from the Government for three areas (1) north of the main rail yard to the Reservation boundary, (2) the Inkom station grounds, and (3) the McCammon station grounds.  After the request, Defendants should have promptly

acted.   Seven years have passed from the first request to the filing of the Tribes' Amended Complaint, and Defendants have unreasonably delayed a response to the survey request.

The Tribes are prejudiced by the Government's actions, since the Government asserts that certain parts of the Tribes' claims are now time-barred. The Government's own failure to respond to the Tribes' litigation assistance request is the main contributing factor for any perceived delay and their failure to conduct a survey leaves the Tribes unable to know the full extent of right-of-way violations.

Defendants come before this Court with unclean hands.  The Tribes sought assistance multiple times, beginning in 2010, and the Government never responded. This lack of response has resulted in the Tribes having no other option but to seek relief under mandamus for assistance.

### iii.   Compelling Defendant to Transfer the reverted parcels into trust and to Record the Subject Lands in the Land Titles and Records Office is relief that can be granted by Plaintiff's Mandamus claim.

The 1888 Act mandates "that when any of the lands granted to the railway company for the right-of-way and station grounds shall cease to be used for purposes specified, it shall revert to the Indians."   Upon reversion, the Land Titles and Records Offices, within the BIA, are "designated as the offices of record and are hereby charged with recording, providing custody, and maintaining records affecting titles to Indian lands, to examine titles, and to provide title status reports for [Indian] land."   Bureau officials delegated authority by the Secretary to approve title documents or accept title are responsible for prompt compliance with the recording requirement.

In 1989, UPR notified the BLM Pocatello Resource Area of its partial relinquishment of rights on land no longer being used for railroad purposes.  Except for the 49.92 acres conveyed to the Tribes by Public Law 86-784 on September 14, 1960, the reverted land remained in Defendants' possession. No railroad companies have claimed interest since the 1989 relinquishment, yet it continues to remain in Defendants' possession.  In 2012, Defendants themselves informed UPR of the automatic reversion for the bus depot, credit union building, and

parking lot.  These three parcels were mentioned specifically, but the DOI Notice Letter was not exclusive to those parcels and further stated evidence of "several additional uses that are for non-railroad purposes and which do not comply with the Congressional easement grants."

Upon reaching its conclusions regarding automatic reversion in the DOI Notice Letter, the Government failed to promptly record the Tribes' interest in the subject lands.  The subject lands remain unrecorded.  In February 2013, Plaintiff contacted Defendants about the reverted land. Plaintiff again contacted Defendants in September 2015.  Again Plaintiff reiterated its request to Defendants in 2016.  Most recently, the Plaintiffs submitted a third request in April 2018.  Despite the first automatic reversion, thirty years ago, and the second, seven years ago, and the Tribes' multiple requests to record, the Government continues to unreasonably delay transferring and recording subject lands into trust for Plaintiff.

Under the 1888 Act, automatic reversion implies that Defendants must act quickly.  The Government has not done this.  Although automatic reversion occurred, recognition of the reversion and transfer of the subject lands into trust never did.  Plaintiff has relied to its detriment upon the DOI Notice Letter stating that automatic reversion of the subject lands occurred and are now left waiting years for the Government to address the rights of way violations and transfer the subject lands into trust.

The Government inaccurately cites to *Wyandotte Nation v. Salazar* as an example. Defendant analogizes the facts in Salazar to this claim and asserts that when applied to situations of taking land into trust, mandamus can compel no one to act.  However, in Salazar, the Secretary did not have specific fiduciary duties because the land the Tribe desired to buy was not already held in trust.  The Wyandotte Nation was waiting for DOI to review an application to accept trust title to land and hold the land in trust for the benefit of the Tribe.  The Tribe desired land, not previously promised under prior legislation, to be accepted as held in trust.  Here, Plaintiff is awaiting the transfer of the reverted parcels, previously promised to them, into trust now that

certain actions have occurred that triggered the reversion. The operative facts differ. Salazar should not be applied here as the Tribes rightfully make a claim for mandamus to achieve the transfer of the reverted parcels into trust.

Under the 1888 Act, federal regulation, and the federal Indian trust responsibility, Defendants have a duty to act in support of the reversion of the lands back to the Plaintiff. The TRAC Test analysis shows that the claim for recording the subject lands is sufficient under Plaintiff's Amended Complaint. Unless the subject trust lands are recorded, it will not be known to the rest of the world that the subject lands, are in fact, Plaintiff's and the Tribes cannot fully use or benefit from them. Refusing to take this action results in Plaintiff having no remedy to "prevent alienation of their lands and waste or conversion of their land resources." The Government must complete the process of reversion by recording the subject lands.

> ### iv. Compelling Defendant to promptly provide all past and future benefits from grants and rights-of-way on tribal lands to Plaintiff is relief that can be granted by Plaintiff's Mandamus claim.

Compensation must be paid for a right-of-way on Tribal land. The compensation must be agreed upon and satisfactory to the Tribes. Application of the TRAC Test shows that benefits from the compensation for the land utilized for railroad purposes must go to the Plaintiff. Payments can be made directly to the Indian landowners (direct pay) or to the Agency on their behalf. Compensation payments should be timely passed on to Plaintiff whenever payments are received by Defendants. However, Defendants have received material compensation for subject lands that have never been given to Plaintiff. Until the Tribes receive rightful payment from the Government they cannot fully obtain the material benefits for the subject lands.

## IV. THERE IS A VIABLE ADMINISTRATIVE PROCEDURE ACT CLAIM AGAINST THE UNITED STATES FOR COUNT IX (BREACH OF TRUST—TRESSPASS).

According to the Administrative Procedure Act (APA), "a plaintiff seeking judicial review must: (1) identify some final agency action and (2) demonstrate that its claims fall within the zone

of interests protected by the statute forming the basis of its claims."[108] To state a claim under

706(1), a plaintiff must assert "that an agency failed to take a discrete action that it is required to

take."[109] An "unexplained inconsistency" is "a reason for holding an interpretation to be an

arbitrary and capricious change from agency practice under the Administrative Procedure Act."[110]

Longstanding agency interpretations cannot be altered without reasonable justification.[111]

The Tribes' complaint identifies various agency legal declarations of specific reversion

rights over discrete sections of land to be protected by the United States: 1928 BIA Letter and

1980 Memorandum; 1960 BIA Memo; 1973 BIA Reversion Letter; 2005 BIA Reversion Letter;

2008 BIA Shawver Decision; and 2012 DOI Notice Letter. These agency actions incorporated in

the Amended Complaint, which discuss the Breach of Trust claimed by the Tribes, (Exhibits 9, 14,

24-31, 39, 42) were, clearly within the zone of interests of the 1882 and 1888 Acts. These agency

actions all describe the trespassory nature of non-railroad uses and the Tribes' right of occupancy

pursuant to specific statutory duties of the Secretary. The 2014 BLM Official Statement contradicts

the prior legal descriptions of the Tribes' right but gives no explanation for the continued delay.

The Tribes' allegations regarding BIA, DOJ, BLM, and DOI actions satisfy the jurisdiction and

prudential doctrines like standing for Section 702 and 706 because the Tribes followed the above

APA rules.

---

[108] 5 U.S.C.A. §§ 551, 702; *WildEarth Guardians v. Bernhardt*, 2020 WL 6799068 (D.N.M., 2020); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. 2199, 2201–02 (2012).

[109] *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64, (2004); *Vietnam Veterans of America v. Cent. Intelligence Agency*, 811 F.3d 1068, 1079 (9th Cir. 2016).

[110] *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (2005).

[111] *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016); *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 863-64 (1984).

## V.   SOVEREIGN IMMUNITY DOES NOT BAR COUNT XVI (EJECTMENT).

Defendants mistakenly argue that there is no waiver of sovereign immunity upon which the Plaintiff can rely for a claim of ejectment against them and cite to the case of *McClellan v. Kimball* for this position. However, Defendants' position is not supported by *McClellan*.[112] The rule set forth in *McClellan* provides that a claim for ejectment will be construed as one for quiet title if it lacks allegations that a federal government official acted outside his or her authority (e.g., violated some federal statute or acted pursuant to an unconstitutional statute).[113]

A suit against a federal official for specific relief is not considered to be against the government, and thus is not barred by sovereign immunity, where the plaintiff alleges: "(1) action by officers beyond their statutory powers [or] (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void."[114]A suit for the recovery of the possession of property from an individual holding property as an officer of the Federal government does not constitute an action against the sovereign, so as to require its consent to be sued.[115]

Plaintiff has alleged claims against certain United States officers, including John Tahsuda III, Twyla Stange, Randy Thompson, Brian Steed, Michael D. Nedd, and Peter Ditton.[116] Plaintiff has raised allegations that these officers acted beyond their statutory and constitutional powers.[117] Thus, because the Plaintiff has brought a claim for ejectment against certain federal officials based upon allegations that these individuals acted beyond their statutory and constitutional powers, this

---

[112] *McClellan v. Kimball*, 623 F.2d 83 (9th Cir. 1980).

[113] *Wright v. Gregg*, 685 F.2d 340, 341-42 (9th Cir. 1982).

[114] *E.V. v. Robinson*, 906 F.3d 1082, 1091 (9th Cir. 2018) (internal citations omitted).

[115] *United States v. Lee*, 106 U.S. 196 (1882); *Tindal v. Wesley*, 167 U.S. 204 (1897); *Sawyer v. Osterhaus*, 195 F. 655 (N.D. Cal. 1912).

[116] Dkt. 21, Am. Compl. ¶12-18.

[117] *Id* at ¶¶ 19, 104.

Court can thus deny the Government's request to dismiss Count XVI in the Amended Complaint based on the lack of a waiver of sovereign immunity.

Moreover, as shown above, the Quiet Title Act's statute of limitations does not bar the Plaintiff's claim. The Defendants contend that the harms underlying the claim for ejectment occurred before the 2012 Settlement Agreement and are now barred by the plain language in the Settlement Agreement. The Government asserts that when the lands had ceased to be used for railroad purposes in 1998, the Plaintiff's claims began accruing. Defendants also claim that "any failure on the United States' part with respect to these lands arose years before May 16, 2012, so the 2012 Settlement Agreement bars the Plaintiff from pursuing its trespass-related breach of trust claim".[118]

An action for ejectment requires proof of (1) ownership, (2) possession by the defendants, and (3) **refusal of the defendants to surrender possession.**[119] The threshold question is to determine when a cause of action for ejectment has "accrued." Ninth Circuit courts have clarified that "for statute of limitation purposes, a federal claim is generally considered to accrue when the plaintiff knows or has reason to know of the injury which is the basis of the action.[120] It is well established that permissive possession is not adverse.[121] Thus, an ejectment claim cannot accrue, if a claimant possesses the land with the owner's permission.[122] The alleged facts shows that the Plaintiff's claim for ejectment did not accrue until after 2012. The series of contradictions from the Defendants after 2012 make it clear that the 2012 Settlement Agreement supporting the Tribes'

---

[118] Dkt. 77 at 14

[119] *Ada County Highway District v. Total Success Investments, LLC,* 145 Idaho 360, 369, 179 P.3d 323, 332 (2008).

[120] *Schulz v. Milne*, 98 F.3d 1346 (9th Cir. 1996).

[121] *Scott v. Elliott*, 451 P.2d 474 (1969).

[122] *Id*.

claims shows that the Tribe was not aware that the cause of action had accrued until after the 2012

Settlement Agreement.

**VI.     DISMISS COUNT I WOULD BE INCONSISTENT WITH THE PLAIN TEXT OF THE DECLARATORY JUDGMENT ACT, SINCE THE TRIBES HAVE PROVIDED A BASIS FOR JURISDICTION OTHER THAN THE DECLARATORY JUDGMENT ACT.**

The Government's position that Count I should be dismissed because a declaratory

judgment is a remedy and reliance upon *Burns Ranches, Inc. v. U.S. Dep't of the Interior*[123] is

misplaced. The Declaratory Judgment Act provides that "In a case of actual controversy within its

jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may

declare the rights and other legal relations of any interested party seeking such declaration, whether

or not further relief is or could be sought."[124]

The Declaratory Judgment Act "confer[s] on federal courts unique and substantial

discretion in deciding whether to declare the rights of litigants."[125] The Act should be liberally

construed to achieve the objectives of the declaratory remedy.[126] The purpose of the Declaratory

Judgment Act is to give litigants an early opportunity to resolve issues without waiting for a federal

cause of action to accrue or be brought.[127]

Some courts have "muddied the waters" by stating that the Declaratory Judgment Act "does

not create 'a cause of action.'"[128] But these cases should be read as "simply reiterating the well-

established principle" that the Declaratory Judgment Act does not create substantive rights or

---

[123] 851 F. Supp. 2d 1267 (D. Or. 2011).

[124] 28 U.S.C. § 2201(a).

[125] *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).

[126] *McDougald v. Jenson*, 786 F.2d 1465, 1481 (11th Cir. 1986); *Aralac, Inc. v. Hat Corp. of America*, 166 F.2d 286, 291 (3rd Cir. 1948).

[127] *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, 1172 (9th Cir. 2002).

[128] *Holder*, 979 F.Supp.2d at 23 (citing e.g. *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 N. 3 (1st Cir. 2007); *Okpalobi v. Foster*, 244 F.3d 405, 423, n. 31 (5th Cir. 2001)).

"confer federal jurisdiction by itself."[129] "Any other interpretation would be inconsistent with the plain text of the Act."[130]

Plaintiff has provided a basis for this Court's jurisdiction other than the Declaratory Judgment Act.[131] Thus, dismissing Count I would be inconsistent with the plain text of the Act.[132] Additionally, Courts, such as the District Court of Idaho, have regularly recognized the rights of litigants to bring a separate cause of action for declaratory relief.[133]

Last, the Government argues that Count I is duplicative of the remedies the Tribes seek in its Prayer for Relief, but Federal Rule of Civil Procedure 57 provides that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."

Also, Government officials acting outside the scope of their authority are not protected by governmental immunity. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971). The Tribes allege specific duties they are owed to compel US officer action pursuant to the Mandamus and Venue Act of 1962. 28 U.S.C. § 1361. Trust obligations are governed by statute rather than common law like contract waiver principles.

The Government has not provided any justifiable basis showing why Count I should be dismissed. The Court can therefore deny the request to dismiss the Tribes' Declaratory Judgment Claim (Count I).

---

[129]*Committee on Oversight and Government Reform v. Holder*, 979 F.Supp.2d 1, 23 (citing *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)); *Skelly Oil Co. v. Phillips Petroleum Co*., 339 U.S. 667, 671-72 (1950).
[130] *Id* at 23-24.
[131] Dkt. 21, Am. Compl. ¶¶ 26-33.
[132] *Holder* 979 F. Supp. 2d at 23-24.
[133] *See Seaman v. Empire Airlines, Inc*., No. 2:16-CV-00304-EJL, 2017 WL 1731686 (D. Idaho May 3, 2017) (The Court denied a request to dismiss Count IV for Declaratory Relief); *Burch-Lucich v. Lucich*, No. 1:13-cv-00218-BLW, 2013 WL 5876317, *3 (D. Idaho Oct. 31, 2013) (The Court denied a request to dismiss Plaintiff's sixth claim, brought under the Declaratory Judgment Act.).

## CONCLUSION

The Government has shown no compunction about arguing in one breath that the lands are trust assets held for the Tribes subject to the 2012 Settlement, yet in the next breath that the Tribes do not have an interest in the lands at all. Like the Supreme Court in *McGirt*, this Court should reject such unprincipled arguments, and remember promises made, and "hold the Government to its word."[134]

Based on the foregoing points and authorities, the Court should deny the Government's renewed motion to dismiss and allow the Tribes to have their day in court.

DATED this 10th day of June 2021.

ECHO HAWK & OLSEN, PLLC

By: */s/ Mark A. Echo Hawk*
    Mark A. Echo Hawk
    Attorney for Plaintiff

SHOSHONE-BANNOCK TRIBES

By: */s/ Bill Bacon*
    William F. Bacon
    General Counsel

---

[134] *McGirt*, 140 S. Ct. at 2452.

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2021, the foregoing was electronically filed through the Court's CM/ECF system, which caused the following parties or counsel to be served by electronic means:

Kristofor R. Swanson
US Department of Justice
kristofor.swanson@usdoj.gov

Syrena C. Hargrove
US Attorney, District of Idaho
Syrena.Hargrove@usdoj.gov

Blake G. Hall
City of Pocatello
bgh@hasattorneys.com

Julianne P. Blanch
Union Pacific Railroad Company
JBlanch@parsonsbehle.com

Lee Radford
Union Pacific Railroad Company
LRadford@parsonsbehle.com

John Cutler
Union Pacific Railroad Company
JCutler@parsonsbehle.com

ECHO HAWK & OLSEN, PLLC


/s/ Mark A. Echo Hawk
Mark A. Echo Hawk