UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,<br><br>    Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>    Defendants. | Case No. 4:18-cv-00285-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiff's Motion to Reconsider. Dkt. 114. The Court has reviewed the record and briefs and finds that the facts and legal arguments are adequately presented. Therefore, to avoid further delay, the Court addresses the motion without oral argument. *See* Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

For the reasons below, the Court GRANTS IN PART and DENIES IN PART the motion.

## II. BACKGROUND

The Court has already explained the factual background of this case and incorporates that background by reference. *See* Dkt. 102, at 1–3; Dkt. 112, at 2–3.

In 2018, the Shoshone-Bannock Tribes of the Fort Hall Reservation ("Tribes") sued the United States and the City of Pocatello to recover lands in Pocatello no longer being used for railroad purposes. *See* Dkt. 1, at 2–3. In 2020, the United States moved to dismiss all the Tribes' claims. Dkt. 77 at 2. On December 16, 2021, the Court dismissed four of the

Tribes' claims: Counts V, VI, VII, and IX. Dkt. 102, at 29. On May 20, 2022, in response to the United States' Motion for Clarification and Reconsideration, the Court dismissed Count XVI. Dkt. 112, at 7.

On June 8, 2022, the Tribes moved to reconsider the Court's decisions pursuant to Federal Rule of Civil Procedure 54(b), arguing that the Court should not have dismissed any of their claims. Dkt. 114, at 2.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides in pertinent part:

> [A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

This rule makes explicit an "inherent procedural power" of district courts; namely, the power "to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (cleaned up). This power "is not subject to the limitations of [Federal] Rule [of Civil Procedure] 59," which provides for modification of final orders and therefore includes limitations that Rule 54 does not.[1] *Id*. However, for reasons of judicial economy, the review of even an interlocutory order is "generally disfavored," so "district courts are

---

[1] For example, Rule 59(e) provides that a motion for reconsideration "must be filed no later than 28 days after the entry of judgment." If this limitation applied to motions seeking reconsideration of interlocutory orders, the Tribes' motion to reconsider the Court's December 2021 order would be untimely because it was filed in May 2022. Dkt. 112.

MEMORANDUM DECISION AND ORDER - 2

frequently guided by substantially the same standards as those used to reconsider final orders pursuant to Rule 59(e)." *Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*, 2020 WL 2841517, at 10 (D. Idaho 2020). Both the Tribes and the United States ask the Court to apply those standards.[2] Dkt. 114-1, at 4–5; Dkt. 121, at 6.

The standards used to reconsider final orders pursuant to Rule 59(e) are rigorous. The Ninth Circuit has held that motions invoking Rule 59(e) should be granted only in three "highly unusual circumstances": (1) when there is newly discovered evidence, (2) when the court commits clear error or issues an order that is manifestly unjust, or (3) when there is an intervening change in the law. *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001); *School Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). The movant bears the burden of establishing one of these grounds. *See, e.g., United States v. Wetlands Water Dist.*, 134 F. Supp. 2d 1111, 1130-31 (E.D. Cal. 2001).

Because motions to reconsider pursuant to Rule 59(e) "[should] be granted sparingly," parties cannot use the motion "to relitigate old matters" or "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n. 5 (2008) (cleaned up). Accordingly, district courts do not abuse their discretion when they deny a motion for reconsideration on the grounds that the evidence could have been presented before. *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

---

[2] The City of Pocatello does not specify a standard. *See* Dkt. 122.

MEMORANDUM DECISION AND ORDER - 3

## IV. DISCUSSION

The Court now considers whether the Tribes have met their burden of showing newly discovered evidence, clear error, or intervening changes in law with respect to the counts the Court has dismissed.

### A. Counts V & VI

The Tribes suggest that the Court committed clear error because the statute of limitations did not bar their claim under the Quiet Title Act ("QTA"). Dkt. 114-1, at 6–37. Specifically, the Tribes argue that (1) the twelve-year statute of limitations did not begin to run in 2004; and that (2) even if it did, the United States abandoned their adverse claim in 2012 and 2014, thereby "reset[ing] the clock" for purposes of the statute of limitations. *Id*. at 15.

**1. Start-date of statute of limitations**

The QTA provides for suit against the United States when a party disputes the federal government's ownership to land. 28 U.S.C. § 2409(a). An action brought under the QTA must be "commenced within twelve years of the date upon which [the action] accrued." 28 U.S.C. § 2409a(g). An action accrues "on the date that plaintiff or his predecessor in interest knew or should have known of the claim of the United States." *Id*. A plaintiff knows or should know about an adverse claim when "the United States' action would have alerted a reasonable landowner that the government claimed an interest in the land." *Shultz v. Dep't of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989).

In this case, the Court gave three reasons for why the Tribes should have known by 2004 that the United States claimed an interest in the land: (1) the land was not being used

for railroad purposes since 1993; (2) the land was being managed by the Bureau of Land Management ("BLM"), not the Bureau of Indian Affairs ("BIA"); and (3) in 2004 the BLM sent a memo to the Tribes stating that "ownership of the lands in question is not 100 percent clear." Dkt. 102, at 15–17. Therefore, because the Tribes' claim accrued in 2004, the Court held that the statute of limitations barred the Tribes from bringing their QTA claim in 2018. *Id*. at 18.

The Tribes argue that the Court erred because (1) it failed to take into account three memoranda suggesting that the United States did not claim an adverse interest in the land[3] and (2) the evidence that the Court relied on did not provide reasonable notice. *Id*. at 13–21. The Court will address each argument in turn.

a. Evidence the Court did not take into account

(i) 1960 memo

In 1960, a BIA officer issued a memorandum on a congressional proposal to transfer land to the Church of Jesus Christ of Latter-day Saints. Dkt. 22-12, at 2. The officer described the land in question and opined that the bill "[was] an attempt by Congress to extinguish a right guaranteed the Shoshone-Bannock Tribes in the Act of September 1,

---

[3] The Tribes also argue the Court should consider additional documents submitted with their motion for reconsideration, including declarations of three individuals and various letters, memoranda, and legal documents. Dkt. 114-1, at 23. None of these documents were presented to the Court originally. In addition, the Tribes do not allege that they reasonably could not have presented the documents originally or that the documents are "newly discovered evidence."

Therefore, because parties cannot use a motion to reconsider "to present evidence for the first time when [the evidence] could reasonably have been raised earlier in the litigation," the Court will not consider this evidence. *Baker*, 554 U.S. at 485 n. 5 (cleaned up); *Bishop*, 229 F.3d at 890 (holding district court did not abuse discretion by denying motion for reconsideration because movant's evidence could have been presented before).

MEMORANDUM DECISION AND ORDER - 5

1888." *Id*.

The Tribes argue that this memo "indicates the United States understood rights in the 1888 Act were still in effect to protect the rights guaranteed to the Tribes." Dkt. 114-1, at 18. The Tribes do not explain, however, how this memorandum reasonably led them to believe that the United States did not claim an interest in their land. Significantly, Congress passed the bill, and land was transferred to the Church of Jesus Christ of Latter-day Saints, as the Tribes themselves acknowledge. Dkt. 21, at 55. Therefore, to the extent that the memorandum disclaimed the United States' interest in the land, reliance on the memorandum became unreasonable after the bill's passage.

### (ii) 1973 memo

In 1973, the BIA's assistant regional solicitor issued a memorandum on the status of the land then being used by the railroad companies. Dkt. 22-12, at 13–16. He believed that the Tribes had no right to use the land because the land "[was] owned in fee by the railroad, subject only to a complete reversion of title to the Tribes and/or the United States sometime in the future when the railroad cease[s] to use the land for the purposes so granted." *Id*. at 14–15.

The Tribes argue that "the United States in the 1973 Memo clearly recognizes the right-of-way lands revert to the Tribes when they no longer are used for a railroad purpose." Dkt. 114-1, at 18. However, the Tribes ignore that the memorandum states that the land reverts to the Tribes or to the United States. Additionally, the Tribes do not explain why it was reasonable to rely on this internal memorandum when a later memorandum directed to the Tribes stated that ownership of the land was in doubt. Therefore, this memorandum

does not negate the reasonable notice provided to the Tribes.

### (iii) 2005 memo

In 2005, the BIA's regional solicitor general sent a memorandum to a BIA superintendent about the status of lands formerly used for railroad purposes. The memorandum concluded that

> [o]ne thing is clear; when the lands cease to be used for railroad purposes, the railroad company forfeits its interest in the land. The railroad would not have been able to transfer its interest in the rights of way to a third party other than another railroad company, the Tribes or the U.S.

Dkt. 22-6, at 13–14.

The Tribes assert that whatever notice existed in 2004 was "overcome" by the position in this memorandum, but they do not explain how. Dkt. 114-1, at 21. The memorandum provides that the railroad could legally transfer its interest to the United States. Therefore, the position in this memorandum is consistent with the United States' assertion of a claim adverse to the Tribes.

### b. Evidence relied on by the Court

### (i) 2004 memo

In February 2004, the Tribes made a request to the BLM pursuant to the Freedom of Information Act (FOIA) for documents relating to the status of the land. Dkt. 77-7, at 22. In March 2004, the BLM responded to that request and provided the Tribes with the relevant documents. *Id*. The documents included an internal memorandum discussing the nature trail built in the early 90s and stating that "ownership of the lands in question is not 100 percent clear." *Id*. at 30. The memorandum concluded that the building of the nature

trail was authorized. *Id*.

The Tribes suggest that reliance on the memorandum is misplaced because the memorandum "[is] buried in the middle of [an] FOIA response." Dkt. 114-1, at 6. The memorandum, however, was one of the documents the Tribes requested because it related to the status of the land. It is reasonable to assume that the Tribes reviewed all the documents BLM sent them pursuant to their inquiry, even those "buried in the middle."

The Tribes also suggest that the language in the memorandum does not "rise to the level of an express adverse claim." *Id*. The QTA does not require the adverse claim to be express. *See, e.g, Kane Cnty. v. United States*, 772 F. 3d 1205, 1212 (10th Cir. 2014) ("a plaintiff must show that the United States has either expressly disputed title or taken action that implicitly disputes it."). Because the memorandum approves the building of the nature trail on the land the Tribes claim is theirs, it contributed to providing reasonable notice of the United States' interest in the land.

### (ii) BLM's management

Since 1993, the BLM and not the BIA has been managing the land in question. Dkt. 102, at 16. The Tribes argue that this fact did not contribute to reasonable notice because 15 U.S.C. § 176 provides that the BLM will conduct surveys of Indian reservations when surveys are needed. Dkt. 114-1, at 13. However, the Court did not rely on the BLM conducting surveys on the land in question; rather, the Court relied on the BLM *managing* the land for years. Dkt. 102, at 16. This continuous management contributed to putting the Tribes on notice of an adverse claim because the BLM does not have authority to regulate or manage lands held in trust for Indian tribes; the BIA does. *See* 25 U.S.C. § 2.

## 2. Abandonment of adverse claim

The Tribes proceed by arguing that even if the statute of limitations began in 2004, it was reset three different times when (1) the Tribes and the United States signed the Salazar Agreement, (2) the BIA sent a letter to the railroad discussing rights to the land, and (3) the BLM accepted the railroad's relinquishment of the land. Dkt. 114-1, at 21–23, 35–37.

### a. Salazar Agreement

In 2012, the Tribes and the United States signed the Salazar Agreement, settling the Tribes' previous claims against the government. Dkt. 102, at 2. The Tribes argue that the settlement reset the statute of limitations because it "provided notice to the Tribes [that] the U.S. was not making an adverse claim to the land." Dkt. 114-1, at 39. The Tribes argue that the agreement "reaffirmed Tribal ownership" because of Section 6(i), which states:

> Exception to Plaintiff's Release, Waiver, and Covenant Not to Sue. Notwithstanding the provisions of Paragraph 4 above, nothing in this Joint Stipulation of Settlement shall diminish or otherwise affect in any way: . . .
>
> i. Plaintiff's claims against third parties for the wrongful use of railroad rights-of-ways located off the Fort Hall Reservation.

*Id.* at 39–40; Dkt. 77-3, at 7, 9.

"If the government has apparently abandoned any claim it once asserted, and then it reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted." *Shultz v. Department of Army*, 886 F.2d 1157, 1161 (9th Cir. 1989). The Salazar Agreement does not "reaffirm tribal ownership" because it does not state that the Tribes own the land or that the United States

MEMORANDUM DECISION AND ORDER - 9

is abandoning any interest in the land. Significantly, the agreement allows the Tribes to sue third parties but not the United States. Therefore, the agreement does not reset the statute of limitations.

### b. 2012 letter

In 2012, the BIA sent a letter to the railroad company about land parcels the company illegally sold. Dkt. 22-11, at 10–12. The Court decided that this letter did not restart the statute of limitations because the parcels of land were not the lands at issue in Counts V and VI. Dkt. 102, at 16. The Tribes now argue that the Court erred because the letter contained "several general statements relating to the entire right-of-way [that] were not limited to the [particular parcels of land]." Dkt 114-1, at 25. The Tribes cite the following language:

> [B]y operation of the explicit Congressional language in the grants, the reversion in the United States has now vested in those areas. We, therefore, wanted to notify you that due to this automatic reversion, we believe that the areas within the grant that are being used for purposes not authorized by the grants have reverted to the United States in trust for the ShoShone-Bannock Tribes.

Dkt. 22-11, at 11.

The Tribes do not explain how the language is not limited to the parcels of land. The antecedent of "this automatic reversion" is clearly "the reversion . . . *now vested in those [particular] areas*." (emphasis added). Therefore, the Tribes have not shown that the Court's reading of the letter was inaccurate or that the letter reset the statute of limitations.

### c. 2014 decision

In 2014, the BLM formally accepted the railroad's 1989 relinquishment of the land

to the United States. Dkt. 77-7. The Tribes argue this decision constituted abandonment of an adverse claim because the railroad's notice of relinquishment land quoted the 1888 Act. Dkt. 114-1, at 25. The Tribes conclude the BLM's acceptance of the relinquishment was made pursuant to that Act, which provides that lands no longer used for railroad purposes should revert to the Tribes or the United States. 25 Stat. 452 at § 11.

The Tribes have not shown how the 2014 decision restarts the statute of limitations. The decision is merely a formal acceptance of the relinquishment; it does not state that the United States forgoes any previous interest in the land, and it does not state that the relinquishment is accepted pursuant to the 1888 Act. Even if it did, the United States is not thereby committed to relinquishing its interest in the land, given that the 1888 Act provides that the lands revert to the Tribes or to the United States. *Id*.

### 3. Summary

The Tribes have not met their burden of establishing that the Court committed clear error in holding that their claims under the QTA were time-barred. The evidence the Court allegedly failed to consider does not prove that the Tribes' claim accrued after 2004. And the evidence the Court discussed supported its finding that by 2004 the Tribes had reasonable notice of the United States' adverse claim. Therefore, the Court will not revise its dismissal of Counts V and VI.

### B. Count VII

The Tribes next suggest that the Court committed clear error in dismissing Count VII because both the 1888 Act and BLM's 2014 decision separately establish a plainly prescribed command for which a writ of mandamus is proper. Dkt. 114-1, at 41–42.

**1. 1888 Act**

The 1888 Act concerns tribal lands over which railroad companies have an easement. *See* 25 Stat. 452 at Art. II, Art III § 11. Specifically, it provides for what happens to those lands once railroad companies stop using the lands for railroad purposes. *Id*. at § 11. The Tribes claim the following statutory language provide the relevant command:

> *Provided*, That no part of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used, except in such manner and for such purposes only as shall be necessary for the construction, maintenance and convenient operation of a railway, telegraph or telephone lines, and *when any portion thereof shall cease to be so used, such portions shall revert to the tribe or tribes of Indians from which the same shall have been taken*, or in case they shall have ceased to occupy said reservation, to the United States, . . . .

Dkt. 114-1, at 41–42; 25 Stat. 452 at § 11 (emphasis added). The duty suggested by this language, however, is obscured by an earlier passage in the same section:

> *Provided*, That all lands acquired by said railway company near its station at Pocatello for its use for station grounds, depot buildings, shops, tracks, side-tracks, turn-outs, yards, and for water purposes, as hereinbefore provided, shall, whenever used by said railway company, or its assigns, for other purposes, be forfeited and revert to the United States, . . . .

25 Stat. 452 at § 11. Therefore, on the face of the statute it is unclear whether the land should revert back to the Tribes or to the United States. Even if it were clear, courts issue writs of mandamus "only to command an official to perform an act which is a positive command and so plainly prescribed as to be free from doubt. The claim must be clear and certain and the duty of the officer ministerial." *Smith v. Grimm*, 534 F. 2d 1346, 1352 (9th Cir. 1976); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (agency

action must be "discrete" and "demanded by law").

In this case, the six actions for which the Tribes seek a writ of mandamus are not "so plainly prescribed" by this statutory language "as to be free from doubt." In fact, none of the actions are prescribed at all. The first action, for example, is that the "the BIA and United States immediately approve the Tribes' litigation assistance request regarding related claims in this civil action." Dkt. 21, at ¶ 423. Nothing in the statutory language relied upon by the Tribes "plainly prescribes" that the BIA and the United States must assist the Tribes with their litigation. Therefore, the Court cannot issue a writ of mandamus based on this statute.

## 2. BLM's 2014 decision

As explained above, in 2014 the BLM issued a decision accepting the railroad's relinquishment of an easement granted to it from the 1888 Act. Dkt. 77-7. The Tribes argue that the following language from that decision provides a clear command for which a writ of mandamus may be sought:

> At this time the BLM accepts the relinquishment of that portion of the right-of-way that was intended to be relinquished and the railroad will continue to use the remainder (mainline) under right-of-way.

Dkt. 114-1, at 42; Dkt. 77-7. The right-of-way refers to rights surrendered in a 1989 letter from the railroad's director:

> I am writing. . . regarding the Railroad's desire to relinquish certain right-of-way it acquired for a water pipeline and reservoir site at Pocatello, Idaho, under Section 11 of the Act of Congress approved September 1, 1888 . . .
>
> Our review of Section 11 of said Act indicates that the right-

MEMORANDUM DECISION AND ORDER - 13

> of-way the Railroad elects to relinquish reverts to the United States in accordance with the provisions contained therein, which state: "when any portion thereof shall case to be used, such portion shall revert to the to the tribe or tribes of Indians from which the same shall have been taken, or in case they shall have ceased to occupy said reservation, to the United States.

Dkt. 22-9, at 2–3.

The Tribes assert that "there is nothing discretionary about the wording nor is it unclear," but the Tribes have not shown how the BLM accepting the railroad's relinquishment constituted "a command to perform [the six actions]." Dkt. 114-1, at 42. Nothing about the BLM's acceptance "clear[ly] and certain[ly]" establishes a discrete duty, for example, to "conduct a survey of all right-of-way lands granted under the Act of 1882 and the Act of 1888 to ascertain whether there are any non-railroad uses of right-of-way lands,"—the sixth action that the Tribes seek to compel. Dkt. 21, at ¶ 23. Therefore, the Court cannot issue a writ of mandamus based on this 2014 BLM decision.

Because neither the 1888 Act nor the 2014 BLM decision prescribes the six actions the Tribes seek to compel, the Tribes have not demonstrated that the Court clearly erred in dismissing their request for a writ of mandamus.

### C. Count IX

The Tribes suggest that the Court committed clear error in dismissing their breach of trust claim because the 1888 Act coupled with the 2014 BLM decision established a trust duty that the BIA violated. Dkt. 114, at 40–41. The Tribes argue that the Court should have considered the 1888 Act and the 2014 BLM decision as possible sources of the trust duty, in addition to the agency decisions and federal regulations considered. *See Id*.

Under the Administrative Procedure Act ("APA"), a plaintiff can challenge an agency's inaction if the agency "failed to take a discrete agency action that it is required to take." *Norton*, 542 U.S. at 64; *see* 5 U.S.C. § 706. Here, the Tribes challenge the BIA's failure to bring trespass actions on the grounds that the 1888 Act and 2014 BLM decision require the agency to do so. *See* Dkt. 21, at 65; Dkt. 114, at 40–41. The Tribes' argument fails for two reasons.

First, the Tribes could have made this argument earlier in the litigation. As explained above, the Tribes cannot use a motion for rehearing to "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Baker*, 554 U.S. at 485 n. 5 (2008) (cleaned up).

Second, even if the Tribes had made this argument before, the Tribes have not established that the BIA "failed to take a discrete agency action that it is required to take." *Norton*, 542 U.S. at 64. The Tribes do not allege that the 1888 Act or 2014 decision explicitly or implicitly require the BIA to bring trespass actions. Therefore, the Tribes have not demonstrated that the Court committed clear error in dismissing their breach of trust claim under the APA.

### D. Count XVI

**1. Against the United States**

The Tribes suggest that the Court clearly erred in dismissing their claim of ejectment and restitution of property against the United States because the statute of limitations has not run. Dkt. 114, at 42.

Historically, plaintiffs seeking to challenge the United States' claim to land circumvented sovereign immunity by suing individual government officers in ejectment and restitution of property. *See Block v. North Dakota ex. Rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280-82 (1983); Dkt. 91, at 31. This device, called an officer's suit, was eliminated when Congress passed the QTA, which "provided the exclusive means by which adverse claimants could challenge the United States' title to real property." *Block*, 461 U.S. at 284–86. As noted above, the QTA imposes a twelve-year statute of limitations. 28 U.S.C. § 2409a(g)

The Tribes assert that the "the statute of limitations does not warrant dismissal of the Tribes claims [in ejectment and restitution of property] against the United States," presumably because the statute of limitations applies only to actions to quiet title under the QTA. Dkt. 114-1, at 42. But the Tribes cannot sue the United States in ejectment and restitution of property; as stated above, the officer's suit device has been eliminated. *Block*, 461 U.S. at 284–86 (holding North Dakota could not dispute United States' title to land under officer's-suit theory). Therefore, it is irrelevant whether the Tribes' action in ejectment and restitution was brought within the statute of limitations.

**2. Against the City of Pocatello**

The Tribes also suggest that the Court committed clear error because the QTA does not bar an action in ejectment and restitution of property against third parties, such as the City of Pocatello. Dkt. 114-1, at 42–43. The City of Pocatello does not address this argument.

The QTA concerns land disputes with the United States, not with individual states, cities, or counties. *See* 28 U.S.C. § 2409a. There is no case law suggesting that the QTA eliminates actions in ejectment and restitution of property against local government entities. Furthermore, Indian tribes have a federal common law cause of action in ejectment, and local governments do not possess sovereign immunity. *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235 (1985) ("That an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question.") (cleaned up); *see Lincoln Cnty. v. Luning*, 133 U.S. 529 (1890). Put simply, Indian tribes can dispute local government claims to land in an ejectment action. *See Oneida*, 470 U.S. at 236 (holding Indian tribes could maintain cause of action against local counties).

In the 2022 order, the Court dismissed the Tribes' ejectment claim "with regards to both the Government [of the United States] and the City of Pocatello." Dkt. 112, at 6. The Court's discussion in that order, however, addressed the claim in ejectment against the United States and not against Pocatello. *Id*. at 4–6. Its reasoning does not apply to suits against local government entities. Therefore, the Court committed clear error in dismissing the Tribes' ejectment claim against Pocatello and revises its dismissal of Count XVI accordingly.

## V. CONCLUSION

The Court did not commit clear error in dismissing Counts V, VI, VII, or IX. The Court also did not commit clear error in dismissing Count XVI against the United States, but it did commit clear error in dismissing Count XVI against the City of Pocatello.

Consequently, the Tribes' Motion to Reconsider is GRANTED with respect to Count XVI against the City of Pocatello and DENIED in all other respects.

## VI. ORDER

It is HEREBY ORDERED that:

1. The Tribes' Motion to Reconsider (Dkt. 114) be GRANTED IN PART and DENIED IN PART as outlined above.

2. The Court promptly issue a notice of litigation order so the parties can develop a litigation plan governing the remainder of this case.

DATED: March 10, 2023

David C. Nye
Chief U.S. District Court Judge