UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,<br><br>Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No. 4:18-cv-00285-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiff Shoshone-Bannock Tribes of the Fort Hall Reservation's (the "Tribes")[1] Amended Motion for Leave to File Second Amended Complaint. Dkt. 155. Defendant United States of America opposes the Motion. Dkt. 156.[2]

Having reviewed the record and briefs, the Court finds the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motion without oral argument. Dist. Idaho Loc. Civ.

---

[1] Grammatically, the parties differ on whether "the Tribes" is a singular or plural entity. The Court will follow the format used by the Tribes which is to treat the entity as singular.
[2] Defendants Union Pacific Railroad and City of Pocatello took no position on the Motion.

R. 7.1(d)(1)(B). Upon review, and for the reasons set forth below, the Court DENIES the Tribes' Motion.

## II. BACKGROUND

This case concerns several parcels of land in Pocatello, Idaho, that were originally part of the Fort Hall Indian Reservation. Pursuant to acts of congress is 1882 and 1888, these lands were ceded to the United States. The United States, in turn, granted rights-of-way to Union Pacific Railroad's predecessor. Act of July 3, 1882, 47 Cong. ch. 268, 22 Stat. 148 ("1882 Act"); Act of Sept. 1, 1888, 50 Cong. ch. 936, 25 Stat. 452 ("1888 Act"). The Tribes allege the lands reverted to the United States to hold in trust for the Tribes when they were no longer put to railroad use. As against the United States specifically, the Tribes endeavor via this lawsuit to have the lands recorded and managed as trust property.

The procedural history of this case is lengthy. The Tribes initiated suit on June 26, 2018. Dkt. 1. An early Motion to Dismiss filed by the United States (Dkt. 20) was followed by an Amended Complaint (Dkt. 21). The United States withdrew its original Motion to Dismiss and filed a subsequent Motion to Dismiss the Amended Complaint. Dkt. 41. Before responding to that Motion, the Tribes sought clarification of its 2012 Settlement Agreement (the "Settlement Agreement") with the United States that had disposed of many claims related to tribes and Indian reservations. Those proceedings, per the Settlement Agreement, had to take place in the District of Columbia. Accordingly, the Court stayed this case and sent the parties to Washington D.C. Dkt. 59.

Upon completion of the proceedings in the District of Columbia District Court, the Tribes voluntarily dismissed several claims against the United States—including its

accounting, treaty violation, and conversion claims. Dkt. 73. In response, the United States withdrew its prior Motion to Dismiss and filed a new Motion to Dismiss. Dkt. 77.

Ruling on the United States' Motion to Dismiss, the Court dismissed two of the Tribes' Quiet Title Act ("QTA") claims, as well as its mandamus and breach of trust claims. Dkt. 102, at 29. The Court later reconsidered the Tribes' ejectment claim against the United States, dismissing it with prejudice. Dkt. 112, at 7.

The Tribes then sought reconsideration of the Court's dismissal of those claims. Dkt. 108. The Court denied that Motion with respect to claims against the United States. Dkt 126, at 17–18. After the Supreme Court's decision in *Wilkins v. United States*, 598 U.S. 152 (2023), the Tribes again sought reconsideration of the Court's dismissal of its QTA and ejectment claims. Dkt. 131. The Court subsequently granted reconsideration of the Tribes' previously dismissed QTA claims, as the United States agreed was warranted, but again denied reconsideration of the ejectment claim. Dkt. 144, at 7. The Court also denied the Tribes' motion for leave to appeal the dismissal of any other claims. *Id*.

At that point, only five QTA claims, each of which concerns a specific parcel or land area, and related declaratory judgment claim remained against the United States under the Amended Complaint. *See generally* Dkt. 21.

The Tribes then filed a Motion for Leave to File a Second Amended Complaint. Dkt. 142. After withdrawing that Motion, the Tribes filed the instant Amended Motion for Leave to File Second Amended Complaint. Dkt. 155. The Government responded in opposition. Dkt. 156.

MEMORANDUM DECISION AND ORDER - 3

It should also be noted that, around this time, the United States filed a separate lawsuit, on behalf of the Tribes, against Union Pacific Railroad. *See* Case No. 4:24-cv-00226-DCN. Two claims are at issue in that case: Declaration of Title and Ejectment. The Tribes intervened in that case and have filed a complaint containing similar claims to some at issue in this case. The parties are collectively waiting for this decision to determine the scope of each lawsuit; namely, which claims can proceed and in which case.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given when justice so requires." Leave to amend lies within the sound discretion of the trial court, which "must be guided by the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).

That said, "[a] motion for leave to amend may be denied if it appears to be futile or legally insufficient." *Leary v. Idaho*, 2009 WL 701473, at *4 (D. Idaho Mar. 17, 2009) (citing *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988)); *see also* Fed. R. Civ. P. 15(a)(2). "[W]hen a proposed amendment would be futile, there is no need to prolong the litigation by permitting further amendment." *Wold v. El Centro Fin., Inc.*, 2009 WL 1738464, at *1 (D. Idaho June 17, 2009) (*quoting Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1088 (9th Cir. 2002)).

### IV. DISCUSSION

As noted, this case is relatively old—having been filed in 2018—but still in the infancy of litigation—with limited to no discovery having been conducted. And that delay

is neither parties' fault. The case was stayed for a time and had to be heard in another court. Different judges have presided over this case, and some of the delay is due to the Court's heavy docket. But at this stage, the case needs to move forward. Adding (or resurrecting) more claims would only invite another round of motions to dismiss and further delay. And insofar as the parties have presented substantive arguments regarding the viability of the proposed claims, the Court is able to analyze the issues to a significant degree.

### A. Breach of Trust, Ejectment, and Mandamus Claims (proposed counts II, VIII, and XI)

As noted, the Court previously dismissed these three claims. Dkt. 102, at 29. Notably, the Court dismissed the Tribes' ejectment claim with prejudice. Dkt. 112, at 7. The Tribes sought reconsideration as to each dismissal, and the Court denied those requests as well. Dkt. 126, at 17–18 (denying motion to reconsider as to breach of trust and mandamus claims); Dkt. 144, at 5–6 (denying reconsideration of ejectment claim).

The Tribes purport to bring the breach of trust claim under the Administrative Procedure Act ("APA"). The mandamus claim is likewise construed as a claim seeking to compel agency action under APA Section 706(1).

The Court previously noted the Tribes had not identified a final agency action by the Bureau of Indian Affairs ("BIA") that the Court could review under the APA. Dkt. 102, at 22–24. The Tribes' proposed Second Amended Complaint does not remedy this concern. While it alleges in a *separate* count that the BIA "unlawfully withheld agency action by refusing to record [certain property]", Dkt. 155-1, at 20, the Tribes did not identify any

new agency action or new legal basis to support these specific claims.[3]

As for the ejectment claim, the Court dismissed that claim with prejudice, and it cannot be reasserted. As explained in prior decisions, that claim fails as a matter of law. *See* Dkt. 112, at 6; Dkt. 126, at 16; Dkt. 144, at 5–6.

The Tribes' Motion to Amend as applied to claims already dismissed is DENIED. The Tribes may not reassert a breach of trust, ejectment, or mandamus claim because doing so would be in opposition to the Court's prior rulings and an exercise in futility.

### B. Tort/Contract Claims (proposed counts VII, IX, and X)

The Tribes' proposed Second Amended Complaint asserts trespass, conversion,[4] and unjust enrichment claims. Trespass and conversion are both torts, *Greenwade v. Idaho State Tax Comm'n*, 808 P.2d 420, 422 (Idaho Ct. App. 1991), while unjust enrichment is a quasi-contract claim, *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1309 (Fed. Cir. 2003). To bring each of these claims, the Tribes would need to identify a waiver of sovereign immunity.[5]

The United States claims "the Tribes have not identified a waiver of sovereign immunity for [these claims]." Dkt. 156, at 14. This is not entirely true. In its reply brief,

---

[3] In its Reply, the Tribes state the Court should allow the mandamus claim to stand in order to compel the United States to comply with its duties and anything the Court may order. Dkt. 161, at 9–11. Again, without a specific code, regulation, or action it is not clear the United States had any duty (or failed any duty) under the APA. Additionally, the Court is confident the United States will comply with any Court order imposed without the need for a separate writ of mandamus.

[4] As noted, the Tribes sua sponte dismissed this claim after the proceedings in the D.C. District Court. Dkt. 73.

[5] Additionally, tort claims must be brought under the Federal Tort Claims Act ("FTCA") and the Tribes has not shown the FTCA's requirements have been met. *See, e.g.*, 28 U.S.C. § 2675 (imposing an administrative exhaustion requirement for FTCA claims).

MEMORANDUM DECISION AND ORDER - 6

the Tribes assert it is relying on 5 U.S.C. § 702's waiver provision. The Court notes that this code section is mentioned just once in the Tribes' proposed Second Amended Complaint—along with multiple other code sections—in the "Jurisdiction and Venue" portion of the document. Dkt. 155-1, at 8.

The Court is not convinced that this single, passing reference—unattached to any specific claim—provides adequate notice for the Tribes' waiver argument.[6]

This notwithstanding, there is an additional problem with these three claims. As the Court has repeatedly explained, the United States Supreme Court in *Block v. N.D. ex. rel. Bd. of Univ. & Sch. Lands,* has held the QTA is the correct avenue to resolve real property disputes involving the United States. 461 U.S. 273, 286 (1983) ("We hold that Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property."); Dkt. 144, at 6 ("[T]he QTA provides the exclusive procedure to challenge the United States' title to real property."); *see also Haury Living Tr. v. United States,* 2019 WL 5699598, at *3 (D. Ore. Nov. 4, 2019) (noting when a plaintiff is challenging the United States' title, "the QTA controls and FTCA and state claims cannot be brought").

The Tribes allege these claims are broader than mere title claims. Be that as it may, the merits of each of these claims turns on the resolution of the QTA claims. Because the

---

[6] To be sure, the United States cites this specific provision in its own brief—seemingly recognizing that the Tribes *did* identify a potential waiver provision—but argues that section cannot apply to claims for monetary relief. *See* 5 U.S.C. § 702 (referencing "action in a court of the United States seeking relief *other than money damages* . . ."). The Tribes, in turn, allege its claims are all for injunctive, rather than monetary, relief, so the waiver should apply. Dkt. 161, at 11–12. But the Tribes' unjust enrichment claim specifically seeks "financial compensation," thus undercutting its own argument. Dkt. 155-1, at 25.

MEMORANDUM DECISION AND ORDER - 7

Tribes already have stand-alone QTA claims that will proceed in this case, there is no compelling reason to include these ancillary claims—especially when plagued with flaws.[7]

In sum, it is unclear whether any waiver applies (because it is unclear whether the Tribe's seek monetary or injunctive relief), the FTCA requirements appear to not have been met, and *Block* controls. The Court will not allow the Tribes to add trespass, conversion, and unjust enrichment claims as doing so would be futile.

### C. Claims Affected by the Settlement Agreement (proposed counts III and XIII)

Proposed Count III alleges violations of "Treaty Rights." Dkt. 155-1, at 19. Proposed Count XIII demands an "accounting" from the United States. *Id*. at 22.

The United States notes the Tribes voluntarily dismissed these two claims years ago (Dkts. 73, 74), but more importantly, argue that each is barred by the Settlement Agreement. The Tribes did not discuss these claims in any detail in its reply. The Court agrees with the United States these claims cannot be brought at this stage.

In 2012, the Tribes entered into the Settlement Agreement which waived and released claims related to the United States' management of its trust assets in exchange for sixty million dollars. *See Shoshone-Bannock Tribes of the Fort Hall Reservation v. Salazar*, No. 1:02-cv-254-TFH (D.D.C. Apr. 11, 2012).[8]

---

[7] The Tribes claim the Court should not dismiss these claims because each applies to more Defendants than just the United States. But there is no way for the Court to know this because some of the proposed counts are directed at "the United States," while others are more broadly directed to "Defendants." The Court truly appreciates that the Tribes simplified its complaint down to roughly 30 pages (from the original 80+ pages). But without more detail, it is difficult to determine with claims apply to which Defendants.

[8] The Parties previously produced the Settlement Agreement to the Court. Dkt. 77-3. It is included with the United States' opposition brief as well. Dkt. 156-1. The Court takes judicial notice of the Settlement Agreement. Fed. R. Evid. 201.

MEMORANDUM DECISION AND ORDER - 8

The Settlement Agreement bars the Tribes' proposed Count III, which alleges the United States' "actions constitute a violation of the Treaty of 1868, which guaranteed the Tribes' exclusive use and undisturbed occupation of the Fort Hall Reservation." Dkt. 155-1, at 19. This claim appears to concern the construction of railways through the Fort Hall Reservation in the nineteenth century. *See id*. at 15. The Settlement Agreement explicitly waived claims related to the United States' alleged "fail[ure] to prevent trespass on [the Tribes'] non-monetary trust assets." Dkt. 156-1, ¶ 4.b.8. This claim would be futile.

The Tribes' proposed accounting claim cannot be added because it too would require summary dismissal. This claim seeks "an accounting from the United States for all financial transactions and benefits derived from the use of the Tribal lands in question[.]" Dkt. 155-1, at 22. This claim would fail in part because the Tribes waived any pre-2012 accounting claim in the Settlement Agreement.[9] With respect to the time period after the Settlement Agreement was entered into, the Tribes agreed that "applicable provisions of the United States Constitution, treaties, and federal statutes and regulations" govern the United States' accounting duty. *Id*. ¶ 9.[10] In other words, the Settlement Agreement required the United States to follow the law, and the Tribes did not identify in the proposed Second Amended Complaint any law requiring the United States to provide a subsequent, new, amended, or updated accounting.

---

[9] The Tribes accepted "the most recent Statements of Performance issued by [the Office of the Special Trustee for American Indians] . . . as accurate, full, true, and correct statements of [their] trust fund accounts as of the date of the Statements[,]" and that the Statements were "in fulfillment of any accounting of [the Tribes'] trust fund accounts that [was] required by law" at the time of the settlement. Dkt. 156-1, at ¶ 8.

[10] The Tribes agreed that any duty "to account for and report to [the Tribes] regarding [their] trust funds" would be satisfied through "compliance with applicable provisions of the United States constitution, treaties, and federal statutes and regulations[.]" Dkt. 156-1, ¶ 9.

MEMORANDUM DECISION AND ORDER - 9

Because these two claims are barred by the Settlement Agreement, the Court will not allow the Tribes to amend its complaint to add them as doing so would be futile.

### D. "Bad Men" Claims (proposed counts XIV and XV)

The Tribes' proposed Second Amended Complaint invokes the "Bad Men" provision of the Fort Bridger Treaty. Dkt. 155-1, at 23–24. Like similar provisions in other treaties from the late 19th century, the "Bad Men" provision here provides that:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs, at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

Fort Bridger Treaty, 15 Stat. at 673.

The Tribes seek to assert two claims under the "Bad Men" provision. Dkt. 155-1, at 23–24. Count XIV asserts that "unknown government employees who have made adverse claims" to the lands at issue in this case have committed a federal crime under 11 U.S.C. § 1163. *Id*. at 23. The Tribes seek damages and "request appropriate action, including criminal charges, be brought against those bad actors." *Id*. Count XV is similar and alleges the United States has "unlawfully withheld agency action" by not arresting and punishing unidentified "bad men [who] are unlawfully occupying" or have converted the lands at issue. *Id*. at 24.

The first problem with these claims is that the "Bad Men" provision of the Fort Bridger Treaty "concerns the rights of and obligations to individual Indians," not the Tribes. *Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970). Since *Hebah*, the Court

MEMORANDUM DECISION AND ORDER - 10

of Federal Claims has reaffirmed that "Bad Men" provisions "created a cause of action for individuals, not tribal governments[.]" *Cheyenne & Arapaho Tribes v. United States*, 151 Fed. Cl. 511, 517 (2020).[11] Thus, the Tribes cannot bring these claims on behalf of the whole tribe.

Second, "Bad Men" claims must also identify "a specific white man or men[,]"—which has generally been interpreted to mean a non-tribal member—who allegedly committed a crime on the Reservation. *Hernandez v. United States*, 93 Fed. Cl. 193, 200 (2010). Count XIV's allegations regarding "unknown government employees" and Count XV's generalizations about undescribed "bad men" will not do. Dkt. 155-1, at 23–24.

Third and finally, any adverse claim to property by the Government in this case is made by the Government as an entity, not its individual employees. Actions by the United States and its agencies cannot support a "Bad Men" claim. *Cheyenne & Arapaho Tribes*, 151 Fed. Cl. at 520 (explaining that ". . . claims against entities are not cognizable under the Treaties and finding otherwise would exceed the intended scope of the 'bad men' clause").

For these reasons, the Tribe's efforts to add "Bad Men" claims would be futile, and the Court will not allow that amendment.

### E. Acts of Congress Claim (proposed count IV)

Proposed Count IV alleges "Defendants have violated the [1882 and 1888 Acts] by

---

[11] The Tribes endeavor to distinguish these cases by citing to a district court case out of South Dakota—*Oglala Sioux Tribe v. United States*, 674 F. Supp. 3d 635 (D.S.D. 2023). But this reference—and the Tribes' weak explanation—does not squarely address what the United States has observed from these other cases; namely that tribes cannot bring "Bad Men" claims on its own behalf.

MEMORANDUM DECISION AND ORDER - 11

misusing the lands granted under these acts for purposes other than those explicitly permitted." Dkt. 155-1, at 19. This claim is duplicative because it simply reiterates the Tribes' other claims. The Tribe argues this claim streamlines issues and makes clear there are two Acts at issue. But there are already claims addressing each Act. Counts II through VI of the operative complaint lists both the 1882 and 1888 Acts as supporting those claims. *See* Dkt. 21, at 49–60. Thus, there is no need for this duplicative claim. *See Timothy v. Oneida Cnty.*, 2015 WL 2036825, at *4 (D. Idaho Apr. 30, 2015) (dismissing duplicative claim); *Sagastume v. RG Transp., Inc.*, 2019 WL 2218986, at *10 (D. Idaho May 21, 2019) (same).[12]

Additionally, the substantive paragraphs within Count IV allude to "agency action" that was done "arbitrarily, capriciously, or otherwise not in accordance with law." Dkt. 155-1, at 20. But again, these phrases apply to APA cases and, as noted above, the Tribes' efforts to fit its claims under the APA are not availing considering it already has these claims under the QTA. *See Halverson v. Haaland*, 2023 WL 2561219, at *4 (D. Mont. Mar. 17, 2023) (explaining that "the QTA preempts other causes of action challenging the United States' title to real property, such as mandamus or Administrative Procedure Act claims").

For these reasons, the Court finds proposed Count IV duplicative and denies amendment for the same.

---

[12] Notably, the Tribes' proposed prayer for relief does not tie any requested relief to Count IV. Dkt. 155-1, at 24–26.

### F. Remedy Claims (proposed counts XII and XVI)

Finally, counts that request remedies rather than identify a cause of action may not proceed. Proposed Count XII requests an injunction, while Count XVI seeks restitution.[13] Dkt. 155-1, at 22, 24.

"Injunctive relief is a remedy—not a stand-alone claim." *Timothy v. Oneida Cnty.*, 2015 WL 2036825, at *3 (D. Idaho Apr. 30, 2015).

Restitution is typically a remedy as well, but to the extent the Tribes intended for this to be a quasi-tort claim against the United States, it has not clearly identified a waiver of sovereign immunity—as discussed above.[14]

For these reasons, the Court will not allow proposed Claims XII and XVI.

### V. CONCLUSION

The Court recognizes the scope of the issue today. This is a motion to amend, not a motion to dismiss. Thus, the burden on the Tribes is not particularly high. Nevertheless, the party opposing amendment can object by showing why the amendments would be futile or legally insufficient. *See Miller,* 845 F.2d at 214. The United States has done that today.

---

[13] The Tribes included two Counts labeled as Count XV in the proposed Second Amended Complaint. The claim for restitution should be labeled as Count XVI.

[14] As noted, *see supra* n.5, the immunity provision the Tribes purportedly relied on—5 U.S.C. § 702—does not apply to claims for money damages. Restitution, by its nature, seeks money damages. The Tribes, in fact, specifically seek "financial compensation" as part of this claim. Dkt. 155-1, at 24. The Tribes also cite to 28 U.S.C. § 2674 in its proposed Second Amended Complaint when discussing waiver. Again, this is not tied to any specific claim and applies to tort claims. So, while it *could* apply to a restitution claim, the Tribes did not meet the other statutory requirements—such as exhaustion. *See supra* n.4. In sum, the Tribes has not clearly outlined any waiver that applies and what it has alluded to in this regard appears inconsistent or flat-out incorrect as applied to the actual proposed claims.

The Court is not a proponent of piecemeal litigation or multiple lawsuits trying to achieve the same goal. Thus, it takes no position here on what the Court's decision in this case means for the other case. But it is important to note that *in this case*, the Court has already analyzed many of the claims the Tribes seek to bring via its proposed Second Amended Complaint. Others proposed claims are new, but are duplicative, procedurally or legally barred, or not otherwise viable causes of action. The already-existing declaratory judgment and QTA claims are where the parties need to focus moving forward.

In sum, the Tribes' Amended Motion for Leave to file Second Amended Complaint is DENIED. Proposed Counts II, VIII, and XI re-plead claims the Court already dismissed without curing the deficiencies previously outlined. The Tribes do not identify a waiver of sovereign immunity for proposed Counts VII, IX, and X. The 2012 Settlement Agreement bars proposed Counts III and XIII. The Tribes cannot bring "Bad Men" claims under proposed Counts XIV and XV. Proposed Count IV is duplicative of other existing claims. Finally, proposed counts XII and XVI request a remedy rather than identify a cause of action.

The Tribes' claims under the QTA and for Declaratory Judgment from the operative complaint (Dkt. 21) shall proceed in this case. The parties will submit a joint litigation and discovery plan within 30 days of the date of this order. If the parties cannot agree, each side shall submit its own documents, and the Court will hold a telephonic scheduling conference to iron out the disagreements.

## VI. ORDER

**IT IS HEREBY ORDERED THAT**:

1. The Tribes' Motion for Leave to File Second Amended Complaint (Dkt. 155) is **DENIED**.

DATED: May 16, 2025

_____
David C. Nye
Chief U.S. District Court Judge